*EXHIBIT-4*



**Kansas**

**Department of Corrections**  **INTERNAL MANAGEMENT POLICY & PROCEDURE**

---

Applicability:  **_X_** ADULT Operations Only_  JUVENILE Operations Only  _ DEPARTMENT-WIDE

---

**IMPP #: 20-105A**                                                                                   **PAGE #: 1 of 5**

**RESTRICTIVE HOUSING: Basic Operations of Administrative Restrictive Housing**

**Original Date Issued: 03-10-21    Replaces IMPP Issued: 04-09-21   CURRENT EFFECTIVE DATE: 05-13-22**

---

Approved By: _____, Secretary        **Next Scheduled Review: 06/2025**

---

### POLICY

The inability to isolate disruptive, violent and/or residents capable of influencing violence and disruption in a prison environment compromises the safety of both residents and staff. Administrative restrictive housing procedures are to be established for the control of residents necessary for purposes other than punishment. Residents are to be housed in the general population at the lowest appropriate custody level unless circumstances or resident behavior dictate otherwise. Only residents who require restrictive housing are to be assigned there. Procedures are to be effectively related to the control of the resident for stated purposes. These procedures may be increased in scope and extent as necessary to maintain effective control. When the need to isolate a resident in restrictive housing no longer exists, the resident is to be returned to the general population.

All basic operations of an administrative restrictive housing unit, including the placement of residents, filing of reports, notification of residents, enforcement of resident privileges and rights, transfer to more restricted areas, and administration of discipline are to be carried out in accordance with the provisions of this IMPP.

In each facility there is to be an administrative restrictive housing review board (RHRB) appointed by the Warden.

### DEFINITIONS

Restrictive Housing Review Board (RHRB): A board consisting of one person from security staff, one person from the site behavioral health staff, and one person from the classification staff.

### PROCEDURES

**I.      Placement Within Administrative Restrictive Housing; Notification Requirements; Hearing**

      A.      In all cases in which residents are placed in administrative restrictive housing, a shift supervisor or the restrictive housing unit manager must approve the placement.

            1.      The shift supervisor is to forward a written report to the warden before the end of that particular shift.

            2.      No resident may be placed in administrative restrictive housing without receiving a medical/ mental health evaluation by qualified medical/mental health staff prior to placement or as soon as possible after placement.

     a.     In addition to the health services restrictive housing screening evaluation, a checklist of possible self-harm indicators (Attachment A) must be completed for each resident placed in a KDOC administrative restrictive housing unit.

        (1)     This checklist must be completed by the restrictive housing unit OIC, unit team counselor, or shift supervisor.

        (2)     The checklist must be completed prior to placement or immediately upon placement in restrictive housing and must be as a result of direct contact between the affected resident and the security, unit team or medical staff completing the checklist.

        (3)     Subsequent to the completion of the checklist, appropriate referrals are to be made as indicated internally on the checklist form (Attachment A).

        (4)     Residents placed on administrative restrictive housing status, but actually housed in county jails, are to be exempt from the completion of the checklist and are subject to the jail's admissions policies and practices.

B.     Except as provided in Section I.C., residents placed in administrative restrictive housing are to be provided with a hearing prior to placement in order to provide them with an opportunity to present objections, explanations, or reasons why such a placement cannot be effected.

     1.     This hearing is to be held by the warden's designee who can consider alternative housing that may be available to meet the separation needs.

C.     A hearing prior to placement is not required if an emergency situation exists.

     1.     The shift supervisor or restrictive housing unit manager may order immediate placement in administrative restrictive housing when necessary:

        a.     To protect the residents or others;

        b.     To prevent escape; or,

        c.     To maintain control of the correctional facility.

     2.     This action must be reviewed by the warden or designee within 24 hours.

## II.    Administrative Restrictive Housing Report

A.     An administrative restrictive housing report (Attachment B) must be completed in all cases of administrative restrictive housing.

     1.     The report (Attachment B) must indicate, specifically, the reason for placing the resident in administrative restrictive housing.

        a.     The administrative restrictive housing report (Attachment B) may be used as the written report of the shift supervisor to the warden as required by Section II.A.1. of this IMPP.

        b.     A copy of the report (Attachment B) may be used as the written notice to the resident required by Section III.A.1. of this IMPP.

## III.    Notice and Explanation to Resident

A.     Written notice of the reasons for placement in administrative restrictive housing, stated in sufficient detail to allow the resident to understand the reasons and make a response to them, must be provided to the resident before the resident is placed in administrative restrictive housing unless a serious emergency or major disturbance exists.

1.  If a serious emergency or major disturbance involves a substantial number of residents, or a clear and present danger thereof, notice and is to be given; not more than three (3) working days after placement in administrative restrictive housing, or sooner, if the nature of the emergency has been resolved.

    a.  The serious emergency or major disturbance is to be described briefly, in writing, by the officer and made part of the record. In all cases, the notice must be given to the resident before the hearing so the resident knows the reason for the placement.

## IV.   Procedure for the RHRB Upon Initial Placement

A.  Within 24 hours, of a resident's initial placement, Monday-Friday, and the next working day following a weekend/holiday, the administrative RHRB must hold an initial hearing to review the placement decision.

B.  The resident is to be given the opportunity to present the resident's case.

C.  When necessary, the RHRB is to obtain clarifying information from the officer and staff involved in the placement.

D.  If the RHRB determines the resident to be disruptive or a danger to self or others, the RHRB may exclude the resident from the review.

1.  In this situation, the RHRB is to, if possible, interview the resident at the cell or obtain a written statement from the resident in response to the placement.

## V.   Regular Review and Monitoring by the RHRB

A.  The administrative restrictive housing review board is to review the status of each resident confined in administrative restrictive housing once per week for the first four weeks, and at least once per month thereafter.

B.  The RHRB may recommend the following:

1.  That the resident be retained in administrative restrictive housing.

    a.  This recommendation must be a unanimous vote of the RHRB; and

    b.  Become the final action in the case for that particular review period and does not require approval by the facility Warden.

    c.  The RHRB must document in detail what is required for the resident to be returned to general population.

2.  That the resident be returned to general population.

    a.  This recommendation must be a unanimous vote of the RHRB; and

    b.  Become the final action in the case for that particular review period and does not require approval by the facility Warden.

3.  The RHRB may recommend that the resident be transferred to another Kansas facility or to another institution in another state or to a federal institution.

    a.  Unless released from administrative restrictive housing status by the warden of the sending facility prior to transfer, the resident is to be held on that same status at the receiving facility pending the resident's next regularly scheduled review.

    b.  These transfers are not to require issuance and service of an administrative

restrictive housing report or an initial appearance before the administrative restrictive housing review board of the receiving facility unless those procedures were not employed at the sending facility due to a serious emergency or major disturbance.

    c.    In appropriate cases, a recommendation that a resident's status be changed prior to the resident's next regularly scheduled review may be made to the Warden of the receiving facility by that facility's administrative review board.

    4.    The following exceptions apply and must be forwarded to the facility Warden (or designee in the absence of the Warden) for approval:

        a.    If the RHRB is not unanimous;

        b.    Removing the resident from Long Term Restrictive Housing status;

        c.    Specific circumstances that could affect the safety and security of the facility if the resident is returned to general population;

        d.    If on a case-by-case basis, the RHRB determines the Warden's approval is necessary.

C.    The resident may submit written requests for release to the RHRB using a Form-9.

## VI.    Privileges and Rights in Administrative Restrictive Housing

A.    When privileges, property, and/or programs are restricted beyond what is allowed by restrictive housing policy, the following shall be documented:

    1.    the opportunities that have been limited;

    2.    the reason for the limitation; and

    3.    the duration of the limitation.

B.    Administrative restrictive housing must not be used or considered as punishment.

## VII.    Transfer to More Restricted Area in Special Cases

A.    A narrative is to be prepared to document any instance or incident leading to more restrictive confinement within the restrictive housing unit.

B.    Transfers to more restrictive confinement may be permitted only for administrative security and control and must not constitute or be used as punishment.

    1.    Each such transfer to a more restrictive confinement is to be authorized and approved by the restrictive housing unit team manager or designee, or in that person's absence, by the shift commander or designee.

## VIII.    Regular Review and Monitoring by the Program Management Committee

A.    The Program Management Committee of each facility housing restrictive housing residents shall review those residents maintained continuously in administrative restrictive housing at least every 180 days.

## IX.    Reports by Warden on Residents Continuously Housed in Administrative Restrictive Housing for Over One (1) Year

A.    The Warden of each facility housing restrictive housing residents is to submit a monthly report to the

Deputy Secretary for Facilities Management for all residents continuously held in administrative restrictive housing for six (6) months, a year or longer, and on each anniversary thereafter.

1.  The report is to include, at a minimum, information justifying the continued placement in RHU.

a.  If the Warden and RHRB cannot articulate reason(s) for continuing the placement, then the placement is to end.

**X.   Discipline While in Administrative Restrictive Housing**

C.  All applicable provisions and requirements of the disciplinary procedure set forth within K.A.R. 44-13-101, *et seq.*, apply to resident housed in a restrictive housing unit.

**NOTE:** The policy and procedures set forth herein are intended to establish directives and guidelines for staff, residents and offenders and those entities that are contractually bound to adhere to them. They are not intended to establish State created liberty interests for employees, residents or offenders, or an independent duty owed by the Department of Corrections to employees, residents, offenders, or third parties. Similarly, those references to the standards of various accrediting entities as may be contained within this document are included solely to manifest the commonality of purpose and direction as shared by the content of the document and the content of the referenced standards. Any such references within this document neither imply accredited status by a Departmental facility or organizational unit, nor indicate compliance with the standards so cited. The policy and procedures contained within this document are intended to be compliant with all applicable statutes and/or regulatory requirements of the Federal Government and the state of Kansas. This policy and procedure are not intended to establish or create new constitutional rights or to enlarge or expand upon existing constitutional rights or duties.

**REPORTS**

| Name/Type of Report | By Whom/To Whom | Due |
|---|---|---|
| Residents Continuously Housed in Administrative Restrictive Housing | Wardens to DSOFM | Monthly |

**REFERENCES**

K.A.R. 44-13-101, *et seq.*

**HISTORY**

03-10-21 Original

04-09-21 Revision 1

05-13-22 Revision 2

**ATTACHMENTS**

| Attachments | Title of Attachments | Page Total |
|---|---|---|
| A | Checklist of Possible Self-Harm Indicators | 1 page |
| B | Administrative Restrictive Housing Report | 1 page |

Attachment A, IMPP 20-105A
Effective 05-13-22

## Checklist of Possible Self-Harm Indicators

Resident Name:_____DOC Number:_____

Reporting Officer:_____Date:_____Time:_____

| YES | NO | | |
|-----|-----|-----|---|
| ____ | ____ | 01. | Escorting officer has information that resident may be a suicide risk. |
| ____ | ____ | 02. | Resident is expressing suicidal thoughts/making threats to harm self. |
| ____ | ____ | 03. | Resident shows signs of depression (crying, withdrawn, passive). |
| ____ | ____ | 04. | Resident is acting/talking in a strange manner (hearing/seeing things that are not there, statements do not make sense). |
| ____ | ____ | 05. | Resident appears to be under the influence of drugs/alcohol. |
| ____ | ____ | 06. | Resident has had a recent family change (death/divorce). |
| ____ | ____ | 07. | Resident brought to restrictive housing due to serious infraction that could leadto criminal charges (assault/battery, drugs/contraband). |
| ____ | ____ | 08. | Resident states he/she is taking psychotropic medication. |
| ____ | ____ | 09. | Resident is normally housed in the Behavioral Health Unit. |
| ____ | ____ | 10. | Resident has been assaulted (physically or sexually) by another resident. |
| ____ | ____ | 11. | Resident shows anger, hostility, and makes threats. |
| ____ | ____ | 12. | Resident displays signs of self-neglect or abuse (poor hygiene, cuts, bruises). |
| ____ | ____ | 13. | Resident states this is his/her first placement in restrictive housing. |
| | | 14. | Resident has recent legal status change (parole violation, new charges). |

**IF ANY ITEM ABOVE IS CHECKED "YES", THE RESTRICTIVE HOUSING OIC MUST IMMEDIATELY TELEPHONE/CONTACT THE CHARGE NURSE, WHO MUST IMMEDIATELY NOTIFY A BEHAVIORAL HEALTH PROFESSIONAL.**

Responding BH staff:_____Date:_____

INSTRUCTIONS: The restrictive housing OIC on shift is to ensure that this form is completed for all residents placed in restrictive housing. The escorting officer must be asked why the resident is being brought in, and whether there is any indication that he/she might engage in self-harm. The resident must be asked if there are any issues of which staff need to be aware, and if he/she takes medications. The officer must note whether or not the resident was uncooperative. Any notes, letters or other documents obtained from the resident that appears to indicate the resident's state of mind must be attached to this report and made available to the behavioral health professional for review.

**COMMENTS**_____
_____
_____

cc:     Clinic, Behavioral Health, Unit Team Manager

Attachment B, IMPP 20-105A
Effective 05-13-22

# Kansas Department of Corrections
## Administrative Restrictive Housing Report

TO:_____          Report Number: _____

FROM: _____

Date This Report Filed ___/__/_____          Time Report Filed ____:____m

Date of Restrictive Housing placement __/__/_____          Time of Placement ____:____m

Resident Name:_____#_____Reason(S) For Restrictive Housing (Including Rule No. and Title)

Moved from Cell #:_____to Restrictive Housing Cell #: _____          _____

_____

☐ Pre-Restrictive Housing hearing conducted

☐ Pre-Restrictive Housing hearing NOT conducted (Explain) _____

_____

Facts:_____

_____

_____

_____

_____

☐ This placement is an Involuntary Protective Custody due to PREA Concerns (Respond to next two (2) sections)What is the

basis for the facility's concern for the resident's safety?

_____

_____

_____

_____

What is the reason no alternative means of separation can be arranged?

_____

_____

_____

_____

_____

Approved By:

_____ Date__/__/_____          _____Date__/__/____
Signature and Title of Reporting Officer          Shift Supervisor or RH Unit Mgr.

_____Date__/__/____
Warden Authorization (If Needed)

*********************************************************************************************************************** RESIDENT
ACKNOWLEDGMENT:

I received a copy of this report on:   Date__/__/____   Time:  :_____m

_____ # _____          _____
Resident Signature and Number          Staff Witness and Title

Record this Document in ImagingOriginal
to Master File
Copy to: Warden
          Resident



*EXHIBIT - 4*

# Kansas
Department of Corrections

# INTERNAL MANAGEMENT POLICY & PROCEDURE

**Applicability:**  __X__ **ADULT Operations Only**   _ **JUVENILE Operations Only**   _ **DEPARTMENT-WIDE**

**IMPP #:  20-104A**                                                    **PAGE #: 1 of 6**

**SEGREGATION/RESTRICTIVE HOUSING: Purpose of Administrative Restrictive Housing and Appropriate Placements**

**Original Date Issued: 10-11-21   Replaces IMPP Issued: 10-11-21   CURRENT EFFECTIVE DATE: 05-13-22**

**Approved By:** _____, Secretary   **Next Scheduled Review:** 06/2024

---

## POLICY

The inability to isolate disruptive, violent and/or residents capable of influencing violence and disruption in a prison environment compromises the safety of both residents and staff.  Administrative restrictive housing procedures are to be established for the control of residents necessary for purposes other than punishment.  Residents are to be housed in the general population at the lowest appropriate custody level unless circumstances or resident behavior dictate otherwise.  Only residents who require restrictive housing are to be assigned there.  Procedures are to be effectively related to the control of the resident for stated purposes.  These procedures may be increased in scope and extent as necessary to maintain effective control.  When the need to isolate a resident in restrictive housing no longer exists, the resident is to be returned to the general population.

## DEFINITIONS

<u>Restrictive Housing:</u> A generic term used to describe housing which separates residents from the general population for both administrative and disciplinary purposes.

<u>Administrative Restrictive Housing:</u> A form of restrictive housing used for residents who pose a threat to life, property, self, staff, or other residents; or when a resident's continued presence threatens the secure and orderly operation of the facility.

<u>Disciplinary Restrictive Housing:</u> A form of restrictive housing to which a resident can be sentenced following conviction of a rule violation through disciplinary proceedings.

<u>Short-Term Administrative Restrictive Housing:</u> Restrictive housing placement less than 15 days.  For purposes of accounting days, the date of admission to restrictive housing is considered day one (1). Classification categories include:

- Disciplinary Restrictive Housing
- Pending Results of an Investigation (PI)
- To prevent further collaboration, intimidation, or disruption
- Pre-Hearing Detention (PHD)
- Communicable Disease
- Critical Monitoring
- Emergency Situations
- Hold Overs
- Refusing to participate in identification procedures

<u>Long-Term Administrative Restrictive Housing:</u> Restrictive housing placement for 15 or more continuous days which requires comprehensive and individualized planning and services to aid in the return of the resident into the general

population setting.  For purposes of accounting days, the date of admission to restrictive housing is considered day one (1):  Classification categories include:

- Protective Custody (PC) refer to IMPP 20-108D [Protective Custody]
- Consistent Bad Behavior (CBB)
- Other Security Risk (OSR)
- Capital Punishment

<u>Long-Term Restrictive Housing Committee:</u> A committee comprised of the sending facility Warden, KDOC Risk Manager, KDOC Classification Manager, Enforcement, Apprehension, and Investigations (EAI) Director or designee, and the KDOC Deputy Secretary of Facility Management.

<u>Severe and Persistent Mental Illness (SPMI):</u> A mental health illness that is prolonged and recurrent, impairs activities of daily living and requires long-term treatment.

<u>Single Event:</u> A situation or instance involving a single or series of related actions or behaviors defining a single incident.

## PROCEDURES

**I.  General Procedures**

    A.  Residents may be confined in administrative restrictive housing for any of the reasons or conditions articulated within this policy.

        1.  Any resident may be held in administrative restrictive housing under any subsection or combination of subsections of this policy simultaneously.

            a.  If the resident is held under more than one (1) subsection, that fact is to be stated in the administrative restrictive housing report in accordance with IMPP 20-105A.

    B.  Residents with disabilities must be placed in cells that accommodate their disability.

        1.  Residents must not be placed in restrictive housing solely due to their disability or due to the lack of available accessible cells.

    C.  Juveniles, pregnant women or women who recently gave birth, and residents with a severe and persistent mental illness (SPMI) must be considered for alternative placement in the infirmary, a mental health unit or in a unit on a suicide watch or crisis level placement.

        1.  Residents considered to be severely and persistently mentally ill for the purpose of this policy are to be assessed for placement in restrictive housing pursuant to short-term restrictive housing categories only.

**II.  Guidelines for Use of Short-Term Administrative Restrictive Housing**

    A.  The time a resident may be placed in any combination of short-term restrictive housing classifications must not exceed 15 days based on a single event.  The Warden/Deputy Secretary of Facility Management must approve any placement considered to be Short Term Restrictive Housing resulting in more than 15 days within a 30-day period.

    B.  The conditions of confinement for residents in short-term restrictive housing are to be followed according to IMPP 20-101A.

    C.  Restraints are to be utilized during movement that occurs outside a resident's cell and/or unit, unless the use of restraints worsens a resident's condition, or the use of restraints is unwarranted.

        1.  Exceptions to the use of restraints is to be granted by the Warden, or Chief of Security in the Warden's absence.

        2.  Facility Wardens may establish procedures in General Orders for limited movement without

restraints for residents housed in double-bunked cell assignments, to activities such as showers and recreation.

III.    **Classification Categories and Independent Criteria for Placement in Short-Term Administrative Restrictive Housing**

A.    Pending results of investigation:

1.    Residents may be placed in administrative restrictive housing pending the completion of an investigation to determine whether charges are to be brought.

2.    Any resident held under pending results of an investigation is to be charged or released within three (3) working days, unless a continued holding in administrative restrictive housing under this section is justified in writing and approved by the Warden.

a.    This notice and explanation is to be provided to the resident in writing.

B.    To prevent the following:

1.    Further disruption, if a threat to security and control, including danger to others, continues to exist in the judgment of the Warden.

2.    The possible intimidation of witnesses or accusers; or

3.    Communication and collaboration between residents involving an attempt to improperly or dishonestly coordinate the testimony which might be given.

C.    Pre-hearing detention:

1.    If necessary to maintain security and control, any resident who has been charged with an alleged violation of law, or a class I or II rule violation, may be held in administrative restrictive housing pending a hearing before the facility disciplinary board, or pending a trial by a court.

a.    Time served in restrictive housing under pre-hearing detention is to be credited towards a sanction of disciplinary restrictive housing resulting from a disciplinary conviction.

b.    The resident's status is to be reviewed by the Warden or designee within three (3) working days.

D.    Communicable disease:

1.    Any resident whom a Doctor of Medicine, nurse, or nurse practitioner has declared to be carrying any communicable disease, or any resident who refuses to participate in testing for communicable disease, may be placed in administrative restrictive housing status until any danger of a contagion is past.

E.    Critical monitoring resident:

1.    As applicable administrative restrictive housing may be applied to the following types of residents.  In the event such placement is made without a hearing, pursuant to Section I.B. of IMPP 20-105A, the Warden or his/her designee is to review the placement.  Residents are to be assessed for application of the Offender Companion Program pursuant to IMPP 10-144A for constant observation.

a.    Any resident accused of or who has a history of aggressive or forcible sexual attacks may be placed in administrative restrictive housing.

b.    Any resident with suicidal tendencies may be placed in administrative restrictive

housing under appropriate observation providing the condition is verified by a qualified behavioral mental health professional and a clinical observation is not available.

    c.    Any resident exhibiting self-injurious behavior under appropriate observation and to give clinical staff an opportunity to determine whether the injury is a significant indication of a suicidal tendency.

    d.    Residents with behavioral, mental health, or emotional problems which cause them to be a threat to themselves or others, when that behavioral, mental health or emotional problem has been verified by a psychiatrist or psychologist, may be placed in administrative restrictive housing under appropriate observation when clinical observation is not available.

    e.    Residents suspected to be under the influence of an illicit substance may be placed in restrictive housing under appropriate observation when clinical or unit observation is not available and or not appropriate.

F.    Emergency situations:

    1.    Any resident, or group of residents, may be placed in administrative restrictive housing or secure confinement in the resident(s) own cell(s) if the resident, or residents, engaged in behavior that threatened the maintenance, security, or control of the facility creating an emergency situation that presents a danger to the resident or others.

        a.    A copy of this explanation and justification shall be provided to the Deputy Secretary of Corrections of Facilities Management.

        b.    Placement may continue for up to three (3) working days.

    2.    Any resident who has been determined by the Warden or, in the Warden's absence, by the Deputy Warden, to be an extreme risk of escape may be placed in administrative restrictive housing.

        a.    The reason is to be explained in writing and reference made to the documents or other basis for the placement unless already apparent from the information shown in the resident's record.

        b.    When these staff are absent during an emergency, restrictive housing may be authorized by the highest-ranking officer on duty.

            (1)    The Warden or the Deputy Warden is to review the placement within 24-hours and must either approve continued placement in administrative restrictive housing or direct other appropriate housing.

G.    Holdovers:

    1.    The Warden or designee may place residents in administrative restrictive housing who are identified as holdovers.

        a.    Holdover residents are those residents who fall into one (1) of the following categories:

            (1)    Any newly committed resident awaiting transportation to Topeka or El Dorado Correctional Facility reception and diagnostic unit.

            (2)    Any resident who is otherwise being held in a facility temporarily while in transit between one facility and another; or,

            (3)    Any parolee, conditional releasee, or post-release supervision releasee who has waived a preliminary violation hearing or is being held at a facility

pending a hearing to determine if probable cause exists that a violation of conditions of release occurred.

    b.    A resident is not to be held on holdover status longer than 15 days to accomplish the transfer to another facility.

H.    Refusal to participate:

    1.    A resident may be placed in administrative restrictive housing when the resident refuses to participate in an identification procedure, including fingerprinting and photographing.

I.    Disciplinary Restrictive Housing

    1.    Placement of any resident in disciplinary restrictive housing requires full compliance with all applicable provisions and requirements of the disciplinary procedures set forth within K.A.R. 44-13-101 *et seq.*

## IV.   Guidelines for Use of Long-Term Restrictive Housing

A.    In the event that a resident presents an extended security threat due to violent and/or disruptive behaviors, or the influence of such, the Restrictive Housing Review Board is to complete  and submit a long-term restrictive housing referral to the Warden for review and approval.

B.    Restrictive housing placement in excess of 15 days requires extended planning and services for eventual placement into a general population setting.

    1.    Residents on long-term restrictive housing status are to have the same housing standards, conditions of confinement for short-term restrictive housing, and  opportunities for three (3) hours or more a day out of cell time.

    2.    Facility General Orders are to specify the process for development of the planning and services specific for each individual resident.

## V.   Classification Categories and Independent Criteria for Placement in Long-Term Administrative Restrictive Housing

A.    Consistent bad behavior:

    1.    Any resident may be placed in administrative restrictive housing indefinitely when the resident's record has shown consistent bad behavior, as evidenced by three (3) single events of documented bad behavior within the preceding 12 months, and when:

        a.    The instances are a substantial threat to the safety and security of the institution or facility; and

        b.    The instances arise from separate fact situations.

    2.    Placement under this classification requires the prior written approval of the warden and is to be within 30 days of approval by the Long-Term Restrictive Housing Committee.

B.    Other security risk:

    1.    The Warden may place in administrative restrictive housing, or secure confinement in the resident's own cell, any resident or group of residents, if the resident or residents have engaged in behavior which has threatened the maintenance, security, or control of the correctional facility.

        a.    The Warden is to, within three (3) working days of the placement, explain in writing the threat to security and show justification for effecting secure confinement under these circumstances to the Deputy Secretary of Facility Management.

       (1)     An exception to the extended planning and services required under long-term restrictive housing placements may be requested with supporting written justification by the Warden.

       (2)     A copy of this explanation and justification shall be provided to the Secretary of Corrections.

C.     Protective Custody:

     1.     Pursuant to IMPP 20-108 [Protective custody] any resident who requests restrictive housing for personal safety, or who the Warden has reason to believe to be in serious and imminent danger, may be placed in administrative restrictive housing if:

       a.     Documentation that protective custody is warranted is provided in writing by the Warden and reasonable alternatives are not available.

       b.     A denial of protective custody is to be fully documented in the EAI file.

## VI.   Timeframes Related to Administrative Restrictive Housing

A.     For purpose of this regulation, the term "working days" means any day except Saturday, Sunday, a holiday, or any other day as authorized by the Governor.

**NOTE:** The policy and procedures set forth herein are intended to establish directives and guidelines for staff, residents and offenders and those entities that are contractually bound to adhere to them. They are not intended to establish State created liberty interests for employees, residents or offenders, or an independent duty owed by the Department of Corrections to employees, residents, offenders, or third parties. Similarly, those references to the standards of various accrediting entities as may be contained within this document are included solely to manifest the commonality of purpose and direction as shared by the content of the document and the content of the referenced standards. Any such references within this document neither imply accredited status by a Departmental facility or organizational unit, nor indicate compliance with the standards so cited. The policy and procedures contained within this document are intended to be compliant with all applicable statutes and/or regulatory requirements of the Federal Government and the state of Kansas. This policy and procedure are not intended to establish or create new constitutional rights or to enlarge or expand upon existing constitutional rights or duties.

## REPORTS

None.

## REFERENCES

IMPP 10-110D, 10-144A, 12-120A, 20-105A, 20-108D

## HISTORY

10-11-21 Original
05-13-22 Revision 1

## ATTACHMENTS

None.



*EXHIBIT - 4*

# Kansas
**Department of Corrections**

## INTERNAL MANAGEMENT POLICY & PROCEDURE

**Applicability:  X ADULT Operations Only   _ JUVENILE Operations Only _ DEPARTMENT-WIDE**

---

**IMPP #:  12-120A**                                                                                      **PAGE #:  1 of 14**

**SECURITY AND CONTROL: Control of Resident Personal Property**

**Original Date Issued: 04-09-21   Replaces IMPP Issued: 12-08-21  CURRENT EFFECTIVE DATE:  04-14-22**

**Approved By:** _____   **Secretary   Next Scheduled Review:** 07/2023

---

### POLICY

Residents incarcerated at a Department of Corrections correctional facility are permitted to possess and obtain a reasonable amount of personal property. The allowable personal property a resident can possess must not constitute a threat to the safety, order and security of the facility, staff, residents and public.

### DEFINITIONS

<u>Admission Property</u>:  That personal property which may be brought with the resident at the time of admission to KDOC custody.

<u>Canteen</u>:  A store through which residents are provided an opportunity to purchase allowable hygiene, snack and property items. Such a store is managed by Kansas Correctional Industries in partnership with a contracted vendor. Local department stores may be designated to serve as canteens for residents in Work Release Centers only.

<u>Canteen Price (CP)</u>:  The current cost to the resident of an approved item of personal property available through the canteen or through a local vendor approved by the Warden.

<u>Consumable Limitation (CL)</u>:  A $150.00 combined value of all items for which a consumable limitation is indicated on Attachment B but does not include consumable handicraft items.

<u>Consumable Property</u>:  That personal property which does not require registration upon receipt but must be recorded on property inventory forms any time a resident's property is inventoried. All such property is subject to the consumable limitation.

<u>Intake Property</u>:  That personal property which may be possessed by a resident while on Intake Level pursuant to IMPP 11-101A.

<u>Inventory</u>:  A detailed listing of property that is actually in a resident's possession. To make a detailed listing of any resident's property.

<u>Legal Material</u>:  That material concerning a pending or anticipated case, wherein the resident is or may be a party, and includes pleadings, transcripts, books, notes, drafts, and correspondence to and from attorneys, courts, and public officials.

<u>Post-Release Supervision</u>:   Refers only to the supervision of residents released as the result of Sentencing Guidelines.

Publication: An item to include book, magazine, journal, periodical, newspaper, calendar, intended for public access through mass distribution and or available for public purchase. Personal correspondence and personal photographs are not considered publications.

Register:  The action of recording an item of property at the time it is received.

Registered Property:  That property which must be recorded in the resident's property record upon receipt.

Soft Metal Cans:  Containers with tops that are manufactured with a means for removing the top without the use of a mechanical can opener; i.e., tops may be removed with a pull-tab, twist-top, or other device that is attached to the can.

Work Release Program:  For purposes of this policy, refers to a traditional program of non-prison-based employment within a community setting utilizing residents with not more than a minimum custody classification. This does not include resident employment with Kansas Correctional Industries or any private industry employment program, as defined by IMPP 10-109A.

## PROCEDURES

I.   **Related Policies**

   A.   Residents seeking compensation for damage/loss of personal property or personal injury must be in accordance with IMPP 01-118D Offender Claims Procedure for Property Damage/Loss or Personal Injury.

   B.   Gifts and/or donations accepted and received on behalf of the Department of Corrections (DOC) must be in accordance with IMPP 01-122 Donations to the Department of Corrections.

   C.   Canteen services are to be made available to all DOC correctional facilities in accordance with IMPP 04-108D Canteen/Package Program, Canteen/Package Program Items and Canteen/Package Program Funds.

   D.   All information regarding a resident's commitment, incarceration, and post-release supervision history must be contained in the records established and maintained for each resident committed into the custody of the DOC in accordance with IMPP 05-103 Establishment, Maintenance, Disposition, and Audit of Offender Records.

   E.   Residents are to be provided routine, regularly established work assignments in accordance with IMPP 10-109A Offender Work Assignments.

   F.   The practice of religion by residents must be in accordance with IMPP 10-110D Religious Programs.

   G.   The establishment of resident handicraft programs must be in accordance with IMPP 10-133 Inmate Handicraft Programs.

   H.   The earning of privileges by residents must be in accordance with IMPP 11-101A Offender Privileges and Incentives.

   I.   The issuance and purchasing of personal hygiene items must be in accordance with IMPP 12-127D Issue of Inmate Hygiene Items, Writing Supplies, and Postage and Copying Services.

   J.   The operation and maintenance of restrictive housing units must be in accordance with IMPP 20-101A Minimum Standards for the Operation of Restrictive Housing Units.

II.   **General Procedures**

   A.   Access to Personal Property

      1.   Residents are permitted to retain, purchase, or receive hygiene and/or personal property items while incarcerated in a KDOC facility. In accordance with K.A.R. 44-16-105, a resident

is permitted to own property at his or her own risk.

2. Consistent with considerations for facility order, safety, and security the Deputy Secretary of Facilities Management is to establish:

   a. The type and amount of property residents may possess as determined by each resident's privileges and incentives and custody level or the housing facility's security designation; and,

   b. Specifications and/or descriptions and value of allowable property items.

      (1) Whenever specifications call for certification by Underwriter's Laboratories (UL), a certification by Intertek's ETL Semko division (ETL) is to be considered equivalent with regards to ensuring that the product meets appropriate quality and/or safety standards.

3. Allowable resident personal property except that categorized as appliances, can be obtained by the resident in a manner determined and specified by the Warden in General Orders.

4. Allowable resident personal property that is categorized as appliances can be obtained by the resident through the canteen or special purchase orders.

5. The Canteen Vendor is authorized to stock over the counter medications in canteen locations that can be included in the resident property allowance.

   a. The purchase and possession of such medications are subject to the "consumable limitation" provision of this IMPP.

   b. In accordance with the provisions of IMPP 04-108D, these canteen items may be made available after consultation with the Health Authority and consistent with security and operational concerns at the discretion of the Warden.

   c. The medication items, purchased through the canteen, can be transferable between facilities as allowable personal property unless there is a documented security reason to deny such items.

B. Safeguarding and Control of Personal Property

1. Any property which, in the original state or through alterations or additions, displays graphics, depicts, or mentions the glorification of drugs, alcohol, sexually explicit materials, or symbols associated with unsanctioned group related activity is prohibited.

2. Personal property is to be controlled through a formal system of acquisition, inventory, registration and identification, storage, and disposal.

   a. Unauthorized and unregistered property items are considered contraband.

   b. Each facility is to establish and maintain an area for the secure storage of resident property that is received, abandoned, or confiscated due to disciplinary or other administrative actions.

3. Resident assumes the responsibility for the care and control of all properly inventoried and registered personal property.

   a. The Department is to take reasonable measures to prevent damage to resident property but must not assume liability for the loss or damage of allowable property possessed by resident.

## III.   Allowable Property

A.   Admission Property

1.    All residents delivered to KDOC custody by a Kansas county sheriff are permitted to retain only that personal property specified on the Admission Property List (Attachment H) during their orientation to the receiving facility.

    a.    Any personal property in such residents possess upon admission that is not authorized, is to be returned to the sheriff or agent delivering the resident.

    b.    Any item returned to the sheriff or agent delivering a resident is to be recorded on the Request/Authorization to Remove Personal Property form (Attachment F) and signed by the party receiving said property.

    c.    The Warden, or designee, overseeing facilities with male and female Reception and Diagnostic Units (RDU's) are responsible for providing each county Sheriff with a current copy of Attachment H and any subsequent revisions.

2.    Residents delivered to KDOC custody by any agent or agency other than a Kansas county Sheriff may be permitted to retain any personal property so long as it is an authorized post intake item and conforms with the specifications shown in Post Intake Property List (Attachment B).

    a.    Authorized property which cannot be in the resident's possession due to incentive level, security/custody considerations, or limitations required by the facility placement is to be stored by the receiving facility.

    b.    Any such property that does not conform is to be removed in accordance with the provisions of Section XI. of this policy.

3.    Residents refusing evaluation or who were convicted of a class I or II disciplinary violation while at RDU are to have their property limited to admission property only.

B.    Post Intake Property

1.    Upon completion of Intake Level per IMPP 11-101A, residents are permitted to possess items of personal property in accordance with the specifications, quantity limits and value limits set out in Attachment A and a fan, hot pot, and tennis shoes, with the following exceptions:

    a.    Residents transferred to a Reception and Diagnostic Unit from another KDOC facility are limited to only the Admission Property List (Attachment H).

    b.    Residents in disciplinary segregation are only to have access to the basic personal hygiene items as allowed by IMPPs 12-127D and 20-101A.

    c.    Residents placed in administrative restrictive housing after the effective date of this policy, are allowed only the property listed in Attachment J, which may be further limited by facility general order.

    d.    Residents in administrative restrictive housing as a suicide or special security risk are limited to only those items specified in facility general orders for residents in that status.

    e.    Residents in disciplinary or administrative restrictive housing are not permitted access to either personal or facility owned typewriters.

        (1)    All correspondence and/or legal material drafted by restrictive housing residents are to be prepared using the writing instruments and paper ordinarily provided to residents within their particular restrictive housing status.

        (2)      Any typewriter possessed by a resident as an item of personal property is to be removed from his/her possession prior to placement in restrictive housing, stored by the facility, and returned to the resident upon his/her removal from restrictive housing.

2.      Except as provided in Section III.B.3. below, it is the responsibility of the Director of Kansas Correctional Industries to determine which items of allowable personal property are stocked in the canteen, based upon space available and historical demand for a particular item by the facility population.

      a.      If a Warden determines residents may purchase a padlock from the canteen, in light of the inclusion of one (1) padlock in the list of allowable post intake property (see Attachment B), the following is to apply:

            (1)      Only "Master" brand series 51 combination padlocks with key are to be sold in the canteen.

3.      Postage stamps are only permitted as a canteen purchase item, and any allowable personal property, which is categorized as an "appliance" in Attachment B may be either stocked in the canteen or made available for purchase by special purchase order.

4.      Work Release Facilities may utilize local merchants as a source for such personal property items as are listed in Attachment B as canteen purchase items.

5.      Except as provided in Section III.B.3. above, it is the responsibility of the Warden of the facility to determine and specify in General Orders the manner in which allowable personal property may be obtained.

      a.      The Warden has the discretionary authority to limit or disapprove access to any item subject to the consumable limitation (CL) except that residents are permitted to exhaust the supply of such property, which they bring with them at the time of transfer.

      b.      Post-release supervision conditions violators with no new sentence are not permitted to possess appliances or items of personal clothing identified in Attachment B.

6.      The Warden may provide storage for some items of resident property that are determined unnecessary for the resident's use while at a particular facility but which the resident wishes to retain on the property inventory.

C.    Legal Material

1.      Residents are permitted to possess that quantity of legal material/documents that fits in one (1) box.

      a.      The box is not to exceed 18" (L) x 12" (W) x 6" (D) in size.

      b.      The box is in addition to the property that must fit within a transfer/storage box as specified in Section V.A.1.

      c.      Upon request of the resident, the facility is to provide the resident with a document storage box.

2.      Residents who possess legal materials in such a quantity that it cannot be contained in the legal material/document box may utilize space within the personal property storage box to retain the excess.

      a.      All personal property and excess legal materials must be contained within the transport/storage box.

(1)    In the event the resident has chosen to retain legal materials in such an amount that personal property items and legal material combined exceed the space available in the transport/storage box:

    (a)    It is left to the resident to choose which legal materials or personal property is to be removed to achieve compliance with the above policy.

        i.    The resident is to be directed by the facility Property Officer to identify the legal materials or personal property to be removed per Section XI. The resident is to be advised that the Warden or designee determines which items are to be removed if the resident refuses to make a choice or makes a choice that does not accomplish compliance.

    (b)    In the event the selection becomes the responsibility of the Warden or designee, the selection is to concentrate on items of personal property of combined dimensions so that the amount removed is no greater mass than that of the excess legal materials.

    (c)    If all of a resident's personal property items have been removed from the facility to provide space for legal materials, and, an excess of legal materials remain, the Property Officer can advise the resident of the need to identify a quantity of legal materials to be removed in accordance with Section XI.

        i.    The resident is to be advised that his/her failure to make an appropriate choice of a sufficient quantity of material to comply with this policy that requires the Warden with facility legal counsel or designee with facility legal counsel to make such a determination per subsection (a), above.

        ii.    The legal material selected for removal shall not be read by any staff member facilitating the reduction excess items.

    (d)    Residents who have been required to reduce their legal material amount to the maximum quantity contained in both the transport/storage box and the legal material/document box may continue to receive legal materials in the mail.

        i.    If new legal material is received the resident is to be notified by the facility Property Officer that an equal amount of legal materials must be removed from the facility within five (5) working days (excluding weekends and holidays) of the resident's receipt of new legal material.

        ii.    The resident is to be provided the opportunity to determine which legal materials are to be removed.

        iii.    Failure of the resident to make a choice may result in the Warden or designee making the determination, per Section III.C II.2.a.(c)i. above.

b.    The legal material/document box is to be utilized for legal materials only and may not be utilized for resident personal property.

3.    The possession of legal materials by residents in restrictive housing may be limited, but access is to be permitted upon request, on a reasonable time and manner consistent with the security and order of the facility.

D.  Religious Material

1.  Residents are permitted to possess religious items and materials as specified in Attachment B and/or in accordance with provisions of IMPP 10-110D.

2.  Any religious item included in the list of allowable personal property must be approved by, obtained, and received through the facility Chaplain.

    a.  At those facilities that do not employ a Chaplain, the Warden or designee are to approve the receipt of any religious items.

3.  Any approved religious item that the Chaplain can obtain for no cost and is given to a resident, is to be considered the personal property of the resident.

    a.  Any such item is to be counted as part of the volume of a resident's personal property.

4.  Any approved religious item that the Chaplain can obtain at some cost and is given to a resident for his/her use as religious material, is to remain the property of the State of Kansas, Department of Corrections, and is not to be considered part of the personal property of the resident.

    a.  Any such item is to be clearly marked as property of the State of Kansas, Department of Corrections.

    b.  Any such item is to remain at the facility upon the resident's departure from the facility, either by release, transfer or otherwise.

    c.  Any such item is not to be counted as part of the volume of a resident's personal property.

    d.  The Chaplain is to make reasonable accommodations and efforts to obtain religious items for residents whose religious beliefs make use of items that cannot be obtained without charge by the facility, consistent with provisions of IMPP 01-122.

E.  Clothing

1.  All items of personal clothing must fit the resident properly and is to be maintained in proper state of repair by the resident.

2.  Items of clothing that would otherwise be permitted but, when worn, are considered immodest or provocative are not allowed.

3.  The Warden is responsible for determining the appropriateness or inappropriateness of any item of clothing and his/her decision is final.

IV.  **Property Specifications**

A.  Containers

1.  No glass containers are permitted.

2.  No aerosol containers are permitted.

3.  No metal containers are permitted except soft metal containers such as aluminum soda cans and potted meat/fish cans.

B.  Waiting Periods

    1.    For residents convicted of crimes committed prior to July 1, 1993, certain items of property may not be possessed until after progressing beyond Intake Level, per IMPP 11-101A.

    2.    On or after January 1, 1996, any resident returned to Incentive Level I and who meets the conditions specified in appropriate procedures of IMPP 11-101A, is to have all unauthorized property removed in accordance with the provisions of this IMPP.

C.    Security/Custody Limitations

    1.    Some property items may be permitted for medium and minimum-security female residents only. When such a limitation is applicable, it is to be so stated in the property specification section of Attachment B.

    2.    Some items of property may be permitted only at work release facilities. When such a limitation is applicable, it is to be so stated in the property specification section of Attachment B.

D.    Gender Specific Property

    1.    Some items of property are permitted only for residents of a specific gender. When such a limitation is applicable, it is to be so stated in the property specification section of Attachment B as, "female only" or "male only".

E.    Clear View Appliances

    1.    To the extent that they are available, all fans, radios, televisions, alarm clocks, calculators, and other appliances (as they become available) must have clear external cases that permit a clear view of the interior of the appliance.

F.    Basic, plain gray sweat suits, as described within Attachment B, obtained by non-work release male and female residents are subject to the following identification procedures:

    1.    The Property Officer is responsible for marking sweat suits when received, with the resident's name and number on the outside of the garment, in the following manner:

        a.    Sweat suit pants or shorts are to be marked with a two (2)-inch capital blocked number/letter stencil, with horizontal letter orientation, in permanent marker, vertically down the side of the right leg, with the resident's number directly next to the name.

        b.    Sweat suit shirts are to be marked with the same two (2)-inch lettering, with the name centered horizontally across the back between the shoulder blade area of the shirt, and the resident's number centered directly below the name.

    2.    The Unit Team Manager or designee is responsible to ensure that existing items of sweat clothing are properly marked in accordance with this policy.

    3.    Any alterations to the name or number is prohibited. Violation may result in disciplinary action in accordance with K.A.R. 44-12-1002.

    4.    Upon the effective date of this policy, existing markings on sweatshirts, pants and shorts are to be approved by the resident's respective Unit Team Manager or designee."

## V.    Quantity of Property

A.    The total amount of personal property that a resident is allowed to possess is limited to that which fits in one (1) standard transport/storage box, excluding legal material (see I.C.1.).

    1.    The standard transport/storage box used by all facilities is 15" (L) x 13¾" (W) x 21" (D) in size, and of the type purchased on state contract.

      2.      Stereos, televisions, typewriters, and fans are not to be included in the volume limit.

      3.      Personal clothing permitted at work release may be considered exempt from this limitation.

B.      At any point in time, a resident may be required to pack personal property in a standard transport/storage box to show that the quantity of property possessed is within the established limit.

      1.      Whenever a resident's personal property is inventoried, all items of property must be recorded including those, which the resident is wearing or has physical possession of at the time the inventory is taken.

      2.      Any excess personal property is to be handled in accordance with the procedures in Section III.C.2. and Section XI.

C.      Unless a specific quantity limit is shown in Attachment B for an item, the resident may possess as many of an item as desired within the volume limit.

D.      Certain items are subject to a consumable limitation. When the consumable limitation is applicable, the letters "CL" appear in the quantity column in Attachment B.

## VI.    Value of Property

A.      Value limits for items of personal property must be as established in the value column of Attachment B.

B.      Residents may not declare any property value in excess of the maximum established value limit.

C.      In the event a property claim is filed in accordance with IMPP 01-118D, the department's liability must not exceed the established value limit, except that the Department's liability for publications including religious texts, books, magazines, and newspapers must not exceed $150.

D.      Items listed on the Special Property Inventory Form (Attachment G) must be valued according to prior applicable versions of IMPP 12-120/12-120A, and General Orders of the facility housing the resident as of April 15, 1991 concerning discretionary property values.

## VII.    Creation and Organization of Property File

A.      Upon a resident's admission to the Department, a property file is to be created.

B.      This file folder is to be green in color and organized as follows:

      1.      Left side: Resident Personal Property Inventory forms (Attachment D, Parts I and II); and Special Property Inventory Forms (Attachment G).

      2.      Right side: Resident Property Receipt forms (Attachment E); Request/Authorization to Remove Personal Property forms (Attachment F); and, any miscellaneous documents regarding the resident's property that comes into existence.

C.      The property file is to be forwarded to the receiving facility with all other resident files at the time of the resident's transfer.

D.      Any time the resident's records are transferred to the inactive resident records repository in accordance with IMPP 05-103, the resident property file is to be included among those records transferred.

## VIII.    Registration of Personal Property

A.      At the time of admission to any Department of Corrections facility, the resident's property must be inventoried and registered using the Resident Personal Property Inventory form (Attachment D).

B.      Any time a registerable item of property is acquired, that item must be recorded on a Resident Property Receipt form (Attachment E).

C.      Any time a registerable item of property is removed, that item must be recorded on the Request/Authorization to Remove Personal Property form (Attachment F).

D.      Until such time as a reason develops to complete a new Resident Personal Property Inventory form, the resident's complete property listing must consist of those items shown on the existing Resident Personal Property Inventory, those items shown on all Resident Property Receipts completed after the date of the last inventory, and less any items shown on the Request/Authorization To Remove Personal Property form. These documents are to be placed in the resident property file in accordance with Sections V.B.1. and 2. above.

   1.    In the event property is removed at the direction of the Warden or designee, and against the wishes of the resident, the Request/Authorization to Remove Personal Property (Attachment F) is to be signed by the Warden or designee.

   2.    At any time, the resident can be required to produce all items of property listed on the Inventory or Property Receipt forms, if directed to do so.

   3.    At any time the resident's property is inventoried the property listed on the new inventory list must be checked against the resident's prior inventory, property receipt record, and removal record.

      a.    Before signing the inventory, the resident is responsible for noting any discrepancies.

      b.    Property that has not been properly registered is to be confiscated.

E.      All items of resident property, except items identified as consumable, are to be registered on the Resident Personal Property Inventory form (Attachment D).

   1.    All non-consumable intake property must be registered at the time of the resident's admission.

   2.    All property received after the resident's admission must be registered at the time of receipt, using the Resident Property Receipt form (Attachment E).

F.      For items of property received after the intake period, residents are required to provide evidence of the item's value. This evidence may be in the form of:

   1.    A receipt from the store where the item was purchased; or

   2.    The resident's declaration of value, Attachment E, as witnessed by the Property Officer on duty.

      a.    When an item's declared value is clearly excessive or inaccurate, the resident may be required to produce other proof of value before being allowed to receive the property.

G.      Any property of value in excess of $15.00 must be engraved with the resident's number.

   1.    If the item cannot be engraved, it must be marked in indelible ink.

   2.    Small items, such as jewelry and prosthetic devices, which cannot be marked, are subject only to recording on the resident's property record.

      a.    The description and value of such an item must be recorded on the resident's property record.

IX.     **Inventory of Resident Property**

    A.    Any time a resident's property is taken into the custody of an employee for storage, transfer, or any other reason, a complete inventory record of the property must be made.

        1.    All items of the resident's property must be recorded on the Resident Personal Property Inventory form, Attachment D.

            a.    Whenever a resident's personal property is inventoried all items of property must be recorded on the Resident Personal Property Inventory form, including those, which the resident is wearing or has physical possession of at the time the inventory is taken.

        2.    Unless precluded for security reasons, the resident must be present at the time of the inventory.

            a.    If the resident is not present at the time the inventory is taken, the reason must be documented in the resident's property file on the inventory form.

            b.    Residents must not be used to pack or assist in the packing of property belonging to another resident.

        3.    The resident must sign the completed inventory form attesting to its accuracy. Any discrepancies are to be noted on the inventory.

        4.    The inventory must be checked against the previous Resident Personal Property Inventory form to ensure that all items of registered property are present. The resident must be required to account for any discrepancies at this time.

        5.    The resident must sign each page of the inventory form, Attachment D.

        6.    The resident must receive a copy of the completed inventory form.

        7.    The property must be packed into the box prescribed in Section V.A.1. and sealed in the presence of the resident, if possible.

        8.    Staff must complete a KDOC Electronics Checklist (Attachment I) for electronic items.

    B.    When the property is returned to the resident, he/she must sign the original inventory verifying that all property has been returned.

        1.    It is the responsibility of the resident to report any discrepancies at the time the property is returned.

        2.    Discrepancies are to be noted by the resident on the inventory form and witnessed by the Property Officer.

        3.    Staff must complete a KDOC Electronic Checklist (Attachment I) for electronic items.

    C.    Each facility must maintain a secure property storage area.

        1.    Access to this area must be strictly controlled.

        2.    Residents must not have access to this area unless under continuing supervision of staff.

X.     **Transfer of Resident Personal Property**

A.  Allowable property items are transferable between all KDOC facilities consistent with the security level of the receiving facility and the incentive level per IMPP 11-101A and security/custody status of the resident in accordance with Section III.C.

    1.  Upon transfer between KDOC facilities, residents are permitted to retain property listed in Attachment B.

        a.  All property transferred must be inventoried and packed in accordance with Section VIII.

B.  Upon transfer from any KDOC facility to Larned State Security Hospital for any reason, only that property which is listed in Attachment C can be transferred with the resident.

    1.  All other property, except food items, must be stored at the sending facility until such time as the resident returns or is otherwise released from the custody of the Secretary of Corrections.

    2.  All food items must be removed from the resident's property and disposed of pursuant to Section IX.

C.  Upon a resident's removal from a work release program, the resident's property must be packed and inventoried.

    1.  Property listed in Attachment B as permissible only in work release must be separated and recorded on a property removal form.

    2.  Property items listed in Attachment B as permissible only to medium and minimum female residents must be separated and recorded on a property removal form if a female resident is to be transferred to the maximum facility and her security classification status is revised to maximum.

    3.  The property is then to be disposed of in accordance with Section XI.

    4.  All other property permitted on Attachment B must accompany the resident.

D.  The resident's name, number and destination must be affixed to the transport/storage box and the legal material/document storage box with a shipping label glued/taped in a secure manner.

    1.  Care must be taken to ensure the transportation/storage box and legal material/document box is securely sealed prior to delivery to the Transportation Unit.

    2.  Shipping labels are to be legible and affixed in such a manner that the containers may be reused for other resident's property storage or transfer.

## XI.   Removal of Property from a Correctional Facility

A.  At any time property is removed from the facility, not accepted, or destroyed at the resident's or facility's request, it must be documented on the Request/Authorization to Remove Personal Property form (Attachment F). Such items shall be held a minimum of 45 days after administrative relief has been exhausted by the resident.

B.  Property may be removed from the facility by:

    1.  Mailing the property to an address of the resident's choosing at the resident's expense or, with the approval of the Warden, at the facility's expense.

    2.  Donating the property to a charitable organization.

    3.  Having the property picked up by an authorized person approved by the Warden.

4. Removing and taking the property to a sponsor's address on an approved furlough.

5. If the resident refuses to designate an approved means of removal, the Warden or designee can make the designation.

C. Facility General Orders are to specify a procedure whereby personal property is removed from the facility.

D. A resident may authorize the destruction of an item of property.

E. Personal property left at a facility by a resident is considered abandoned property pursuant to K.S.A. 75-52,135.

1. Any personal property not claimed by a resident or authorized representative within 90 days of a resident's release from custody is considered abandoned property.

2. Any personal property left at a facility by a resident who has escaped from custody is immediately determined to be abandoned property.

3. Any personal property determined to be abandoned, pursuant to K.S.A. 75-52,135 must be reported to the State Treasurer, pursuant to K.S.A. 58-3950.

a. The State Treasurer may dispose of the abandoned resident property in accordance with the provisions of K.S.A. 58-3934 et seq., and amendments thereto.

b. The State Treasurer requires wedding bands to be sent to them in compliance with K.S.A. 75-52, 135. All other abandoned property may be disposed of in a manner determined by Secretary of Corrections or designee.

## XII.   Implementation

A. On and after the effective date of this IMPP, residents are allowed to receive only that property which is permitted by the provisions of these procedures.

B. Residents who on April 15, 1991 were in possession of personal property approved under previous policies, or who prior to November 7, 1995 were in possession of certain general handicraft tools as specified within IMPP 10-133, Section IV.D., must be permitted to retain that property until:

1. They are transferred to another facility;

2. They are convicted of a disciplinary violation involving a particular item of such property; or,

3. Repair or replacement of such property becomes necessary (excluding prosthetic or other devices prescribed by any facility Health Authority, or the general handicraft tools referenced within Procedure X.B., above).

C. If it becomes necessary, for any reason, to inventory a resident's personal property before transfer to another facility, the Special Property Inventory form (Attachment G), is to be used to document the possession of personal property approved under previous policies.

1. Special Property Inventory forms are considered null and void upon transfer to another facility at which time a resident's personal property must fully comply with the provisions of this IMPP.

D. All residents who are transferred to another facility within the Kansas Department of Corrections after the effective date of this IMPP are permitted to retain only those property items appropriate to the receiving facility and custody level as described in Attachment B.

**NOTE:** The policy and procedures set forth herein are intended to establish directives and guidelines for staff, residents and offenders and those entities that are contractually bound to adhere to them. They are not intended to establish State created liberty interests for employees, residents or offenders, or an independent duty owed by the Department of Corrections to employees, residents, offenders, or third parties. Similarly, those references to the standards of various accrediting entities as may be contained within this document are included solely to manifest the commonality of purpose and direction as shared by the content of the document and the content of the referenced standards. Any such references within this document neither imply accredited status by a Departmental facility or organizational unit, nor indicate compliance with the standards so cited. The policy and procedures contained within this document are intended to be compliant with all applicable statutes and/or regulatory requirements of the Federal Government and the state of Kansas. This policy and procedure are not intended to establish or create new constitutional rights or to enlarge or expand upon existing constitutional rights or duties.

## REPORTS

None.

## REFERENCES

K.S.A. 58-3934, 58-3950, 75-5257, 75-52,135
K.A.R. 44-12-1002
IMPP 01-118D, 01-122, 04-108D, 05-103, 10-109A, 10-110D, 10-133, 11-101A, 12-120A, 12-127D, 20-101A

## HISTORY

04-09-2021 Original
07-26-2021 Revision 1
08-09-2021 Revision 2
12-08-2021 Revision 3
04-14-2022 Revision 4

## ATTACHMENTS

| Attachments | Title of Attachments | Page Total |
|---|---|---|
| A | Intake Property List | 1 page |
| B | Post Intake Property List (alphabetical) | 9 pages |
| C | Items Transferable to LSSH | 1 page |
| D | Resident Personal Property Inventory | 3 pages |
| E | Resident Property Receipt | 1 page |
| F | Request/Authorization to Remove Personal Property | 1 page |
| G | Special Property Inventory | 1 page |
| H | Admission Property List | 1 page |
| I | Kansas Department of Corrections of Correction Electronic Checklist | 1 page |
| J | Property Allowed in Restrictive Housing | 4 pages |

Attachment A, IMPP 12-120A
Effective 04-14-22

## INTAKE PROPERTY

The following items may be possessed by a resident while on the Intake Incentive Level pursuant to IMPP 11-101A.

| ITEM | SPECIFICATIONS | QUANTITY | VALUE |
|------|----------------|----------|-------|
| Bible/Primary Religious Text | Approved by reception facility chaplain. | 1 | |
| Contact Lenses | May be in resident's possession until replaced. Replace with eyeglasses from State contract unless health care provider determines that contacts are the preferred corrective device. | 1 | |
| Dentures | As prescribed by health authority. | 1 set | |
| Drinking Cup | Plastic; no logo permitted; up to 16 ounces. If insulated, must be clear view/ /double walled. | 1 | CP |
| Eye Glasses | As received, prescription only. | 1 | |
| Headphones (appliance) | One (1) large and one (1) small. | 2 | CP |
| Letters, Personal | | 10 | |
| Padlock | Combination type with key access, must be from Master Padlock series 51. | 1 | CP |
| Photographs | Non-Polaroid, 8 1/2" x 11" or smaller, each separate physical image on multi-image sheets counts as one (1) photograph (ex. 20 images on one sheet counts as 20 photographs). Commercial/published pictures, whether individual or packaged, are prohibited. "Commercial published content" is defined as those depictions which are produced in bulk, considered a commodity and often are replicated/ produced for sale or purchase. | 50 | |
| Prosthetic Device | As received with resident and approved by Health Authority. | As received | |
| Shower Shoes | As received with the resident. | 1 pair | CP |
| Religious medal, scapular, or crucifix | Approved by reception facility Chaplain. | 1 item | 40.00 |
| Wedding Band | Plain, no stone. | 1 | 50.00 |
| Wristwatch | No stones. | 1 | 25.00 |

## POST INTAKE PROPERTY
### (Alphabetical)

| ITEM | SPECIFICATIONS | QUANTITY | VALUE |
|---|---|---|---|
| Address Book | Not to exceed 8" x 9," to be purchased through canteen or special purchase order. | 1 | CP |
| Afro Curler | | 2 & CL | CP |
| Antenna (APPLIANCE) | Small UHF-VHF combination type; must be attached to TV. | 1 | CP |
| Baby Powder | | 2 & CL | CP |
| Batteries | AA size as sold. | 8 | CP |
| Belt | Work release only; buckle may not exceed width of belt by more than ½". | | Each 20.00 |
| Bible/Primary Religious Text | Must be approved by facility Chaplain. | 1 | |
| Bicycle | Work release only; permitted only if most suitable form of transportation. | 1 | 100.00 |
| Bicycle Lock | Work release only. Cable thickness of 10mm or larger. | 1 | 10.00 |
| Billfold | Work release only. | 1 | 10.00 |
| Blankets | Work Release only. | As approved by Warden | CP |
| Blow Dryer (APPLIANCE) | Female and work release residents only.  Hand-held only. Wattage restrictions and/or requirements as set by General Order. | 1 | 20.00 |
| Blue Book, AA Text | | 1 | Current AA Rate |
| Books/Magazines/ Newspapers | From publisher or vendor only, but may be purchased by third parties for a resident's use. | 12 | |
| Brassieres | Work release females only. | 5 | Each 20.00, 100.00 Total |
| Cable | Coax cable for cable TV hook up - Six ft. maximum length. Must be approved by the Warden. | 1 | CP |
| Cakes | | CL | CP |
| Calculator (APPLIANCE) | Display only; solar dual power only; pocket size. | 1 | 25.00 |
| Calendar | Issue by facility or commercially printed calendars received by mail direct from vendor only. Calendars are not to contain metal bindings other than staples. Maximum size is restricted to 11 inches by 17 inches when open. | 1 | CP |
| Candies | | CL | CP |
| Cards | Poker or Pinochle. | 2 decks | CP |
| Checkers | Plastic or wooden; factory manufactured, to include cardboard or paper checker board. | 1 set | CP |
| Chess Set | Plastic or wooden; factory manufactured, to include cardboard or paper chess board. | 1 set | CP |
| Chips | | CL | CP |

| Clock, Alarm (APPLIANCE) | | 1 | 15.00 |
|---|---|---|---|
| Coat | Work release only.  No fur; no leather. | 1 | 100.00 |
| Cold Cream | | 2 & CL | CP |
| Cologne | Non-alcoholic; non-glass container only. | 1 | 10.00 |
| Comb | Plastic only. | 1 | CP |
| Conditioner | | 2 & CL | CP |
| Contact Lenses | As received, may be in resident's possession until replaced.  Replace with eyeglasses from State contract unless health care provider determines that contacts are the preferred corrective device; may be in resident's possession until replaced. | 1 pair | |
| Cookies | | CL | CP |
| Copy Ticket | | CL | CP |
| Cosmetics | Work release females.  Non-toxic; any combination. | 10 | 30.00 Total |
| | Non-work release females.  Hypo-allergenic. | 10 | CP |
| Coveralls | Work release only. | 2 | 60.00 |
| Crackers | | CL | CP |
| Crochet Hooks | Plastic, flexible. | 1 set | CP |
| Curling Iron (APPLIANCE) | Work release females. Crimp iron or electric rollers. | 1 | 30.00 |
| | Non-work release females. One barrel only. | 1 | CP |
| Dental Floss | | 2 & CL | CP |
| Denture Adhesive | | 2 & CL | CP |
| Denture Container (Cup) | | 1 | CP |
| Denture Creme | | 2 & CL | CP |
| Dentures | As received with resident or prescribed by Health Authority. | 1 set | |
| Deodorant, Crème | | 2 & CL | CP |
| Deodorant, Stick | | 2 & CL | CP |
| Dictionary | In addition to book limitation. | 1 | |
| Dips | | CL | CP |
| Dominoes | Wood or plastic; factory manufactured. | 1 set | CP |
| Drinking Cup | Plastic; no logo permitted; up to 22 ounces. If insulated, must be clear view/double walled. | 2 | CP |
| Drink, Dry | | CL | CP |
| Duffel Bag/Gym Bag | Work release only; 24" max. length. | 1 | 25.00 |
| Earplug (APPLIANCE) | | 2 & CL | CP |
| Earplug Adapter | | 2 & CL | CP |
| Earrings | Females only.  No precious metals or stones. | 2 pair | 15.00 Total |
| Emery Boards | | 2 packs & CL | CP |
| Envelopes | All sizes. No padded envelopes of any kind, including those containing "bubble wrap" as a component. | CL | CP |

| | | | |
|---|---|---|---|
| Eye Glasses | As received during or after admission (with frames approved by the warden or designee) or as provided per health authority determination, prescription only. Unless required by Health Authority prescription, are to be non-tint, non-wired, non-mirrored, non-wraparound. Received eyeglasses approved by a Warden are transferable property. | 1 pair | Frames limited to $200, with claims replacement limited to value of eye glasses issued by Health Authority. |
| Eye Glasses, non-prescription / reading | As received during or after admission (with frames approved by the warden or designee), are to be non-tint; non-wired; non-mirrored; or non-wraparound. Received reading glasses approved by a Warden are transferable property. | 1 pair | 20.00 |
| Fabric Softener | Work release females and males. | 2 & CL | 5.00 |
| | Non-work release females. Hypo-allergenic items only. | 2 & CL | CP |
| Fan (APPLIANCE) | Blade size limited to twelve (12) inches diameter fan; electric; plastic blades; UL approved; safety guard. Additionally, on and after 04/01/97, the safety guard on all fans purchased by residents through SPOs, or purchased by a facility canteen for resale to residents, must be constructed of plastic. | 1 | CP |
| Feminine Napkins, Tampons, Pads | Females only. | CL | CP |
| File Folder | Non-metal only. | CL | CP |
| Foot Powder | | 2 & CL | CP |
| Footwear | Work release females and males. Sandals/thongs, shoes/boots (work/dress/casual), shoes (tennis/any color), slippers - any combination. | 5 pair | 80.00 max per one pair 100.00 Total |
| | Non-work release females housed at the TCF AE Compound may possess personal footwear as follows: Tennis Shoes (1 pair only limited to black, white, gray, black/white/gray combination or 2 pair if on a medical boot restriction, with second pair issued by Health Authority); Work Boots (may possess up to 2 pair; however, if 2 pair are possessed, the second pair is in lieu of a pair of state issued. If on a medical boot restriction, no boots may be possessed); and one pair of either Dress Shoes or sandals/thongs or house slippers. No footwear is to be taller than the resident's ankle. | Up to 4 pair per description | Tennis 80.00 max Work Boot CP Others 25.00 per pair |
| | Non-work release females, residents housed at the IJ Compound. Tennis shoes (limited to black, white, gray or black/white/gray combination), shower shoes. Work Boots (limited to purchase/replacement at those facilities whose Wardens opt to offer the boots through the canteen and/or special purchase orders transferable to all other facilities, style/type and manufacture to be set by DSFM or designee, 2nd pair of boots is in lieu of state issue boots). | 1 pair each, tennis shoes & shower shoes. 2 pair boots, 2nd pair in lieu of state issue. | Tennis 80.00 Shower CP Work Boot CP |

| | | | |
|---|---|---|---|
| | Non-work release males. Tennis shoes (limited to black, white, gray or black/white/gray combination or 2 pair if on a medical boot restriction, with second pair issued by Health Authority), shower shoes. Work Boots (limited to purchase/replacement at those facilities whose Wardens opt to offer the boots through the canteen and/or special purchase orders transferable to all other facilities, style/type & manufacture to be set by DSFM or designee, 2nd pair of boots is in lieu of state issue boots If on a medical boot restriction, no boots may be possessed). | 1 pair each, tennis shoes & shower shoes. 2 pair boots, 2nd pair in lieu of state issue. | Tennis 80.00 Shower CP Work Boot CP |
| Gloves | Work release only. | 4 pair | 16.00 Total |
| Greeting Cards | If sold in canteen, or Chaplain provides, then they cannot be purchased from an outside vendor. | 10 & CL | CP |
| Gum | | CL | CP |
| Hairbrush | Wood or Plastic only. | 1 | 5.00 |
| Hair Accessories | Females only. Examples: barrettes, clips, ribbons, elastic bands, etc. | 24 | 15.00 Total |
| | Males only - hair ties. | 24 | CP |
| Hair Dressing/Grease | | 2 & CL | CP |
| Hair Rollers | Work release females. Non-electric and fasteners. | 30 | 10.00 Total |
| | Non-work release females. Foam only; small and medium size only. | 30 | CP |
| Hair Spray | Pump container only. | 2 & CL | CP |
| Hair Straightener | Non-work release males and females. Lye free cream or gel. | 2 | CP |
| | Work release males and females. Lye free cream or gel. | CL | CP |
| Handkerchiefs | Work release only. | 6 | 12.00  Total |
| Handicraft Tools and Materials | As provided in IMPP 11-101, also see IMPP 10-133. | CL | CP |
| Hangers, Clothes | Work release only. Plastic only. | 30 | 10.00 Total |
| Hat/Cap/Visor | Work release only. | 2 | 10.00 Total |
| Hat, Summer | LCMHF only. Style as approved by Warden.  With medical authority approval. | 1 | 5.00 |
| Headphone Extension (APPLIANCE) | Maximum length 12'. | 1 | CP |
| Headphones (APPLIANCE) | One large and one small. | 2 | CP |
| Hot Pot (APPLIANCE) | 6 cup capacity limit; UL approved, non-boiling. | 1 | CP |
| Ice Chest | 6-pack size; hard plastic; no styrofoam. | 1 | 16.50 |
| Ice Cream | | CL | CP |
| Lamp (APPLIANCE) | High intensity reading lamp; desk top. | 1 | CP |
| Laundry Detergent | Medium and minimum females and work release only. Non-toxic; hypo-allergenic. | 2 & CL | CP |
| Laundry Starch | Work release females and males. | 2 & CL | CP |
| | Non-work release females. | CL | CP |

| | | | |
|---|---|---|---|
| Letters, Personal | | 10 | |
| Lotion, Aftershave | Non-alcoholic; clear plastic container. | 2 & CL | CP |
| Lotion, Hand | Non-alcoholic; clear plastic container. | 2 & CL | CP |
| Lotion, Suntan | Non-alcoholic; clear plastic container. | 2 & CL | CP |
| Lunch Box | Work release only. | 1 | 5.00 |
| Mattress Pad | Work release only. | 1 | 20.00 |
| Medications / Over The Counter | Over the counter medications as specified by General Order may be purchased from local merchants by Work Release Facilities. Residents at all other facilities are limited to the following items: Acetaminophen, Aspirin, A&D Ointment, Alka-Seltzer, Alka-Seltzer Cold +, Acne-Peroxide Lotion – Benzyl Peroxide, Ben Gay, Carmex, Cough Drops, Chest Rub, Eucerin or Nivea Cream, Imodium, Motrin, Medicated Shampoo, Pepto-Bismol, Medicated Foot Powder, Metamucil Powder, Natural Tears, Hydrocortisone cream, Ibuprofen, Pepcid AC, Antacid tablets, Anti-fungal cream, Hemorrhoidal cream, Triple antibiotic cream. | CL | CP |
| Mirror | Plastic; pocket size. | 1 | 3.50 |
| Model Cars | Finished product to be mailed out. | 1 | CP |
| Model Car Glue | Non-toxic, non-flammable. | 1 | CP |
| Mouthwash | Non-alcoholic, clear plastic container. | 2 & CL | CP |
| MP3 Player | MPE player and accessories (4 double A rechargeable batteries, charger, and AC wall adapter) | 1 | CP |
| Nail Clippers | Fingernail size. | 1 | CP |
| Needles | Bead craft, needle point, cross stitch and knitting per IMPP 10-133; Length and composition to be determined by General Order. | 1 set per craft | CP |
| Nightwear | Work release females and males. Bathrobes, nightgowns and pajamas. Nightwear must be appropriate to resident's gender and no shorter than 2" above the knee. | 3 | 60.00 Total |
| | Non-work release females. Pajama type top and bottom – may include robe. | 2 sets | 40.00 Total |
| Notebooks | Non-metal only. | 1 | 2.00 |
| Nuts | | CL | CP |
| Outerwear | Work release females and males.  Shirts, blouses, pants, skirts, T-shirts, sweaters, dresses, walking shorts, jackets, or blazers.  Includes work, dress and casual clothes. Type of garment must be appropriate to resident's gender. | 30 items; limit | 25.00 each item |
| Outerwear | Non-work release medium and minimum custody females housed within the perimeter of the TCF AE-Compound may possess a personal clothing outfit. A dress, or a blouse/shirt and skirt combination, or a pants/slacks and blouse/shirt combination is be considered one (1) outfit. | 1 Outfit | 50.00 |
| | Non-work release medium and minimum females only. Blouse/shirt and skirt, dress, or pants/slacks and blouse/shirt. (An outfit equals one dress, or a combination of top and bottom of the other articles.) | 1 outfit | 50.00 Total |

| | | | |
|---|---|---|---|
| Padlock | Combination type with key access; must be from Master Padlock series 51. | 1 (Up to 2 at discretion of Facility Warden) | CP |
| Paint-by-number | | CL | CP |
| Paints | Water based, per IMPP 10-133. | CL | CP |
| Pantyhose | Work release females. | CL | CP |
| | Non-work release medium and minimum females only. | 2 pair | CP |
| Paper, Writing | | CL | CP |
| Paper, Toilet | | CL | CP |
| Pastries | | CL | CP |
| Pen, Ballpoint | Non-retractable tip only. | CL | CP |
| Pencil, Drawing | | CL | CP |
| Pencil, Writing | | CL | CP |
| Perfume | Work release females. Two (2) oz.; non-alcoholic; non-glass container only. | 1 | 10.00 Total |
| | Non-work release females. Non-alcoholic. Non-glass container only. | CL | CP |
| Permanent Products | Work release females. | 2 | CP |
| | Non-work release females. | CL | CP |
| Pillow | Standard size, work release residents only. | 1 | 10.00 |
| Pillowcase | Non-white, twin size, work release residents only. | 2 | 12.00 Total |
| Photo Album | Non-metal; non-glass; 10" x 14". | 2 | 20.00 Total |
| Photo Frames | No larger than 8" x 10"; no glass, metal or plastic. | 1 | 10.00 |
| Photographs | Non-Polaroid, 8 1/2" x 11" or smaller, each separate physical image on multi-image sheets counts as one (1) photograph (ex. 20 images on one sheet counts as 20 photographs). Commercial/published pictures, whether individual or packaged, are prohibited. "Commercial published content" is defined as those depictions which are produced in bulk, considered a commodity, and often are replicated/ produced for sale or purchase. | 50 | |
| Pick, Hair | Plastic only, no handle; no rattail. | 1 | 5.00 |
| Plastic Bowl, with lid re-sealable | | 1 | CP |
| Plastic Spoon | | 1 | CP |
| Pop, Canned or plastic bottled | | 36 & CL | CP |
| Postage Stamps | Any denomination up to and including that which is required to mail a one (1) ounce First Class letter. | 25 | CP |
| Prepared Foods | | CL | CP |
| Prosthetic Devices | As received with resident and approved by health authority. | As received | |
| Purse | Work release females only. | 1 | 20.00 |
| Q-Tips | | 2 packs & CL | CP |

| | | | |
|---|---|---|---|
| Radio – AM/FM /Tape Player /or/ Clock Radio – AM-FM (APPLIANCE) | 20" x 10" x 8"; may be radio, tape player, or radio/tape player (single cassette/tape deck) combination, standard cassette; equipped for headphone, earphone or earplug; UL approved. Only AM/FM Radios or AM/FM Clock Radios may be purchased by residents on SPO or ordered by facility canteens. Existing appliances with tape player capability may be sold by facility canteens until the existing stock is depleted, and existing units held by residents may be retained and transferred but may be neither repaired nor replaced with anything except AM/FM Radios or AM/FM Clock Radios. | 1 If device is an AM/FM clock radio, no separate clock is permitted as personal property. | CP |
| Rain suit/poncho | Work release only. | 1 | 15.00 |
| Razor | Disposable only. | CL | CP |
| Razor, Electric (APPLIANCE) | Work release only, otherwise must be determined to be medically necessary by Health Authority. | 1 | 45.00 |
| Religious Beads (e.g., prayer, rosary) | Must be approved by facility Chaplain/Warden and received through Chaplain/Warden. | 2 | 20.00 Total |
| Religious Head Garments | Must be approved by facility Chaplain/Warden and received through Chaplain/Warden. | 2 | 25.00 Total |
| Religious Medal or Medallion with Chain | Must be approved by facility Chaplain/Warden and received through Chaplain/Warden. No precious metals or stones. Longest dimension may not exceed two (2) inches. | 1 | 20.00 |
| Rug, Prayer | Must be approved by facility Chaplain/Warden and received through Chaplain/Warden. | 1 | 25.00 |
| Sardines, Canned | | CL | CP |
| Sausages, Canned | | CL | CP |
| Scissors | Sewing kit accessory, blunt tipped type, cutting edge no longer than two (2) inches, pure plastic construction only. | 1 | CP |
| Sewing Kit | No scissors. | 1 | 5.00 |
| Shampoo | | 2 & CL | CP |
| Shaving Creme | Non-aerosol. | 2 & CL | CP |
| Shaving Cup/Brush | Plastic only. | 1 | CP |
| Shaving Powder | | 2 & CL | CP |
| Shaving Soap | | 2 & CL | CP |
| Sheets, Bed | Non-white, work release residents only | 2 | 20.00 Total |
| Shirts, Under | | 7 | 66.50 Total |
| Shoe Insoles | | CL | 5.00 |
| Shoe Laces | As appropriate to shoe style & color; black or white only for tennis shoes. | 2 pairs & CL | CP |
| Shoe Polish | | 2 & CL | CP |
| Shorts, Athletic | A minimum of 4" inseam, gray only. | 2 | 30.00 Total |
| Shorts, Boxer or Brief | | 7 | 35.00 Total |
| Shower Cap | | 2 | CP |
| Slip, Full or Half | Medium and minimum females only. | 1 | 15.00 |
| Snacks | | CL | CP |

| | | | |
|---|---|---|---|
| Soap, Bar or Gel | | 4 & CL | CP |
| Soap Dish | Plastic. | 1 | 2.00 |
| Soap, Liquid Dishwashing | Clear soap in clear plastic container, 12 oz or less, prohibited in restrictive housing. | 1 | CP |
| Socks | Work release females and males. Any color. | 7 pairs | 15.00 Total |
| | Non-work release females. | 4 pairs | 10.00 Total |
| | Non-work release males. White tube. | 7 pairs | 16.00 Total |
| Soup, Packaged | | 30 & CL | CP |
| Sport Glasses Strap | | 1 | CP |
| Spreads | Food item. | CL | CP |
| Sugar Twin | | CL | CP |
| Sunglasses | Non-mirror; non-prescription; non-wrap around; non-wire frame. | 1 | 10.00 |
| Surge Protector (APPLIANCE) | Single outlet or power strip type, no more than six (6) outlets, UL approved. | 1 | CP |
| Sweat Suit (Basic) | Non-work release males and females. Plain gray; pullover hoodless; no logo; unaltered. No designer sweat suits, including those approved under previous policies, i.e. grand fathered prior to the effective date of this IMPP. | 1 | 55.00 |
| Sweat Suit (Designer) | Work release males and females. Designer styles of any fabric or color; may include a designer's/manufacturer's logo, but no printing or wording other than the designer's/manufacturer's name. | 1 | 50.00 |
| Tablet | | CL | CP |
| Talc, Body | | 2 & CL | CP |
| Tape, Cellophane | | 2 & CL | CP |
| Tapes | Commercially produced recorded tapes, standard size cassette only. All tapes must be engraved with the resident's OMIS number. In lieu of one of the recorded tapes allowed within the limitation, a dry system tape head cleaner may be substituted. After the effective date of the current revision to this policy, no tapes or tape head cleaners may be purchased by residents on SPO. Existing tapes and tape head cleaners held by residents may be retained and transferred but may be neither repaired nor replaced. | 15 | 10.00 Each |
| Television (APPLIANCE) | B & W or color; 13" or 15"; equipped with earphone, headphone or earplug. Any television equipped with a remote control may be either purchased by residents through SPOs, or purchased by a facility canteen for resale to residents. Batteries for the remote control units are available in the canteen. | 1 TV & 1 set of Batteries for Remote control, if so equipped. | CP |
| Television Digital Converter (APPLIANCE) | Provides conversion from the new digital signals transmitted after 01/01/2009 to the analogue signals tunable by the majority of older existing Televisions. | 1 | CP |
| Telephone credit card | Work Release Facilities only. May not contain any magnetic strip, bar code, or "smart card" technology. | 1 | CP |
| Thermos Jug | Work release only. | 1 | 5.00 |
| Thesaurus | In addition to book limitation. | 1 | |
| Ties | Work release only. | 5 | 25.00 Total |
| Tissues | | CL | CP |

| Tooth Polish | | 2 & CL | CP |
|---|---|---|---|
| Toothbrush | | 2 & CL | CP |
| Toothbrush Box | | 2 & CL | CP |
| Toothpaste, Tube | | 2 & CL | CP |
| Towel, Bath | Non-white; work release residents only. | 5 | 25.00 Total |
| Towel, Hand | Non-white; work release residents only. | 5 | 15.00 total |
| Towel, Wash Cloth | Non-white; work release residents only. | 5 | 10.00 Total |
| Towel, Wash Cloth | Non-white, 12´x 12" maximum size; non-work release residents, no red, blue, or green. | 2 | CP |
| Tweezers | | 1 | CP |
| Typewriter (APPLIANCE) | Electric or manual; non-memory type only. | 1 | CP |
| Under Pants | Work release females only, briefs only. | 10 | 30.00 Total |
| Underwear (Boxer Shorts) | Males only. Transferable. | 6 pair | CP |
| Underwear, Insulated | | 3 pair | 86.00 Total |
| Umbrella | Work release only. | 1 | 10.00 |
| Vitamins/Nutritional Supplements | Multi-purpose vitamins; type and brand authorized by Health Authority. Nutritional supplements of a type, composition and manufacture as specified by the Deputy Secretary of Facilities Management / designee. | CL | CP |
| Wave Caps | White or Black only. | CL | CP |
| Wedding Band | Plain, no stone. | 1 | 50.00 |
| Wig | As determined to be medically necessary by the Health Authority. | 1 | as prescribed |
| Wristwatch | No stones. | 1 | 50.00 |
| Yarn, Skein | | CL | CP |

Attachment C, IMPP 12-120A
Effective 08-09-2021

## THE FOLLOWING ITEMS MAY BE TRANSFERRED WITH
## RESIDENTS TO LARNED STATE SECURITY HOSPITAL

PERSONAL ITEMS RESIDENTS/PATIENTS MAY HAVE: Shaving lotion, hair-dressing, shampoo, deodorant (no stick deodorant).  ALL OF THESE ITEMS MUST BE LIMITED TO REASONABLE AMOUNTS and ALL MUST BE IN PLASTIC CONTAINERS.

      One (1) Electric Razor, one (1) Small Comb, one (1) Toothbrush, Toothpaste (in tube only).

      Two (2) Books, three (3) Magazines, one (1) Pen or Pencil (must be less than four [4] inches long), a reasonable amount of paper or stationery, postage stamps (any denomination up to and including that which is required to mail a one ounce First Class letter, not more than 25 stamps at one time).

      One (1) Battery-powered Radio (must have earphone-jack but no antenna), four (4) Extra Batteries.

      One (1) Small Religious Medal (no chain).

DO NOT SEND ANY FOOD ITEMS, OR ANY TOILET ARTICLES OR GROOMING AIDS THAT HAVE A HIGH ALCOHOL CONTENT.

*IMPP 01-103  RULE BOOK*

*EXHIBIT-9*

## KANSAS DEPARTMENT OF CORRECTIONS

| | **INTERNAL MANAGEMENT POLICY AND PROCEDURE** | **SECTION NUMBER**<br>01-103 | **PAGE NUMBER**<br>1 of 2 |
|---|---|---|---|
| DOC | | **SUBJECT:**<br>ADMINISTRATION: Inmate Rule Book Distribution and Translation. | |

| **Approved By:** | **Original Date Issued:** | 03-22-02 |
|---|---|---|
| Secretary of Corrections | **Current Amendment Effective:** | 07-28-06 |
| | **Replaces Amendment Issued:** | 05-07-04 |

| **Reissued By:** | The substantive content of this IMPP has been reissued as per the appropriate provisions of IMPP 01-101. The only modifications within the reissue of this document concern technical revisions of a non substantive nature. | |
|---|---|---|
| Policy & Procedure Coordinator | **Date Reissued:** | 08-12-11 |

### POLICY

Upon admission to the facility, each inmate shall be given a copy of the Department of Corrections' inmate rule book. A copy shall be made available to each staff member in either paper or electronic version.

### DEFINITIONS

None

### PROCEDURES

I.  **Translation**

    A.  When a literacy or language problem prevents an inmate from understanding the rule book, a staff member or translator shall assist the inmate in understanding the rules.

        1.  To the extent practical, a translation may be made for anyone whose language is other than English.

        2.  A translation shall be made for any language spoken by significant numbers of inmates.

            a.  An oral or written translation may be made available at the discretion of the warden.

    B.  The explanation or translation of the rules to the inmate upon admission shall be such as to reasonably result in adequate comprehension within the capability of the inmate.

    C.  An audio version of the Department of Corrections' inmate rule book shall be available in each library or branch library for reference use by inmates.

II.  **Statement of Receipt of Rule Book**

    A.  If an inmate cannot read or understand English, that inmate shall be required to sign a statement that the inmate has received a rule book and that it has been explained to the inmate.

III.  **Content and Distribution of Rule Book**

    A.  The inmate rule book shall be a reprint of the regulations of the Secretary of Corrections articles 44-12, 44-13, 44-15 and 44-16.

    B.  At least two complete sets of the regulations of the Secretary of Corrections in either paper or electronic version [i.e.: K.A.R. 44-1-101 et. seq. through K.A.R. 44-16-101 et. seq.] shall be available in each library or branch library for reference use by inmates.

**NOTE:** The policy and procedures set forth herein are intended to establish directives and guidelines for staff and offenders and those entities that are contractually bound to adhere to them. They are not intended to establish State created liberty interests for employees or offenders, or an independent duty owed by the Department of Corrections to employees, offenders, or third parties. Similarly, those references to the standards of various accrediting entities as may be contained within this document are included solely to manifest the commonality of purpose and direction as shared by the content of this document and the content of the referenced standards. Any such references within this document neither imply accredited status by a Departmental facility or organizational unit, nor indicate compliance with the standards so cited. The policy and procedures contained within this document are intended to be compliant with all applicable statutes and/or regulatory requirements of the Federal Government and the state of Kansas This policy and procedure is not intended to establish or create new constitutional rights or to enlarge or expand upon existing constitutional rights or duties.

### REPORTS REQUIRED

None.

### REFERENCES

KSA 75-5210, 75-5210(f), 75-5251, 75-5252

### ATTACHMENTS

None



## KANSAS DEPARTMENT OF CORRECTIONS



| DOC | INTERNAL MANAGEMENT POLICY AND PROCEDURE | SECTION NUMBER 10-107 | PAGE NUMBER 1 of 3 |
|---|---|---|---|
| | | SUBJECT: PROGRAMS AND SERVICES: Library Facilities, Holdings, and Services | |

| Approved By: | | |
|---|---|---|
| *[signature]* Acting Secretary of Corrections | Original Date Issued: | 08-15-82 |
| | Current Amendment Effective: | 11-07-02 |
| | Replaces Amendment Issued: | 01-07-01 |
| Reissued By: *[signature]* Policy & Procedure Coordinator | The substantive content of this IMPP has been reissued as per the appropriate provisions of IMPP 01-101. The only modifications within the reissue of this document concern technical revisions of a non substantive nature. Date Reissued: 01-07-11 | |

### POLICY

To provide for the rehabilitation interests, access to court materials, and to provide positive activity, each facility shall maintain and/or provide access to library resources and services to allow inmates an appropriate range of religious, educational, vocational, recreational, and legal material. (ACI 3-4423)

Library materials shall be selected to meet the educational, informational, and recreational needs of the inmate population. (ACI 3-4450) Procedures shall be established to ensure the availability of a reference collection containing general and specialized material, with the planned and continuous acquisition of materials to meet the needs of staff and inmates. (ACI 3-4447) Facilities shall establish procedures for participation in interlibrary loan programs and coordination with local libraries to supplement the materials available through the library. (ACI 3-4451)

Access to the library facilities and/or library services shall be available daily, including evenings and weekends. When restrictions are necessary for the safe and secure operation of the facility, procedures shall provide for access to library services for all inmates, including access to legal materials and reading materials for inmates in segregation. (ACI 3-4256; 3-4257) The hours of availability and procedures to access the library services shall be made available to all inmates.

Library services shall be coordinated and supervised by qualified staff assisted by a person with a master of library science who shall be responsible to provide training for all library staff. (ACI 3-4448; 3-4449) Procedures shall be developed to provide for the selection, training, and use of volunteer and/or inmate library assistants. (ACI 3-4453)

Neither inmate patrons of a library nor inmate library assistants shall be permitted either INTERNET access or access to devices affording INTERNET access.

### DEFINITIONS

Access: Ability to enter into and/or use the facility, equipment, or environmental surroundings of the library and its holdings, or the means by which library services and materials are made available.

Comprehensive library resources: Materials and services that include a reference collection containing general and specialized materials to meet the education, informational, and recreational needs of the inmate population.

Library services: Assistance provided by the library staff in locating books, documents, or reference materials either within the library holdings or through outside resources.

### PROCEDURES

I.    **Access to Library Services**

    A.   Library services shall be accessible daily, including evenings and weekends. (ACI 3-4452)

          1.   Hours of operation shall be posted.

    B.   In facility areas where direct access to the library is restricted due to security or other considerations (administrative and disciplinary segregation, infirmary, etc.), provisions shall be made to provide inmates an opportunity to have access to legal reference materials and to borrow reading materials from the facility library. (ACI 3-4256; 3-4257; 3-4261; 3-4264)

II.   **Law Library**

    A.   Each facility shall establish space within the facility or otherwise provide access to:

          1.   State and federal constitutions;

          2.   State statutes and decisions;

          3.   Procedural rules and decisions and related commentaries;

          4.   Federal case law materials;

          5.   Court rules and practice treatises;

          6.   Selected legal periodicals and indexes;

          7.   KDOC Inmate Rule Book;

          8.   IMPPs and general orders which are not restricted to staff use only; and,

          9.   Regulations of the Secretary (two copies).

    B.   The management and control of legal materials shall be established by orders of the warden.

III.  **Religious Reading**

    A.   One or more copies of the Bible or the main texts of other religious doctrines shall be either maintained in the religious reading section of the library, or made available by other means. Such copies may be made available for inmates to check out, for a limited time, according to library procedures.

    B.   Other religious materials may be made available, but may be limited in numbers and amounts.

    C.   Any religious material in the religious reading section of the library shall be approved by the facility chaplain or warden's designee, per IMPP 10-110.

IV.   **General Orders**

    A.   Facility general orders shall provide for:

          1.   Selection, training, and use of inmates as library assistants. (ACI 3-4453)

          2.   Control of holdings and supervision of library area.

          3.   A description of library services, holdings availability, general access information, and possession limits.

          4.   Principles, purpose, and criterion used in the selection and maintenance of library materials. (ACI 3-4450)

              a.   Procedures for the assessment of inmate interest, recommendations by program staff to support academic, vocational, or self-help topics, etc., shall be included.

          5.   Access to supplies, services, and assistance in legal matters.

**NOTE:** The policy and procedures set forth herein are intended to establish directives and guidelines for staff and offenders and those entities who are contractually bound to adhere to them. They are not intended to establish State created liberty interests for employees or offenders, or an independent duty owed by the Department of Corrections to either employees, offenders, or third parties. Similarly, those references to the standards of various accrediting entities may be contained within this document are included solely to manifest the commonality of purpose and direction as shared by the content of the document and the content of the referenced standards. Any such references within this document neither imply accredited status by a Departmental facility or organizational unit, nor indicate compliance with the standards so cited. The policy and procedures contained within this document are intended to be compliant with all applicable statutes and/or regulatory requirements of the Federal Government and the state of Kansas. This policy and procedure is not intended to establish or create new constitutional rights or to enlarge or expand upon existing constitutional rights or duties.

### REPORTS REQUIRED

None.

### REFERENCES

K.A.R. 4-7-113, 44-12-701
ACO 2-5F-01
IMPP 10-110
ACI 3-4256, 3-4257, 3-4423, 3-4447, 3-4448, 3-4449, 3-4450, 3-4451, 3-4453

### ATTACHMENTS

None.

01-101D

EXHIBIT-9

DOUBLE SIDED

# Kansas
Department of Corrections

## IMPP DEVELOPMENT GUIDE

All KDOC IMPPs must be written according to the procedures and standard formats outlined in this guide.

**Policy Formatting Requirements**

I.   **Margins**

    A.   Policies must be drafted for a standard 8.5" x 11" page using .75" for the left margin, .7" for the right margin, and top margin of .4" and bottom margins of .8". Except for section hearings, captions and page headers, text must be black Arial 10 pt., right-justified.

II.  **First Page Header**

1. **Kansas** 2 **Internal Management Policy & Procedure**
Department of Corrections

3 Applicability: ☐ Adult Operation Only   ☐ JUVENILE Operations Only   ☐ DEPARTMENT-WIDE

---

4 IMPP #:                                                 5 PAGE #:

6 [CHAPTER and SUBJECT]

7a Original Date Issued: _____   7b Replaces IMPP Issued: _____   7c CURRENT EFFECTIVE DATE: ____

8 Approved By: _____, Secretary   9 Next Scheduled Review: mm/yyyy

---

    A.   The header must include:

        1.   The Kansas Department of Corrections (KDOC) Logo;

        2.   Title – Internal Management Policy & Procedure

        3.   Applicability: The applicability of the policy must be indicated by a capital letter "X" in bright red font

        4.   IMPP #: The first two (2) digits identify the policy chapter number, followed by the sequential number of the policy within the chapter. Every IMPP number must be followed by a letter as follows:

            a.   **XX-XXXA** – policy applies to **ADULT** Operations Only
            b.   **XX-XXXJ** – policy applies only to **JUVENILE** Operations Only
            c.   **XX-XXXD** – policy applies to **DEPARTMENT-WIDE** operations

        5.   Page #: The number of pages, excluding attachments, in the policy.

      6.   Chapter and Subject:  The policy chapter title must be entered in all capital letters, following by the policy title.  Policy titles must be presented using the Title Case.  Policy titles are to be concise.  Do not include the words "CHAPTER and SUBJECT".

      7.   Issued Dates:

        a.   Original Date Issued

        b.   Replaces IMPP Issued date, and

        c.   Current Effective Date.

      8.   Signature line for the Secretary.

      9.   Next scheduled review.

III.  **POLICY STATEMENT**

    A.   The "POLICY STATEMENT" must state what action is to be taken and the rationale for the policy by using several short and complete sentences instead of long, complex ones.

      1.   Policy Statements must be limited to two (2) or four (4) sentences and must not include procedures.

IV.  **DEFINITION(S)**

    A.   The "DEFINITION" section contains only those key words or phrases used within the IMPP to be defined that:

      1.   Are not commonly understood;

      2.   Need further explanation; or

      3.   Have a specific meaning.

    B.   The Online Policy Glossary provides guidance for terms to be used in policies and is available on the department's intranet under the IMPP page.

      1.   Where an acceptable definition is already in use in existing policies, that definition must be used in a new or revised policy.

    C.   Words or phrases being defined must be written in Title Case, underlined, and followed by a colon which is not underlined, and two (2) spaces, followed by the definition.

      1.   Definitions are to be in complete sentences, if applicable, but must not include procedures.

      2.   Examples:

        a.   <u>Bona Fide Occupational Qualification (BFOQ):</u>  For purposes of this policy, any prerequisite that has been demonstrated valid as a minimum qualification for assignment to a specific post and is reasonably necessary to the normal operation of the facility or office in compliance with the provisions of Title VII.

        b.   <u>Manager of Equal Employment Opportunity (EEO) and Affirmative Action (AA):</u>  The staff member assigned to the Central Office Human Resources Division who is responsible for the administration of the Department's EEO and AA Programs.

    D.   If no definitions are necessary, state "None."

---

V.   **PROCEDURES**

    A.   The "PROCEDURES" section must outline in detail the procedures to be followed.

      1.   Procedures must be presented in outline style to provide clear and concise standards of communication in the following outline format:

I.   **Major topic (Upper case Roman numerals) in bold print.**

    A.   (Upper case letters)

      1.   (Arabic numerals)

        a.   (Lowercase letters)

          (1)   (Arabic numbers inside parentheses)

            (a)   (Lowercase letters inside parentheses)

              i.   (Lowercase Roman numerals)

    B.   Each outline level must be single-spaced, with double spacing between outline levels.

      1.   Each outline level must be indented five (5) spaces, and text must begin five (5) spaces after the outline number.

        a.   Use margin and tab settings to indent, not the space bar.

        b.   Do not use periods after or within parentheses when numbering outline levels.

    C.   Procedures must be in direct, simple, complete sentences stating the specific actions to be taken (how) and by whom.

      1.   Indicate the individual or unit responsible for the action and state the extent to which discretion is allowed.

        a.   Use descriptive titles (e.g. "chief of security)

      2.   Procedures must be written in an "active voice", using the terms "must" and "must not" to indicate what is mandatory.

        a.   To indicate that a procedure is permissive and allows for discretion, use the term "may".

        b.   Avoid the use of the terms "will" and "should".

        c.   To avoid creating legal rights, include provisions for exceptional circumstances.

      3.   Use the terms like:

        a.   "Facility"; not "institution", "institutional", or "prison".

        b.   "Corrections" or "correctional"; not "penal".

        c.   "Offender; not "inmate", "juvenile", "youth", or "resident".

    D.   Applicability Exceptions

      1.   In some instances, a policy will generally be applicable to all operations of the Department, but a specific provision will require different treatment for adult and juvenile operations.

---

        a.   In such cases, the procedures relating to adult operations must be set forth first, preceded by the word "ADULT" in bold capital letters.

        b.   The procedures relating to juvenile operations must be set forth in the subsection after the adult provision, preceded by the word "JUVENILE" in bold capital letters.

        c.   Example:

      1.   Text of general policy provision.

        a.   **ADULT:**  text of the adult-specific version of the policy provision.

          (1)   Include any subsections applicable to adult procedures.

        b.   **JUVENILE:**  Text of the juvenile-specific version of the policy provision.

          (1)   Include any subsections applicable to juvenile operations.

    E.   "Exclusive Policy" Provision

      1.   If the policy can serve as policy for all KDOC facilities without allowances for facility differences, the following statement must be included, in bold print, as the final Roman numeral topic at the end of the "PROCEDURES" section:

        a.   **"VII.     This IMPP must serve as final policy in all departmental facilities, and no General Orders must be allowed on this subject."**

VI.  **NOTE section**

    A.   The following "NOTE" must follow the "PROCEDURES" section of all policies:

"**NOTE:**  The policy and procedures set forth herein are intended to establish directives and guidelines for staff and offenders and those entities who are contractually bound to adhere to them.  They are not intended to establish State created liberty interests for employees or offenders, or an independent duty owed by the Department of Corrections to employees, offenders, or third parties.  Similarly, those references to standards of various accrediting entities as may be contained within this document are included solely to manifest the commonality of purpose and direction as shared by the content of this document and the content of the referenced standards.  Any such references within this document neither imply accredited status by a departmental facility or organizational unit, nor indicate compliance with the standards so cited.  The policy and procedures contained within this document are intended to be compliant with all applicable statutes and/or regulatory requirements of the Federal Government and the State of Kansas.  This policy and procedure is not intended to establish or create new constitutional rights or to enlarge or expand upon existing constitutional rights or duties."

VII. **REPORT(S)**

    A.   Any report(s) that are required on a regular basis must be listed in this section.

      1.   Specify the report, who is responsible for preparation of the report, to whom the report is submitted to, and the time schedule for the required report.

        a.   Example:

| Name/Type of Report | By Whom/To Whom | Due |
|---|---|---|
| Maintenance Inspection Sheet | Chief of Security to Appointing Authority | Monthly |

    B.   If no reports are required, state "None."

## POLICY REVIEW WORKSHEET and POLICY REVISION COVER SHEET

**Please complete and submit this document.** Use additional pages if needed. The information provided will assist in the annual review and processing of the policy; it will be shared with the System Management Team members who review the proposal for a new policy, revision of the current policy or the revocation of the policy; it will be presented to the Secretary when the final version of the policy is submitted for signature; and it will be added to the IMPP history file.

**IMPP #:** _____ **STAFF READ ONLY:** ☐ Yes ☐ No **Date Reviewed:** _____

**Chapter and Subject:**

**PART A. POLICY REVIEW WORKSHEET:** ☐ New Policy ☐ Annual Review

**Name(s) of Person(s) Conducting the Review:**

### SECTION I. POLICY REVIEW QUESTIONS

| A.  NEED | N/A | Yes | No |
|---|---|---|---|
| Is the policy necessary to comply with statues, regulations, rules, standards? | | | |
| Is the policy obsolete, duplicative, or ambiguous to a degree that warrants repeal or revision? | | | |
| Is the policy broader than necessary to accomplish its purpose or objective? | | | |
| Is the policy suitable for placement in a new or existing IMPP? | | | |
| COMMENTS: | | | |

| B.  CLARITY | N/A | Yes | No |
|---|---|---|---|
| Is the policy written and organized in a clear and concise manner, so it can be readily understood by those to whom it applies? | | | |
| Is the policy too long (exceeds eight [8] pages excluding attachments)? | | | |
| COMMENTS: | | | |

| C.  COSTS | N/A | Yes | No |
|---|---|---|---|
| Have the benefits of the policy been considered in relation to its costs? | | | |
| Do the benefits of the policy exceed the costs of the policy? | | | |
| COMMENTS: | | | |

| D.  FAIRNESS | N/A | Yes | No |
|---|---|---|---|
| Does the policy result in equitable treatment of those required to comply with it and those affected by the policy in other ways? | | | |
| Has the policy been effective in achieving the purpose for which it was established? | | | |
| COMMENTS: | | | |

| E.  EFFECTIVENESS | | | |
|---|---|---|---|
| Has the policy been effective in achieving the purpose for which it was established? | N/A | Yes | No |
| COMMENTS: | | | |

### SECTION II. POLICY REVIEW TEAM DECISION

| Policy needs to be: | Revised | Revoked | No Revisions Needed at This Time |
|---|---|---|---|

---

**PART B.  POLICY REVISION COVER SHEET:** ☐ New Policy ☐ Policy Revision ☐ Revocation

| Endorsing Management Team Member: | | Endorsing Management Team Member's Signature: | |
|---|---|---|---|
| Policy Review Team Chairperson | | Telephone No.: | |

### SECTION III.  POLICY REVISION QUESTIONS

| A.  RELATED POLICIES | N/A | Yes | No |
|---|---|---|---|
| Are there any related policies that will be impacted by the revisions being proposed to this policy? | | | |
| If "Yes", list all related policies and how the proposed revision(s) will impact them. | | | |

**B.  SUMMARY.** Provide a summary describing the nature of the proposed revision(s) and the reason(s) for revising the policy.

**C.  RATIONALE FOR PROPOSED REVISION(S).** For each section of the policy, provide details about proposed revisions.

| 1.  POLICY STATEMENT. | N/A | Yes | No |
|---|---|---|---|
| Has the mission of the Department changed such that the current POLICY is either inadequate or inaccurate? | | | |
| Is the current IMPP inadequate as to performing the required functions indicated within the POLICY? | | | |
| If "Yes" to either of the above questions, explain why the POLICY STATEMENT needs to be revised, the desired result and the consequence(s) of not making the proposed revisions. | | | |

| 2.  DEFINITIONS | N/A | Yes | No |
|---|---|---|---|
| Do the DEFINITIONS within the IMPP require revision? | | | |
| Are new DEFINITIONS required? | | | |
| Was the Department's Online IMPP Glossary searched for existing DEFINITIONS? | | | |
| Explain why new or revised DEFINITIONS are needed. | | | |

| 3.  PROCEDURES | N/A | Yes | No |
|---|---|---|---|
| Do existing PROCEDURES need revising? | | | |
| Are new PROCEDURES required? | | | |
| If "Yes" to either of the above questions, describe what would be achieved by implementing the proposed changes. | | | |

| 4.  REPORTS | N/A | Yes | No |
|---|---|---|---|
| Do existing REPORTS need to be modified? | | | |
| Are additional REPORTS required? | | | |
| If "Yes" to either of the above questions, described what would be achieved by implementing the proposed revisions and the consequence(s) for not doing so. | | | |

| 5.  ATTACHMENTS | N/A | Yes | No |
|---|---|---|---|
| Do ATTACHMENTS need to be revised? | | | |
| Are new ATTACHMENTS required? | | | |
| If "Yes" to either of the above questions, describe what would be achieved by implementing the proposed revision(s) and the consequence(s) of not doing so. | | | |

---



# Kansas
Department of Corrections

# INTERNAL MANAGEMENT POLICY & PROCEDURE

## Policy Memorandum[1]

| **Policy Issuance #:** | ☐ Is STAFF READ ONLY | ☐ Is for Both Staff and Offenders |
|---|---|---|

**Effective Date:** _____ **Expiration Date[2] (required):** _____

☐ Addresses subject matter for which an IMPP will be forthcoming and assigned to Chapter ___ of the IMPP manual.

☐ Amends or modifies existing IMPP #

☐ Elaborates on the contents of IMPP #

_____     _____
Secretary of Corrections                  Date

[1]Note: To keep your IMPP Manual current, please place this Policy Memorandum in your manual at the appropriate location. If the memorandum addresses subject matter for which an IMPP will be forthcoming, place this issuance before the first IMPP in the Chapter indicated. If the memorandum addresses an existing IMPP, the issuance should be placed in front of the existing policy. If this memorandum is for both staff and offenders, it shall be immediately posted.

[2]Unless another Policy Memorandum or IMPP on this subject is issued, the requirements contained herein have no force and effect after the indicated expiration date.

---

# Kansas
Department of Corrections

# INTERNAL MANAGEMENT POLICY & PROCEDURE

**Applicability:** ☐ Adult Operation Only ☐ JUVENILE Operations Only ☐ DEPARTMENT-WIDE

**IMPP #:** _____ **PAGE #:** _____

**(CHAPTER & SUBJECT)**

### STATEMENT OF ANNUAL REVIEW

The above-referenced IMPP issued effective __-__-__ was reviewed during the month of MM/YYYY in accordance with IMPP 01-101D. At the time of this annual review, the Policy Review Team determined:

No change and/or modification to this IMPP is necessary at this time and this IMPP shall remain in effect as issued on the above stated date.

The next scheduled review of this IMPP is MM/YYYY.

This Statement of Annual Review Shall be placed in front of the referenced IMPP in all policy manuals.

_____     _____
Policy Review Team Chairperson          Date

_____     _____
Endorsing Management Team Member        Date

_____     _____
Secretary of Corrections                Date

11-106A

EXHIBIT 1

DON RIE STEED

11-106A

# Kansas
**Department of Corrections**

## INTERNAL MANAGEMENT POLICY & PROCEDURE

**Applicability:** [X] Adult Operation Only  [ ] JUVENILE Operations Only  [ ] DEPARTMENT-WIDE

**IMPP #:** 11-106A                                                              **PAGE #:** 1 of 7

**DECISION MAKING:** Facility Case Management

**Original Date Issued:** 02-19-20    **Replaces IMPP Issued:** N/A    **CURRENT EFFECTIVE DATE:** 02-19-20

**Approved By:** _(signature)_ , **Secretary**    **Next Scheduled Review:** February 2021

## POLICY

Unit Team Counselors must provide case management to all offenders, which includes developing a recidivism-reduction case plan, and managing custody and classification issues.

## DEFINITIONS

**Case Management:** The overall management of the case including addressing recidivism-reduction through a case plan with goals and addressing all custody and classification issues.

**Case Plan:** A set of goals and steps to address risk/need areas with an offender to reduce the risk of that offender recidivating in the future that includes using motivational interviewing, assessing motivation and readiness, and guiding the offender to participate in risk/recidivism-reduction programs and services with progress tracked and recorded.

**Case Review:** The process of the Unit Team Counselor reviewing the status of the case on various issues related to risk reduction, risk containment, custody and classification.

**Custody Classification:** A process to assess the level of danger an offender poses to correctional security or to the community in the event of authorized or unauthorized access to the public. Custody classification is conducted through the use of objective criteria established in the Inmate Custody Classification Manual.

**Program Management Committee:** Senior level staff at the facility chaired by the Warden or designee who makes decisions about custody, movement, and other critical security and risk containment issues.

## PROCEDURES

### I.   Case Management

A.   Each offender admitted to the KDOC must participate at the Reception and Diagnostic Unit (RDU)

Section III. below provides an opportunity to check progress and ensure that the case plan is moving forward.

(a)   If the offender has five (5) years four (4) months or more to serve, and/or is low risk/need, and the case plan does not need to progress as quickly, the case plan updates must occur less frequently than every 120 days.

(b)   If the offender has less than five (5) years four (4) months to serve, and/or is higher risk/need, progress on the plan needs to occur more quickly, and review of the case plan must occur at least every 120 days, and more often if needed to ensure the plan is completed before release.

B.   Awarding and withholding good time credits must be in accordance with K.A.R. 44-6-115a.

1.   The "assigned programs" for purposes of K.A.R. 44-6-115a(e) must be:

a.   Sex offender program (SOP), unless the provider has determined the offender is low risk enough to not require SOP or to get SOP in the community, or unless the offender lacks sufficient time at admission to serve to complete SOP in prison.

b.   Any program the Unit Team Counselor has included in the case plan.

2.   Any other program the offender enrolls in must be voluntary and must not be considered an "assigned program" for purposes of K.A.R. 44-6-115a(e).

### III.   Case Review, Custody & Classification

A.   Each case must have a regularly scheduled case review, which must occur:

1.   Every 120 days for offenders with less than five (5) years four (4) months to serve.

2.   Annually for offenders with five (5) years four (4) months or more to serve.

B.   After the initial custody classification at admission, each offender's case must be reviewed for custody at the offender's regularly scheduled case review, for all custodies except minimum, which must be event driven.

1.   It is in the Warden's discretion whether to make any classification decision (custody, housing, visitation, etc.) part of the case review process, or to make other arrangements for custody review of all cases.

2.   Custody reviews must occur outside of regularly scheduled reviews at any other time when the circumstances warrant, including;

a.   readmission as a violator,

---

orientation completed by the facility/unit is finished, within seven (7) days the offender must be assigned a Unit Team Counselor.

C.   The assigned Unit Team Counselor must be responsible for case management with the offender, which must include developing a risk/recidivism-reduction case plan, updating custody and classification, and conducting periodic case reviews. The risk/recidivism-reduction work must be coordinated with custody and classification, and the case review must be used to address all aspects of the case.

### II.   Case Planning

A.   When a Unit Team Counselor is assigned a case, that Counselor must review the electronic master file, risk/need profile of the offender, recommendations from RDU, and in consideration of the offender's time to serve, status as a known aggressor or known victim per the screening at admission under IMPP 10-139D related to sexual abusiveness and victimization, risk or recidivating (LSI-R risk level), areas of risk/need per the LSI-R and RDU, custody, classification, level of motivation and ability, develop a recidivism-reduction case plan for all moderate (19-31 on LSI-R) and high (32+) risk offenders. The case plan is opened, and work is to begin on the case plan within 30 days of the case assignment. (The 120-day review process must suffice for low risk offenders, remembering that the focus is on reinforcing pro-social and sustained employment.)

1.   The RDU LSI-R score must be used to develop the case plan. Except, if the offender did not receive an LSI-R at the most recent admission, due to the length of his/her current incarceration, the Unit Team Counselor must rely upon the most recent LSI-R available. If no LSI-R has ever been completed on the offender, an LSI-R must be completed by a certified assessor.

2.   The program plan must be used as recommendations, but in the course of case planning, different programs may be accessed for advancing the case plan when appropriate.

3.   When establishing case plans, the criteria for placement in offender programs per IMPPs 10-101A, 10-102D, 10-104D, 10-108 and 10-109A may provide guidance. However, ultimately referrals to programs and services to advance recidivism-reduction plans must be based upon the offender's current risk/need.

4.   Based on the case plan, the Unit Team Counselor must make referrals to programs and services as needed, working with program providers to get the offender enrolled; helping to keep the offender motivated and engaged; and addressing progress or issues that arise during the course of the program or service. When making program referrals, the offender's status as a known aggressor or known victim per the screening at admission under IMPP 10-139D must be considered.

5.   The case plan must be prepared using the electronic Case Plan in TOADS.

a.   When the Unit Team Counselor meets with the offender to work on the plan, progress notes must be made in the plan reflecting updates.

i.   receipt of a new journal entry,

j.   incentive level change (up or down),

k.   change in mental health level or diagnosis or special management status,

l.   transfer to a new living unit/facility, or

m.   for any other reason the facility deems appropriate.

3.   Within 72 hours after receiving a custody classification decision, the offender may appeal the decision to the Warden by submitting the appeal through the Unit Team Counselor on a Form-9.

a.   If the Warden did not participate in the custody classification decision, the Warden must review the decision and the offender's written appeal and return a written response to the offender within 15 working days of receipt.

b.   If the Warden was a participant in the custody classification decision, the offender's appeal must be forwarded to the Deputy Secretary of Facilities Management or designee for review, who must return a written response to the offender within 15 working days of receipt.

c.   The decision of the Warden or Deputy Secretary or designee is final.

C.   At the case review described in Section III.A. above, in addition to addressing custody, the Unit Team Counselor must address:

1.   Ensuring job and program assignments are made consistent with IMPP 10-139D, related to sexual victimization and abusiveness.

a.   When an offender has been identified as a known aggressor or known victim per the screening for sexual abuse and victimization pursuant to IMPP 10-139D, the Counselor must take that into consideration in making and reviewing housing, job and program assignments.

(1)   A chronological entry must be made in TOADS at the time of the case review, which specifically reflects that known aggressor or known victim status was considered when such occurs and impacts housing, job or program placement.

2.   Good time award. Annual good time awards must be submitted as three (3) separate 120-day awards, which may be completed on an annual schedule.

3.   Updates to emergency notification, disposition of deceased body, telephone list and visiting list.

11-106A

11-106A

### Role Clarification

1. Identify the KDOC goals; public safety offender change.

2. Ask offender what he hopes to accomplish while under supervision

3. Identify what you hope to accomplish with/for this offender.

4. Define the supervision process; conditions of supervision; negotiable/non-negotiable situations; role of offender, officer, or provider and other MDT members in parole process.

### Behavioral Analysis

1. Explain the document to the offender.

2. Have the offender complete the document.

3. Review the completed document.

4. Interview the offender.

5. Ask the offender what trends he sees and whether the results help identify anything he would like to work on.

6. Begin developing, with the offender, targets to change in an effort to reduce risk.

### RACE

Recognize, Avoid, Cope, Evaluate

1. Recognize – Identify one high-risk person, place, or thing related to the Behavioral Analysis Chart.

2. Develop an action plan to avoid the high-risk influence-not a passive process.

3. Develop an action plan for coping with high-risk influence if that influence cannot be avoided

4. Evaluate the outcome.

### CHART

Check-in, Homework, Assess and Apply, Reinforce Teach

1. Check-in: any crisis situations that need to be addressed.

2. Homework: review of any homework assignments.

3. Assess & Apply: help the offender identify foreseeable real-life situations in which the offender can use the skill.

4. Reinforce: reinforce any progress the offender has made

5. Teach: corrective feedback and/or structured learning.

### Effective Use of Reinforcement

1. Tell the offender what they did that you like and why it is important.

2. Ask the offender to describe the short- and long-term benefits of continuing to use the behavior you are discussing.

3. Contract with the offender to use the skill/behavior you are discussing in the future again.

### Effective Use of Disapproval

1. Identify inappropriate behavior, tell offender in an objective manner that you disapprove of what was said or done.

2. Ask the offender to explore the short- and long-term consequences of continuing to engage in that behavior.

3. Ask the offender to identify and discuss pro-social alternatives that could replace the unacceptable behavior.

4. Contract with the offender to use the pro-social alternative in the future.

─────── If intervention is administered add steps 5 and 6 ───────

5. Tell the offender what the consequences will be.

6. Deliver the consequences.

IMPP 04-119D GRANTS-LAW   EXHIBIT-4

# KANSAS DEPARTMENT OF CORRECTIONS

| Kansas Department of Corrections | **INTERNAL MANAGEMENT POLICY AND PROCEDURE** | **SECTION NUMBER** 04-119D | **PAGE NUMBER** 1 of 10 |
|---|---|---|---|
| | | **SUBJECT:** FISCAL: Federal Grant Management and Oversight | |
| Approved By: *Ray Roberts* | | **Original Date Issued:** 07-30-15 | |
| Secretary of Corrections | | **Replaces Version Issued:** N/A | |
| | | **CURRENT VERSION EFFECTIVE:** | 07-30-15 |

| **APPLICABILITY:** | _ ADULT Operations Only | _ JUVENILE Operations Only | X DEPARTMENT-WIDE |
|---|---|---|---|

## POLICY STATEMENT

The Kansas Department of Corrections (KDOC) shall maintain fiscal and programmatic accountability of all federal funds, property and other assets awarded to KDOC in accordance with all applicable federal Office of Management and Budget Circulars, regulations, statutes, and awarding agency financial guidelines in addition to KDOC Internal Management Policy and Procedures and the Kansas Department of Administrations Policy and Procedure Manual.

## DEFINITIONS

**Allowable Cost:** Costs allowable under a federal grant program and are governed by cost principles of the Office of Management and Budget (OMB), Code of Federal Regulations (CFR), and Kansas Department of Administration and KDOC policies and procedures.

**Closeout:** The process in which the awarding agency determines that all applicable administrating actions and all required work of the award have been completed by the recipient and sub-recipients.

**Consultant:** An individual who provides professional advice or services.

**Contract:** An agreement between an entity and KDOC for the provision of goods or services.

**Contractor:** An entity that provides goods and services for KDOC.

**Drawdown:** The payment of grants fund by the awarding agency to KDOC.

**Grant Adjustment Notification (GAN):** A request to the federal awarding agency to make programmatic, administrative and/or financial change to a federal award. This is done electronically using the Federal Grant Management System (GMS).

**Grant Specialist:** The Fiscal Division staff member responsible for the financial oversight and management of all federal awards received by the Department.

**Official Grant File:** The repository for all official documents for each individual award. Such documentation shall include, but is not limited to, the solicitation, application, bid documents, sole source documentation, award documents, certifications, special conditions, financial reports, program/progress reports, grant adjustments, audit reports, site visit/desk review reports, corrective action plans, and close out documentation.

**Periodic Certification:** Periodic certifications are required in lieu of timesheets when employees work on a single federal award. This certification shall be sign and certified by the employee and supervisors having first-hand knowledge of the grant related work and submitted every six (6) months.

**Program Income:** Gross income earned during the funding period as a direct result of an award. Program income may be used only for allowable program expenses.

**Project Costing:** The module within the SMART system used to track project-related financial, distribution and operational data. Project costing is integrated with other SMART modules, and accumulates a large amount of resource transaction data including payroll, expenses, revenue and assets during the life of the award.

**Program Manager:** The KDOC staff member who is responsible for the implementation and program management of a federal award. The program manager works closing with the grant specialist to ensure that federal funds are used only for those expenditures associated with activities that conform to the goals and objectives approved for the grant.

**Project Period:** The period for which implementation of the federal award or project is authorized.

**SHARP:** State of Kansas Human Resources and Payroll System.

**SMART:** Statewide Management, Accounting and Reporting Tool.

**Sub-grant:** The award of federal funds received by KDOC to any entity which will perform program activities aimed at achieving the goals and objectives of the federal award.

**Sub-recipient:** An entity that KDOC may sub-award federal funds to in order to carry out part of a federal program, but does not include an individual that is a beneficiary of such program. Sub-recipients are required to adhere to applicable laws of their jurisdiction and financial, program and administrative rules set forth by KDOC, DOJ, OCFO guidelines, OMB and CFR's.

**Supplanting:** Deliberately reducing state or local funds because of the availability of federal funds. For example, when state funds are appropriated for a stated purpose and federal funds are then used in place of the appropriated state funds so they may be used elsewhere, supplanting has occurred.

**Un-allowable Cost:** Expenses that cannot be charged against federal funds.

## PROCEDURES

I.  Federal Grant Application

    A.  KDOC and sub-recipients shall follow all applicable statutory and regulatory requirements.

    B.  Prior to applying for a federal grant, the grant application and the federal grant request form (Attachment A) shall be submitted to the Grant Specialist at least 30 working days before application due date for review. The grant application shall include, at a minimum, the following:

        1.  All required federal certifications and assurances shall be completed and submitted with the grant application for fiscal review, including but not limited to:

            a.  Debarment and Suspension Certification;

            b.  Drug Free Workplace;

            c.  Lobbying;

            d.  Equal Employment Opportunity Plan (EEOP);

            e.  Federal Funding Accountability and Transparency Act (FFATA); and

            f.  Any other required certification and assurance listed as part of the federal grant program.

        2.  A Complete Budget and Budget Narrative.

            a.  The budget shall include line items and rounded using whole dollar amounts.

            b.  The narrative shall contain detailed explanations for each line items expense including calculations used and matching requirement.

            c.  When costs are allocated among multiple funding sources, a detailed discussion of the allocation methodology shall be included.

            d.  Travel expenses shall be based on the State of Kansas travel and per diem rates as established by the Kansas Department of Administration. The budget narrative must state that all travel costs are based on the state travel rates.

            e.  When applicable, the source of match funds, whether from state or local funds, shall be clearly identified. The use of matching funds is subject to the same requirements and restrictions as federal funds.

            f.  Any proposed allocation methodology shall be reasonable, attainable, and measurable. Such allocation methodologies include time and labor statistics, and caseloads.

            g.  The name, title, email address and phone number of KDOC program manager that will handle the day-to-day management of program or project.

        3.  Any consultant, contractor and or sub-recipients, if known.

    C.  Allowable and Unallowable Cost.

        1.  All expenditures shall be allowable and follow the applicable Office of Management and Budget cost principles, agency polices, program regulation, and the terms of the grant program.

        2.  Proposed contractual and sub-recipient agreements shall be reasonable, allowable, and necessary to the project.

        3.  The following items are considered unallowable costs:

            a.  Any cost that was not approved by the federal awarding agency;

            b.  Cost incurred outside of the project period;

            c.  Food or beverages;

            d.  Lobbying;

            e.  Fundraising;

            f.  Entertainment;

            g.  Fines and penalties;

            h.  Credit card fees;

            i.  Passport charges;

            j.  Tips;

            k.  Bar charges/alcoholic beverages;

            l.  Membership fees to organizations whose primary activity is lobbying; and

            m.  Supplanting.

II.  Acceptance

    A.  Secretary of Corrections shall be the Authorized Official in the application to indicate full acceptance of all terms and conditions; and shall be the Authorized Official to acceptance the award.

    B.  The Grant Specialist shall be designated as the financial point of contact (FPOC) on all federal awards. The FPOC shall be responsible for the financial administration of the award.

    C.  The Grant Specialist shall, upon receipt of signed award documents, establish in the Statewide Management, Accounting, and Reporting Tool (SMART) a fund, budget unit and project costing ID.

    D.  Upon notification from the federal awarding agency of award approval, the program manager shall forward all signed original award documents to the Grant Specialist, who shall maintain the official grant file.

        1.  The official grant file for each federal award shall include, but is not limited to;

            a.  Application;

            b.  Signed award documents;

            c.  Certification and assurances;

            d.  Special conditions;

            e.  Approved budget and narrative;

            f.  Sub-grantee reports and documentation;

            g.  Bid documentation;

            h.  Sole sources documentation;

            i.  Contracts;

            j.  Financial reports (SFR);

            k.  Program/progress reports;

            l.  Grand adjustments; and

            m.  Closeout documentation

    E.  Current approved budgets from federal awarding agency shall be submitted to the Grant Specialist along with any approved award adjustments before any funding can be expended

III.  Management

    A.  KDOC shall utilize the reporting capabilities of SMART to report on receipts, obligations, and expenditures through project costing and general ledger.

*(Handwritten annotations at top: "IMPP 04-119D GRANTS - LAW", "EXHIBIT - 4". Vertical handwritten left margin: "IMPP 04-119D GRANTS-LAW". Vertical handwritten right margin: "DOUBLE SIDED")*

(3) Review of the sub-grantee's single or program-specific audit for sub-grantees who receive $750,000 or more in federal awards during the sub-grantee's fiscal year. Audit reports must be received within nine months of the close of the sub-grantee's fiscal year.

(4) Review of detailed financial and program data, to include timesheets, time and effort records, invoices, internal controls, validity of cost allocation methodologies, and reconciliation of financial reports to the sub-grantee's general ledger. Such reviews shall be conducted during site visits or as a desk review.

c. Every attempt shall be made to ensure each sub-grantee is reviewed at least once during the award period.

(1) Priority of reviews shall be given to sub-grantees with complex compliance requirements, who receive large dollar amounts, and those sub-grantees that exhibit behaviors which indicate mismanagement, waste, fraud, and/or abuse may be present. Such indicators include:

(a) Reports that are frequently late and/or inaccurate.

(b) Lack of supporting documentation.

(c) Frequent budget adjustments.

(d) Reported expenditures are routinely in equal shares (i.e., quarterly reports show one-fourth of the annual award amount).

(e) Changes in all or a majority of the Official to Sign, Program Manager, and Fiscal Officer.

(f) Inability or unwillingness to provide completed audits.

d. All findings shall be documented in a final report and presented to the sub-grantee. If necessary, the sub-grantee shall prepare a corrective action plan to address any deficiencies.

e. The final report, corrective action plans, progress reports, and any other documentation pertaining to the review shall be retained in the official grant file.

2. Contractors.

a. Contractors shall be monitored to ensure they are in compliance with federal financial management requirements and the terms of the contract.

b. Contractor monitoring shall include:

(1) Review of invoices and supporting documentation to verify costs are reasonable and allocable to federal awards and compliance with the terms of the contract.

(2) Monitoring contractor performance against outcomes outlined in the contract.

(3) Site visits to observe operations.

(4) Regular communication with contractors.

(5) Review of the contractor's single or program-specific audits for contractors who receive $750,000 or more in federal awards during the contractor's fiscal year. Audit reports must be received within nine months of the close of the contractor's fiscal year.

**NOTE:** The policy and procedures set forth herein are intended to establish directives and guidelines for staff and offenders and those entities that are contractually bound to adhere to them. They are not intended to establish State created liberty interests for employees or offenders, or an independent duty owed by the Department of Corrections to employees, offenders, or third parties. Similarly, those references to the standards of various accrediting entities as may be contained within this document are included solely to manifest the commonality of purpose and direction as shared by the content of this document and the content of the referenced standards. Any such references within this document neither imply accredited status by a Departmental facility or organizational unit, nor indicate compliance with the standards so cited. The policy and procedure is not intended to establish or create new constitutional rights or to enlarge or expand upon existing constitutional rights or duties.

**REPORTS REQUIRED**

None.

**REFERENCES**

OMB A-102 Administration Rules
OMB A-87 Cost Principles for State, Local, and Indian Tribal Governments
OMB A-133 Audits
Uniformed Guidance dated December 12, 2014
IMPP 01-105D, 04-114D, 04-116D, 04-117D, 04-118D

**ATTACHMENTS**

| Attachment | Title of Attachment | Page Total |
|---|---|---|
| A | Federal Grant Application Review Form | 1page |
| B | Certification Regarding Lobbying; Debarment, Suspension and Other Responsibility Matters; and Drug-Free Workplace Requirements | 2 pages |
| C | Compliance with the Equal Employment Opportunity Plan (EEOP) Requirements | 2 pages |
| D | Five Most Highly Compensated Officers | 1 page |
| E | Periodic Certification Form | 1 page |

**Bottom-left form:**

**FEDERAL GRANT APPLICATION REVIEW FORM**

Date: _____
Program Division: _____
Submitted by: _____  Email: _____
Name of Federal Agency: _____
Name of Solicitation: _____
Solicitation Number: _____  CFDA # _____
Federal Dollar Amount: $ _____  Match Dollar Amount: $ _____
Due Date of Solicitation: _____  If Funded Time Frame: _____

Explain how will the project be sustained when Federal funding ends:
_____

Will there be any subawards or subgrantees? If so please explain:
_____

Will any contracts or sole sources be required? If so please explain:
_____

Please attached solicitation, application, budget, budget narrative and any supporting documentation.

Date Received by Fiscal: _____  By: _____
Date Reviewed by Fiscal: _____  By: _____
Approved _____  Date _____
Denied, please provide justification:
_____

Program Manager Notified: _____  Date: _____

The Fiscal Division Grant Specialist shall review the proposal/request for funding and appropriate rules and regulations pertaining to federal grants. During the review period additional information may be required to complete the process. The Fiscal Division Grant Specialist shall approve or deny the solicitation/application request within thirty (30) working days of receipt of the solicitation/application.

U. S. DEPARTMENT OF JUSTICE
OFFICE OF JUSTICE PROGRAMS
OFFICE OF THE COMPTROLLER

**CERTIFICATIONS REGARDING LOBBYING; DEBARMENT, SUSPENSION AND OTHER RESPONSIBILITY MATTERS; AND DRUG-FREE WORKPLACE REQUIREMENTS**

Applicants should refer to the regulations cited below to determine the certification to which they are required to attest. Applicants should also review the instructions for certification included in the regulations before completing this form. Signature of this form provides for compliance with certification requirements under 28 CFR Part 69, "New Restrictions on Lobbying" and 28 CFR Part 67, "Government-wide Debarment and Suspension (Nonprocurement) and Government-wide Requirements for Drug-Free Workplace (Grants)." The certifications shall be treated as a material representation of fact upon which reliance will be placed when the Department of Justice determines to award the covered transaction, grant, or cooperative agreement.

**1. LOBBYING**

As required by Section 1352, Title 31 of the U.S. Code, and implemented at 28 CFR Part 69, for persons entering into a grant or cooperative agreement over $100,000, as defined at 28 CFR Part 69, the applicant certifies that:

(a) No Federal appropriated funds have been paid or will be paid, by or on behalf of the undersigned, to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the making of any Federal grant, the entering into of any cooperative agreement, and the extension, continuation, renewal, amendment, or modification of any Federal grant or cooperative agreement;

(b) If any funds other than Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with this Federal grant or cooperative agreement, the undersigned shall complete and submit Standard Form - LLL, "Disclosure of Lobbying Activities," in accordance with its instructions;

(c) The undersigned shall require that the language of this certification be included in the award documents for all subawards at all tiers (including grants, contracts under grants and cooperative agreements, and subcontracts) and that all subrecipients shall certify and disclose accordingly.

**2. DEBARMENT, SUSPENSION, AND OTHER RESPONSIBILITY MATTERS (DIRECT RECIPIENT)**

As required by Executive Order 12549, Debarment and Suspension, and implemented at 28 CFR Part 67, for prospective participants in primary covered transactions, as defined at 28 CFR Part 67, Section 67.510—

A. The applicant certifies that it and its principals:

(a) Are not presently debarred, suspended, proposed for debarment, declared ineligible, sentenced to a denial of Federal benefits by a State or Federal court, or voluntarily excluded from covered transactions by any Federal department or agency;

(b) Have not within a three-year period preceding this application been convicted of or had a civil judgment rendered against them for commission of fraud or a criminal offense in connection with obtaining, attempting to obtain, or performing a



public (Federal, State, or local) transaction or contract under a public transaction; violation of Federal or State antitrust statutes or commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, or receiving stolen property;

(c) Are not presently indicted for or otherwise criminally or civilly charged by a governmental entity (Federal, State or local) with commission of any of the offenses enumerated in paragraph (1)(b) of this certification; and

(d) Have not within a three-year period preceding this application had one or more public transactions (Federal, State, or local) terminated for cause or default; and

B. Where the applicant is unable to certify to any of the statements in this certification, he or she shall attach an explanation to this application.

**3. DRUG-FREE WORKPLACE (GRANTEES OTHER THAN INDIVIDUALS)**

As required by the Drug-Free Workplace Act of 1988, and implemented at 28 CFR Part 67, Subpart F, for grantees, as defined at 28 CFR Part 67 Sections 67.615 and 67.620—

A. The applicant certifies that it will or will continue to provide a drug-free workplace by:

(a) Publishing a statement notifying employees that the unlawful manufacture, distribution, dispensing, possession, or use of a controlled substance is prohibited in the grantee's workplace and specifying the actions that will be taken against employees for violation of such prohibition;

(b) Establishing an on-going drug-free awareness program to inform employees about—

(1) The dangers of drug abuse in the workplace;

(2) The grantee's policy of maintaining a drug-free workplace;

(3) Any available drug counseling, rehabilitation, and employee assistance programs; and

(4) The penalties that may be imposed upon employees for drug abuse violations occurring in the workplace;

(c) Making it a requirement that each employee to be engaged in the performance of the grant be given a copy of the statement required by paragraph (a);

(d) Notifying the employee in the statement required by paragraph (a) that, as a condition of employment under the grant, the employee will—

*IMPP 04-119D GRANTS- LAW*

Attachment E, IMPP 04-119D
Effective 07-30-15

*EXHIBIT - 4*

Where employees are expected to work solely on a single Federal award or cost objective, charges for their salaries and wages will be supported by periodic certifications that the employees worked solely on that program for the period covered by the certification. These certifications will be prepared at least semiannually and will be signed by the employee **and** supervisory official having firsthand knowledge of the work performed by the employee.

This is an after-the-fact certification of time worked; therefore, it should be signed and dated after the end of the time period.

## Periodic Certification Form

*Part I: To be completed by the employee.*

I understand that my position is supported entirely by funds from federal grant _____. I certify that 100% of my job duties were related to activities in compliance with this program during the period from _____ to _____. The information recorded on this form is true and correct to the best of my knowledge.

_____           _____
Print Employee Name                                    Employee Signature

_____
Date

*Part II: To be completed by a supervisor having firsthand knowledge of the employee's work.*

The information recorded on this form is true and correct to the best of my knowledge.

_____           _____
Print Supervisor Name                                  Supervisor Signature

_____
Date

*IMPP O2-116 D ACCOUNTABILITY COMPLIANCE*
*EXHIBIT-4*

*IMPP O2-116 D A-C*

*DOUBLE SIDED*

**KANSAS DEPARTMENT OF CORRECTIONS**

| Kansas Department of Corrections | **I**NTERNAL **M**ANAGEMENT **P**OLICY AND **P**ROCEDURE | SECTION NUMBER 02-116D | PAGE NUMBER 1 of 1 |
|---|---|---|---|
| | SUBJECT: HUMAN RESOURCES: Conflict of Interest: Relationships on the Job and Outside Employment | | |

| Approved By: *Ray Roberts* Secretary of Corrections | Original Date Issued: | 03-18-15 |
|---|---|---|
| | Replaces Version Issued: | N/A |
| | CURRENT VERSION EFFECTIVE: | 03-18-15 |

| APPLICABILITY: | △ ADULT Operations Only | JUVENILE Operations – Only | △ DEPARTMENT-WIDE |
|---|---|---|---|

**POLICY STATEMENT**

Employment by the Department of a person or officer of the state who has a family or household member employed by, in the custody of, or under the supervision of the Secretary of Corrections shall be permitted, so long as the person or officer would not be in a position to directly or indirectly supervise the family or household member, and/or no breach of security or rules of confidentiality would occur. No person or officer of the state employed by the Department of Corrections shall use his or her official position to secure privileges or advantages for such a family or household member.

No employee shall advocate or cause the employment, appointment, promotion, transfer, or advancement to any office or position of the state, of a member of such officer's or employee's household or family member. No employee shall participate or be in the employment or discipline of a member of the officer's or employee's household or a family member. (ACI 3-4067; APPFS 3-3068)

Personal relationships between supervisors and subordinates or employees under the supervisor's span of control shall be prohibited, to avoid situations that may affect a supervisor's judgment, or that may affect a supervisor's ability to effectively supervise subordinates or other employees in his or her span of control; to avoid the appearance of conflict; and to promote professionalism among staff of the Department.

Employees of the Department of Corrections shall not use their official position, nor shall they disclose or use confidential information acquired in the course of their official duties, to advance their own or someone else's economic interests, or to secure additional privileges and advantages for themselves or others. (ACO 2-1C-24, ACI 3-4067, APPFS 3-3068) Employees may engage in outside employment or enterprise to the extent that it does not constitute a conflict of interest, (ACI 3-4067, APPFS 3-3068) interfere with the performance of their duties, or impair their ability to respond to a request to return to work in emergency situations.

**DEFINITIONS**

**Advancement:** To aid the progress of another in any way, to cause an event to happen earlier, to assist in an improvement in a person's rank, position, or value.

**Appointing Authority:** As defined in IMPP 02-109, any person or group of persons empowered by the constitution, by statute, or by lawfully delegated authority to make appointments to positions in the State service pursuant to K.A.R. 1-2-9. Anytime this term is used in this IMPP, it can be referring to the "appointing authority or designee".

**Family Member:** A person's spouse (including common-law), parent, grandparent, brother, sister, half siblings, children, grandchildren, first cousin, niece, nephew, aunt or uncle and any parent or child of a preceding or

subsequent generation as noted by the prefix of "great". Where applicable, each of these categories includes foster, step, adoptive or in-law relationships.

**Household Member:** A person having legal residence or co-tenancy in the employee's place of residence or any person who has had legal residence and/or lived within the employee's place of residence at any time within the past twelve months.

**Outside Employment:** An employment other than employment with the Kansas Department of Corrections.

**Post-incarceration Supervision:** The supervision of offenders for any type of release from a KDOC facility, to include parole, conditional release, and post-release supervision.

**Prohibited Personal Relationship:** More than mere social interaction, including, but not limited to, dating, cohabitation, co-tenancy, or romantic involvement with another person.

**Span of Control:** Any area in which a supervisory employee may have some impact, including giving directions, assigning duties, conducting performance reviews, in whole or in part, sitting on promotion boards, or otherwise having any impact on the terms or conditions of employment.

**Supervisory/Subordinate Relationship:** Includes any person over whom the supervisor has a supervisory responsibility, and shall include the entire chain of command within the Department.

**Work area:** Any KDOC facility or satellite unit, Parole Office, or Central Office division.

**PROCEDURES**

I. **When Family or Household Members Are in the Custody or Under the Supervision of the Secretary of Corrections**

  A. When a person is applying for employment at a facility within which a family or household member is housed, the following procedures shall be followed:

   1. The warden/superintendent shall evaluate the position for which the person is applying to determine whether a potential breach of security would occur if the person were employed in that position.

   2. The person shall be denied employment for any position within a facility housing a family or household member if the warden/superintendent determines that a breach of security would occur.

   3. An otherwise qualified applicant may be considered for any other position where direct or indirect supervision would not occur.

  B. When a person is applying for employment at a facility other than the one within which a family or household member is housed, that person shall be considered for employment in any position for which they are otherwise eligible.

  C. When a person is applying for employment at a parole office in which a family or household member is under post-incarceration supervision, the following procedures shall be followed:

   1. The parole director shall evaluate the position for which the person is applying to determine whether:

    a. the person would be in direct or indirect supervision over the family or household member; and/or

    b. a potential breach of rules of confidentiality would occur if the person were employed in that position.

   2. The person shall be denied employment for any position within a parole office supervising a family or household member if the parole director determines that the person would be in direct or indirect supervision over the family or household member and/or a breach of rules of confidentiality would occur as a result of the employment.

    a. An otherwise qualified applicant may be considered for any other position where direct or indirect supervision would not occur and where a breach of rules of confidentiality would not occur.

  D. When a person is applying for employment at a parole office other than the one under which a family or household member is supervised, they shall be considered for employment in any position for which they are otherwise eligible.

  E. When a person is applying for employment at a KDOC Central Office Division while a family or household member is committed to the custody of the Secretary of Corrections or is currently being supervised by parole services, the following procedures shall be followed:

   1. The appointing authority shall evaluate the position for which the person is applying to determine whether:

    a. the person would be in direct or indirect supervision over the family or household member; and/or

    b. a potential breach of rules of confidentiality would occur if the person were employed in that position.

   2. The person shall be denied employment for a position within Central Office if the appointing authority determines that the person would be in direct or indirect supervision over the family or household member and/or if a breach of rules of confidentiality could occur as a result of the employment.

    a. An otherwise qualified applicant may be considered for any other position in Central Office where direct or indirect supervision would not occur and where a potential breach of rules of confidentiality would not occur.

  F. When a current employee becomes aware that a family or household member is incarcerated within any of the Department's facilities, the following procedures shall be followed:

   1. The employee shall:

    a. immediately make a verbal report of all pertinent facts to his or her immediate supervisor; and

    b. file a written report with the warden/superintendent prior to the end of the employee's tour of duty on that day.

   2. The warden/superintendent shall determine whether the continued employment of an individual who has a family or household member incarcerated within the facility would constitute a breach of security.

   3. If the warden/superintendent determines that a breach of security would exist by the continued employment of the person, the warden/superintendent may take any of the following actions:

    a. Transfer the offender to another facility;

    b. Adjust the employee's work schedule to ensure minimal contact with the offender family or household member;

    c. To the extent possible, change or modify the employee's job duties to nullify the potential breach of security;

    d. With the employee's permission, arrange for the transfer of the employee to another facility; and/or

    e. Any satisfactory alternative action that is approved by the Deputy Secretary of Facility Management.

  G. When a current employee becomes aware that a family or household member is supervised by the parole office where the employee is employed, the following procedures shall be followed:

   1. The employee shall:

    a. immediately make a verbal report of all pertinent facts to the immediate supervisor; and

    b. file a written report with the parole director prior to the end of that business day.

   2. The parole director shall determine whether the continued employment of the person would result in the employee's having direct or indirect supervision over the parolee and/or result in a breach of the rules of confidentiality.

   3. If the parole director determines that direct or indirect supervision and/or a breach of the rules of confidentiality would exist by the continued employment of the person, the parole director may take any of the following actions:

    a. To the extent possible, change the employee's work schedule and/or job duties to ensure minimal contact with the offender family or household member;

    b. With the employee's permission or the written approval of the Secretary of Administration, arrange for the transfer of the employee to another parole office;

    c. Arrange for the supervision of the offender by a different employee from a different district office or from a different region, whichever is sufficient to remedy the conflict; and/or

    d. Any satisfactory alternative action that is approved by the Deputy Secretary for the Division of Community and Field Services.

  H. When a Central Office employee becomes aware that a family or household member is incarcerated within a KDOC facility or is under the supervision of parole services, the following procedures shall be followed:

   1. The employee shall:

    a. immediately make a verbal report to his or her immediate supervisor; and

    b. file a written report with the appointing authority prior to the end of the business day.

   2. The appointing authority shall determine whether the continued employment of the person would constitute a conflict of interest and/or a potential breach of security or confidentiality.





2. Under no circumstances shall an employee who is on leave from employment with the Department due to a Worker's Compensation covered injury participate in outside employment requiring the performance of duties that are comparable to the essential functions of the employee's normally assigned duties or of adjusted duties available to the employee under the Return to Work Program (IMPP 02-108).

NOTE: The policy and procedures set forth herein are intended to establish directives and guidelines for staff and offenders and those entities that are contractually bound to adhere to them. They are not intended to establish State created liberty interests for employees or offenders, or an independent duty owed by the Department of Corrections to employees, offenders, or third parties. Similarly, those references to the standards of various accrediting entities as may be contained within this document are included solely to manifest the commonality of purpose and direction as shared by the content of the document and the content of the referenced standards. Any such references within this document neither imply accredited status by a Departmental facility or organizational unit, nor indicate compliance with the standards so cited. The policy and procedures contained within this document are intended to be compliant with all applicable statutes and/or regulatory requirements of the Federal Government and the state of Kansas This policy and procedure is not intended to establish or create new constitutional rights or to enlarge or expand upon existing constitutional rights or duties.

**REPORTS REQUIRED**

None.

**REFERENCES**

K.A.R. 1-2-8
K.S.A. 22-2202(13), 46-215 et seq., 46-246a, 19-40-4
IMPP 02-108
ACO 2-CO-1C-24
ACI 3-4067
APPFS 3-3068

**ATTACHMENTS**

| Attachment | Title of Attachment | Page Total |
|---|---|---|
| A | Employee's Application for Permission to Engage in Outside Law Enforcement/Corrections Employment | 1 page(s) |
| B | Outside Employment in Non-Law Enforcement and Non-Corrections Positions Contact for Emergency Call-Back Purposes | 1 page(s) |

---

EXHIBIT - 9

Page 1 of 1, Attachment A, IMPP 02-116D
Effective 03-18-15

**EMPLOYEE'S APPLICATION FOR PERMISSION
TO ENGAGE IN OUTSIDE LAW ENFORCEMENT/CORRECTIONS EMPLOYMENT**

| 1. Name of Employee | 2. Title |
|---|---|
| 3. Facility or Office | 4. Present Location/Post and Shift |

5. Request is hereby made for permission to engage in the outside employment described in detail as follows: _____
Name of Employer          Address          Phone Number

Maximum number of hours per week to be devoted to outside employment: _____.
If approved, on what date would you begin working? _____
If this is a temporary job, when is it scheduled to end? _____

What would be your expected hours and days to work at the outside job?
_____ to _____ Sun.     _____ to _____ Tues.     _____ to _____ Thurs.     _____ to _____ Sat.

_____ to _____ Mon.     _____ to _____ Wed.     _____ to _____ Fri.

Describe duties to be performed if approved:

I hereby certify that my services in connection with the outside employment referred to above are conditional on my being available, alert and attentive, and will not have a direct or material bearing on, nor conflict with, nor infringe on my duties or responsibilities to the Kansas Department of Corrections, including recall for emergencies or overtime, and that the statements made herein are complete and correct.
_____          _____
Signature of Employee                          Date

This request for permission to engage in outside employment or business is: ____ Approved    ____ Denied

If denied, reason for denial:

_____          _____
Appointing Authority's Signature                   Date

_____ I am not satisfied with the response from my appointing authority and wish to appeal the decision to the Deputy Secretary or the Secretary of Corrections.

Final determination: _____ Approved _____ Denied
Comments:

_____          _____
Secretary                                      Date

---

**OUTSIDE EMPLOYMENT IN NON-LAW ENFORCEMENT AND NON-CORRECTIONS POSITIONS**

**CONTACT FOR EMERGENCY CALL-BACK PURPOSES**

1. Name of Employee:_____
   Position Title

2. Current Location/Post and Shift: _____

3. Outside Employer: _____ Phone Number: _____

4. Scheduled Hours and Days of Work with Outside employer: _____
_____
_____

I understand that, as an employee of the Department of Corrections, I am subject to being called-back or called-in if necessary for the continued safe operations of my facility/office. Further, I acknowledge and understand that my employment with the Department of Corrections has priority over any other employment in which I may engage and that I must report for duty within one hour if called to do so while performing work for an outside employer.

Employee's Signature: _____ Date_____

*EXHIBIT-4*
*DOUBLE SIDED*

# TABLE OF CONTENTS

■ / A – ADULT OPERATIONS ONLY   ■ / J – JUVENILE OPERATIONS ONLY   D – DEPARTMENT-WIDE

**POLICY NUMBER**  **EFFECTIVE DATE**

## ADMINISTRATION

| | | |
|---|---|---|
| 01-000D | Vision, Mission, and Values | 09-16-14 |
| 01-101D | Development, Review and Dissemination of Departmental Policies and Procedures and Administrative Regulations | 05-09-19 |
| 01-102D | Policy and Procedure Compliance and Operational Audits | 01-18-17 |
| 01-103 | Inmate Rule Book Distribution and Translation | 07-28-06 |
| 01-104D | Power of Attorney | 11-03-15 |
| 01-105D | Contracts for Programs and Services | 03-12-15 |
| 01-106D | Denial of Entry for Contract Personnel | 09-20-16 |
| 01-107D | Access to Legal Counsel and Litigation Management | 11-24-15# |
| 01-110D | Notarization of Offender Documents | 11-03-15 |
| 01-111 | Extradition of Escaped and Absconded KDOC Offenders from Other States | 04-01-13 |
| 01-113D | Incident Reports and Immediately Reportable Incidents | 12-18-17 |
| 01-114D | Deceased Offenders: Notifications and Required Procedures | 12-10-15 |
| 01-115 | Payment of Inmate Funeral Expenses to an Inmate's Next of Kin | 12-07-02* |
| 01-117D | Claims Procedure for Department Employees and the General Public | 03-02-18 |
| 01-118D | Offender Claims Procedure for Property Damage/Loss or Personal Injury | 03-30-16 |
| 01-120 | Establishment, Maintenance, Disposition, Inventory, and Audit of Facility Real Estate Records | 03-01-01* |
| 01-122 | Donations to the Department of Corrections | 04-21-95* |
| 01-123D | Authorization for Construction, Renovation or Demolition of Physical Structures | 11-06-14 |
| 01-124 | Inmate and Contract Personnel Operation of State Vehicles | 09-07-04*# |
| 01-126 | Declaration of Marital Status, Affidavit of Common-Law Marriage, and Marriage Ceremonies for Inmates | 04-28-08* |
| 01-127D | Development and Review of General Orders | 04-29-15 |
| 01-128 | Discrimination Complaints by Non-Offender Program Beneficiaries | 09-27-13# |
| 01-129D | Masks Protocol | 09-23-20 |
| 01-131J | Office of Inspector General | 01-18-17 |
| 01-180J | Community Critical Incident Reporting and Notification | 07-25-17 |
| 01-181 | Investigations and Inquiries | 09-14-12 |

## HUMAN RESOURCES

| | | |
|---|---|---|
| 02-101D | EEO Discrimination Complaint Resolution | 09-15-15# |
| 02-102D | Security Post Rotation and Shift Assignment | 06-30-15 |
| 02-104D | Separation of Employment and Exit Interviews | 04-29-15 |
| 02-105D | Establishment and Review of Positions Descriptions | 04-29-15 |
| 02-106D | Temporary Limited Duty Assignments | 03-12-15 |
| 02-107D | Probationary Periods and Performance Management Process | 02-19-20 |
| 02-108D | Return to Work | 03-12-15 |
| 02-109D | Designation of Appointing Authorities | 03-12-15 |
| 02-110D | Substance Abuse – Employees, Contract Employees and Volunteers | 12-22-15 |
| 02-112D | Telecommuting | 11-22-16 |
| 02-113D | Employee Work Schedules and Compensation | 05-27-15 |
| 02-114D | Employee Leave and Absences | 11-22-16# |
| 02-115D | Employee Grievances | 06-30-15 |
| 02-116D | Conflict of Interest: Relationships on the Job and Outside Employment | 03-18-15 |
| 02-117D | Use and Review of Flex Time and Adjusted Work Schedules | 04-29-15 |
| 02-118D | Employee and Volunteer Rules of Conduct and Undue Familiarity | 07-01-15# |

**\* Indicates either a Statement of Annual Review has been issued, or the substantive content of the IMPP has been reissued under the provisions of IMPP 01-101, effective July 02, 2010**

**# Indicates one or more Policy Memoranda issued subsequent to 06/06/06, and that such documents have yet to be incorporated into the main body of the IMPP.**

# TABLE OF CONTENTS

■ / A – ADULT OPERATIONS ONLY  ■ / J – JUVENILE OPERATIONS ONLY  D – DEPARTMENT-WIDE

| POLICY NUMBER | | EFFECTIVE DATE |
|---|---|---|
| 05-102 | Expungement of Offender Records; Reversed/Vacated/Dismissed Convictions | 06-26-06* |
| 05-103 | Establishment, Maintenance, Disposition, and Audit of Offender Records | 06-26-06* |
| 05-104 | Organization of Offender Files | 06-26-06* |
| 05-105 | Health Record | 06-26-06* |
| 05-106D | Electronic Records Management and Preservation | 06-16-16 |
| 05-107 | Confidentiality/Release of Medical & Mental Health Information | 11-13-09*# |
| 05-108A | Detainer Processing For All Offenders | 11-29-17 |
| 05-110D | Secure Purchasing and Acquisitions | 03-18-15 |
| 05-110 | Case Records Management | 11-29-06 |
| 05-111D | IT Personnel Security | 03-18-15 |
| 05-112D | IT Physical Security and Protection | 04-25-17 |
| 05-113D | System Audit and Accountability | 10-18-18 |
| 05-114D | Risk Management & Security Planning | 03-18-15 |
| 05-115D | Incident Response and Handling | 03-18-15 |
| 05-116D | Security Awareness and Training | 03-18-15 |
| 05-117D | Systems Operation and Security | 10-18-18 |
| 05-118D | IT Access Control | 03-18-15# |
| 05-119D | Systems Configuration | 03-18-15 |
| 05-120D | Microsoft Office 365 | 09-12-19 |
| 05-121D | Mobile Devices and Wireless Technologies | 04-21-17 |
| 05-122D | External Media Devices | 04-21-17 |
| 05-129D | Internet/Intranet Usage & Management | 03-18-15 |
| 05-145D | Customer Service Center | 07-13-16 |
| 05-147D | Change and Configuration Management | 04-06-15 |
| 05-151D | Application Development and Management | 04-06-15 |
| 05-153D | Application Structure Management | 04-06-15 |
| 05-172D | KCJIS Security Policy | 06-16-16 |

## EVALUATION AND RESEARCH

| 06-101D | Research and Evaluation Activities | 03-30-16 |
|---|---|---|

## PLANNING

| 07-101D | System-Wide Triennial Planning | 02-15-16 |
|---|---|---|
| 07-102 | Proposals for the Development, Implementation, Modification, or, Termination of Programs, Services or Projects | 03-21-03* |

## COMMUNICATION

| 08-101D | Public Information Program | 04-27-16 |
|---|---|---|
| 08-104D | Media and Public Access to Correctional Facilities, Parole Offices and Offenders | 04-27-16 |

## SAFETY, SANITATION AND INSPECTIONS

| 09-101D | Fire Safety and Inspections Procedures; Schedules for Emergency Equipment Testing | 08-19-15 |
|---|---|---|
| 09-102D | Housekeeping Plans and Health and Sanitation Inspections | 02-01-16 |
| 09-103D | Industrial Safety Inspections and Preventive Maintenance Plans | 02-01-16 |
| 09-104D | Security Inspection Program | 08-19-15 |

**\* Indicates either a Statement of Annual Review has been issued, or the substantive content of the IMPP has been reissued under the provisions of IMPP 01-101, effective July 02, 2010**

**# Indicates one or more Policy Memoranda issued subsequent to 06/06/06, and that such documents have yet to be incorporated into the main body of the IMPP.**

*EXHIBIT - 1*

Monday, January 25, 2021

*DOUBLE SIDED*

# TABLE OF CONTENTS

■ / A – ADULT OPERATIONS ONLY     ■ / J – JUVENILE OPERATIONS ONLY     D – DEPARTMENT-WIDE

| POLICY NUMBER | | EFFECTIVE DATE |
|---|---|---|
| 10-136 | Development of Pre-Release Risk Reduction & Reentry Programs and Services, and Placement or Participation of Offenders in those Programs and Services | 12-31-10 |
| 10-137 | Developing Risk Reduction and Reentry Interventions, Services or Programs | 11-05-07* |
| 10-138D | Assistance for Offenders and/or Victims with Limited English Proficiency | 02-01-16# |
| 10-139D | Screening for Sexual Victimization and Abusiveness | 10-16-19 |
| 10-140J | Reporting Abuse and/or Neglect of an Offender | 07-01-14 |
| 10-141D | Job Readiness Offender Resource Rooms | 02-13-19 |
| 10-142D | Offender Tablets | 04-10-19 |
| 10-143D | Transgender and Intersex Offender Placement | 07-17-19 |
| 10-144A | Offender Companion Program | 02-19-20 |
| 10-145D | Advance Directives | 06-03-20 |

## DECISION MAKING

| | | |
|---|---|---|
| 04-205 | Classification | 01-15-02 |
| 11-101A | Offender Privileges and Incentives | 04-23-19 |
| 11-101J | Privileges and Incentives Program | 02-16-17 |
| 11-102 | Offender Admissions:  Scheduling, Processing, and Orientation | 04-21-06* |
| 11-102J | Juvenile Correctional Facility Preadmission, Admission and Release Process | 05-11-17 |
| 11-103 | Inter-Facility Transfers | 01-21-03* |
| 11-104 | Interstate Corrections Compact - Facility Transfer | 12-07-02* |
| 11-105 | Notifications and Transfers of International Offenders | 04-21-06* |
| 11-106A | Case Management | 02-19-20 |
| 11-106J | Case Management | 08-17-16 |
| 11-107 | Offender Program Plans | 08-26-14 |
| 11-108 | Job and Emergency Furloughs | 12-05-05*# |
| 11-109 | Transfer of Inmates to the Larned Correctional Mental Health Facility (LCMHF) and Larned State Security Hospital (LSSH) | 05-25-07 |
| 11-110 | Application for Release of Functionally Incapacitated Inmates or Release Pending Imminent Death | 08-06-10 |
| 11-111 | Programmatic Furloughs for Work Release Participants | 12-05-05* |
| 11-113A | Level of Service Inventory – Revised Risk and Needs Assessment | 11-07-19 |
| 11-113J | Youthful Level of Service/Case Management Inventory | 07-01-15 |
| 11-114 | Recommendation for Sentence Modification Pursuant to KSA 21-4603 | 02-21-97* |
| 11-115A | Sex Offender Program, Management and Supervision | 11-30-19 |
| 11-116A | Administration of the Sex Predator Commitment Act | 04-27-16 |
| 11-117 | Risk-Reduction-Based Reentry and Release Planning | 12-11-13* |
| 11-118D | Kansas Offender Registration Process | 11-06-15 |
| 11-119 | Documentation of the Disciplinary Process | 12-11-13 |
| 11-119 | Documentation of the Disciplinary Process | 03-08-13 |
| 11-120A | Offender Community Identification | 09-12-19# |
| 11-121 | Release Checklist | 02-06-06* |
| 11-122J | Documentation of Juvenile Offender Grievance Procedures | 08-28-17 |
| 11-123A | Application of Program Credit Pursuant to K.S.A. 21-6821 | 11-30-20 |
| 11-124D | Letter of Recommendation for Offenders | 04-04-19 |
| 11-125A | Offenders Eligible for Discharge from the Prison Portion of a Sentence Pursuant to K.S.A. 75-5220 | 08-19-15 |
| 11-126A | House Arrest Program | 02-15-16# |
| 11-127 | Restoration of Withheld Good Time and Forfeited Good Time and Program Credits | 07-24-13 |

**\* Indicates either a Statement of Annual Review has been issued, or the substantive content of the IMPP has been reissued under the provisions of IMPP 01-101, effective July 02, 2010**

**# Indicates one or more Policy Memoranda issued subsequent to 06/06/06, and that such documents have yet to be incorporated into the main body of the IMPP.**

# TABLE OF CONTENTS

*Double Sided*

■ / A – ADULT OPERATIONS ONLY   ■ / J – JUVENILE OPERATIONS ONLY   D – DEPARTMENT-WIDE

| POLICY NUMBER | | EFFECTIVE DATE |
|---|---|---|

## COMMUNITY PARTICIPATION

13-107D   Mentoring ............................................................................................................... 07-01-14

## PAROLE SERVICES

14-103A   Release Investigation Process.................................................................................. 05-14-15
14-104A   Initial Reporting and Case Management Procedures ............................................. 05-14-15
14-105A   Interstate Compact for Adult Offender Supervision ............................................... 10-31-18
14-107A   Offender Fees Payment Procedures ....................................................................... 06-05-19
14-108A   Processing of Direct Placement to Parole Release Supervision.............................. 02-25-19
14-109A   Availability of Supervision Services ....................................................................... 03-28-18
14-110A   Conditions of Supervision ...................................................................................... 09-01-18
14-111A   Offender Risk Management and Classification Levels............................................ 12-31-18
14-112A   Substance Abuse Testing of Offenders on Post-Incarceration Supervision............ 06-03-15
14-113A   Case Plans .............................................................................................................. 06-03-15
14-114A   Global Positioning Tracking System ...................................................................... 12-19-18
14-115A   Supervision of DUI Offenders................................................................................ 06-03-15
14-116A   Development and Utilization of Community Resources .......................................... 09-20-17
14-117A   Supervision Standards ............................................................................................ 09-16-14
14-118A   Offender Report Form and Offender Sign-In Log.................................................. 07-25-17
14-120A   Good Time During Post-Release Supervision ....................................................... 10-22-20
14-121A   Notification to Third Parties ................................................................................... 12-10-15
14-122A   KDOC Pre-Revocation Program ............................................................................ 12-20-16
14-123A   Intrastate Transfer of Offenders............................................................................. 08-19-15
14-124A   Sex Offender Supervision and Case Management.................................................. 07-29-20
14-125A   Management of Offender Money and Property ...................................................... 05-05-16
14-126A   Offender Financial Obligations .............................................................................. 10-22-14
14-127A   Management of Donations and Financial Incentives .............................................. 02-23-16
14-128A   Offender Travel Permission and Permits................................................................ 06-03-15
14-129A   Parole Officer Authority Regarding Detention and Arrest .................................... 09-20-17
14-130A   Delinquent Time Assessments on Community Supervision .................................... 07-13-16
14-131A   Failure to Report and Absconder Procedures ........................................................ 04-29-15
14-132A   Law Enforcement Role and Responsibilities .......................................................... 08-19-15
14-133A   Discharge from Supervision ................................................................................... 07-25-17
14-134A   Transportation Memo ............................................................................................. 05-05-16
14-135A   Management of Domestic Violence Cases .............................................................. 03-12-15
14-136A   Payment of Transportation Costs as a Condition of Release ................................. 01-27-16
14-137A   Encouraging Pro-Social Behavior and Responding to Violations .......................... 10-22-20
14-138A   Violation Reports.................................................................................................... 09-20-16
14-139A   Condition Violation Warrants................................................................................. 07-10-18
14-140A   Mandated Reporting of Suspected Abuse............................................................... 03-28-18
14-141A   Revocation Packet .................................................................................................. 09-16-14
14-142A   Condition Violation Preliminary Hearings ............................................................ 08-14-19
14-143     Termination of Supervision: Closing Summary ..................................................... 03-28-05*
14-144A   Waiver of Final Revocation Hearing ...................................................................... 07-17-19
14-145A   Order to Arrest and Detain .................................................................................... 04-29-15
14-146A   Case Management and Caseload Review Processes................................................ 01-30-18
14-147A   Parole Duty Officer ................................................................................................ 12-11-18

\* Indicates either a Statement of Annual Review has been issued, or the substantive content of the IMPP has been reissued under the provisions of IMPP 01-101, effective July 02, 2010

# Indicates one or more Policy Memoranda issued subsequent to 06/06/06, and that such documents have yet to be incorporated into the main body of the IMPP.

# TABLE OF CONTENTS

■ / A – ADULT OPERATIONS ONLY     ■ / J – JUVENILE OPERATIONS ONLY     D – DEPARTMENT-WIDE

**POLICY**                                                                      **EFFECTIVE**
**NUMBER**                                                                      **DATE**

20-108      Protective Custody.................................................................................... 02-15-02*
20-109      General Lockdown, Waiver of Rights, & Transfer of Inmates in Administrative Segregation................ 07-21-04*
20-110J     Treatment Units for Behavioral Health Offenders ....................................................... 08-17-16

## VICTIM SERVICES

21-101      Victim Notification.................................................................................... 09-19-11
21-102      Facility Tours for Victims of Violent Crime ........................................................... 10-07-03*
21-103      Victim/Offender Dialogue Program ...................................................................... 05-10-13
21-104      Apology Repository/Offender Preparation of Apologies .................................................. 10-01-07*
21-105      Processing Requests by Victims and Others for Cessation of Communications
              from Inmates...................................................................................... 01-13-12
21-106      Facilities - Contact with Victims ..................................................................... 12-05-11

## OFFICE OF ENFORCEMENT, APPREHENSIONS & INVESTIGATIONS

22-101D     Duties and Responsibilities of the Director ........................................................... 12-28-17
22-102      Operation of Emergency Vehicles ....................................................................... 02-23-09*
22-103      Investigation Procedures............................................................................... 04-01-14#
22-105A     Arrest and Transportation of Offenders ................................................................ 12-28-17
22-106      Use of Offenders as Informants ........................................................................ 02-23-09
22-107      Use of Firearms ....................................................................................... 09-17-12
22-108      Searches, Seizure, Chain of Evidence, and Disposal of Contraband ...................................... 12-11-13
22-109J     Racial and Biased-Based Policing – Special Investigator................................................ 04-16-15

## PRISONER REVIEW BOARD

23-101A     Applying for Clemency Consideration and Payment of Publication Notice ................................. 04-29-15

* Indicates either a Statement of Annual Review has been issued, or the substantive content of the IMPP has been reissued under the provisions of IMPP 01-101, effective July 02, 2010

# Indicates one or more Policy Memoranda issued subsequent to 06/06/06, and that such documents have yet to be incorporated into the main body of the IMPP.

**KANSAS DEPARTMENT OF CORRECTIONS**

| | | SECTION NUMBER | PAGE NUMBER |
|---|---|---|---|
| **Kansas** Department of Corrections | **I**NTERNAL **M**ANAGEMENT **P**OLICY AND **P**ROCEDURE | 15-101A | 1 of 8 |
| | | **WORK RELEASE AND PRISON/NON-PRISON BASED PRIVATE INDUSTRY PROGRAMS:  Selection Criteria and Placement Procedures** | |

| Approved By: | | |
|---|---|---|
| | **Original Date Issued:** | **11-16-17** |
| | **Replaces Version Issued:** | **11-16-17** |
| Secretary of Corrections | **CURRENT VERSION EFFECTIVE:** | **07-10-18** |

| APPLICABILITY: | X ADULT Operations Only | _ JUVENILE Operations Only | _ DEPARTMENT-WIDE |
|---|---|---|---|

### POLICY STATEMENT

In order to reduce recidivism and facilitate reentry and transition to the community at release, it is the policy of the KDOC to prepare offenders for, and provide access to, work release and prison-and-non-prison-based private industry employment, when it is safe for the community and the offender has a need for such a program.

### DEFINITIONS

Clinical Services Report:  A report prepared by clinical professional staff that provides information about risk and need of potentially violent offenders, including sex offenders.

Director of Sex Offender Management: A Central Office position that oversees the department's management of sex offenders, monitors the sex offender treatment program/contract, and administers the Multidisciplinary Team (MDT) and override process for sex offenders.

Multidisciplinary Team: Individuals selected by the Secretary of Corrections from a variety of state and private sources for the express purpose of assessing whether or not a person meets the definition of a sexually violent predator.

Private Non-Prison Based Work Release:  Minimum-custody offender employment for a private business enterprise that operates within a community setting outside a correctional facility, pursuant to K.A.R. 44-8-115.

Private Prison Based Work Release:  Offender employment for a private business enterprise that operates on the grounds of a correctional facility, pursuant to K.A.R. 44-8-116.

Program Management Committee: The committee, consisting of the warden or designee and an administrative/supervisory representative from the Programs and the Security divisions of the facility responsible to review and approve or deny proposed classification exceptions, program placements including amendments to program plans, and transfer requests/recommendations.

Traditional Work Release:  Offender employment for a private business enterprise pursuant to K.S.A. 75-5267 and K.S.A. 75-5268.

Work Release Program:  Any work release programs as authorized by KSA 75-5267 and governed by KSA 75-5268, applicable Internal Management Policies and Procedures, and facility general orders as approved by the Secretary of Corrections or designee, in a KDOC facility or county facility pursuant to an agreement with that county.

what plan the offender has for seeking/gaining/keeping employment, including the transportation to/from job search/work plan when applicable.

2.      Relevant substance abuse history (e.g., recent use, treatment, impact on employment in the past, etc.).

3.      If the offender is high or moderate risk for anti-social thinking, based on the LSIR attitudes/orientation, criminal history, companions and/or leisure time domains, what has been done to address this, if anything (e.g., completed *Thinking for a Change*).

4.      Whether the offender completed a work release readiness class; if so, was it a successful/unsuccessful completion, and when.

5.      The status of the offender's identification (driver's license, birth certificate, social security card) and if the offender was required to register for selective service, if/when that was done.  *Note*:  Identification is necessary to obtain employment, so should be addressed before an offender goes to work release.

6.      Any special services related to employment assistance the offender may qualify to receive, such as vocational rehabilitation or veteran status.

7.      If there is a pending detainer, what has been done to address it, and the status; and specifically, if the offender will likely be required to serve time in a local jail after release, and how that fact impacts work release placement.

8.      Any pro-social support the offender may have (e.g., family, clergy, mentor, etc.; describe the status of this relationship, and where this person is), and whether the offender will still have access to him/her if placed in work release.

9.      Is work release placement a goal in this offender's case plan and/or is the referral made at the recommendation of the Prisoner Review Board?  If so, please indicate any details about the Board's recommendation.

10.     Is there any pending behavioral or medical health issue that work release should know about, and if so, what is the status?

11.     Any other information you think would be useful to making the decision about whether to place this offender in work release, or about what case management and job assistance the offender may require once at work release.

12.     That the rules of the program to which the offender is being referred have been provided to and reviewed with the offender, including special rules related to offenders managed as sex offenders when applicable.

        a.      Rules and procedures for non-KDOC for work release programs are available, and will updated as needed, on the KDOC Intranet.

B.      Once the referral has been completed, it shall be processed as follows:

1.      If the offender is **managed as a sex offender**, send the referral to the Director of Sex Offender Management.

        a.      The Director of Sex Offender Management shall make a recommendation to approve or disapprove the referral for further processing, after considering sex offending history, risk/need assessments, treatment progress, notes and discharge summary, polygraph results, status current or potential as a sexually violent predator, clinical reports or information, diagnoses, parole violations, institutional behavior, or any other information relevant to current risk for sexually reoffending.  The Director shall forward information with his/her

    a.    If program and unit team staff determine the offender needs to complete some programming at the facility prior to full time employment that shall be reflected in the offender's case plan and his/her job search and employment requirement shall be tailored to this plan.

6.    Remain in the facility at all times except when going to/coming from work, or as approved, for job searching, job training or point-to-point passes.

    a.    The facility shall develop, publish, post and make available information about how to request a pass; when passes will be granted; and methods for insuring the passes are used for the purposes granted only.

B.    Offenders managed as sex offenders shall also be required to do the following:

1.    For offenders with a SOTP Discharge Summary recommendation providing for no contacts with minors, the following shall apply:

    a.    No contact: the offender shall not have face-to-face or telephonic communication, physical touching of any kind, written correspondence, electronic/computer correspondence, or any indirect communication through third parties; and,

    b.    Incidental contact: the offender may have contact that randomly occurs as one goes about daily life, without prior planning or intent.

2.    Fully comply with all treatment requirements, including any community contract or relapse prevention plan prepared or agreed-to by the offender as part of sex offender treatment, including the requirement to participate in ongoing group treatment, polygraphs, or any other treatment requirements;

3.    Participate with unit team and treatment staff in developing a specific personal maintenance contract, using Attachment C, that takes into account the sexual preoccupation or sexual offending cycle of the offender, that addresses employment, transportation (vehicle or walking), social activities (church, library, shopping), computer access, programs, medication, visits, any conditions imposed by the Director of Sex Offender Management as a condition of approval of the work release referral, and any other issue deemed necessary by SOTP treatment, program or treatment staff.

    a.    Unit team and SOTP treatment staff shall communicate a minimum of once per month about progress, behaviors, and status of all offenders managed as sex offenders as part of the case management plan during work release.

C.    The Warden or Designee shall maintain as a permanent record in the offender's file of the following:

1.    Disbursement of the offender's earnings in accordance with IMPP 04-109A;

2.    The name, address, and telephone number of the employer;

3.    The job or position title in which the participant is employed;

4.    The rate of compensation and pay period interval; and

5.    The offender's regular work schedule.

D.    The Warden or designee shall provide information to the employer about the work release program including the address and telephone number of the facility.

employment shall be dictated by the security of the area where the industry is located and reflected in facility general orders. All facilities shall utilize Attachment D, Prison Based Private Industry Application, to determine eligibility per KDOC policies and requires Program Management Committee's approval.

C.    Offenders may be referred to private industries at other facilities, using the referral form and criteria at Attachment A, except in the wardens' discretion sex offenders who are in treatment, making progress, and not deemed to be an undue risk after consultation with the treatment provider, can be placed in a non-prison-based or prison-based private industry. Referrals for private industries at other facilities shall be sent to the Classification Administrator of the receiving facility, and if the offender is approved, the offender shall be transferred to the receiving facility. Transfer for prison based private industries is at the discretion of the warden and Attachments D, E and F must accompany the transfer request.

## VII.   Per Diem

A.    For any offender placed in a work release program or private industry job, a per diem rate of 25% of his/her income shall be charged to the offender for food and lodging. The per diem for KDOC work release programs shall be returned to the State General Fund or to the political subdivision, federal government or community-based center for such offender's food and lodging in work release; for non-KDOC work release programs it shall be placed in that entity's fund per internal policy; or if the offender is participating in a private industry program other than work release, the minimum amount collected shall be deposited to the correctional industries fund.

NOTE: The policy and procedures set forth herein are intended to establish directives and guidelines for staff and offenders and those entities that are contractually bound to adhere to them. They are not intended to establish State created liberty interests for employees or offenders, or an independent duty owed by the Department of Corrections to employees, offenders, or third parties. Similarly, those references to the standards of various accrediting entities as may be contained within this document are included solely to manifest the commonality of purpose and direction as shared by the content of the document and the content of the referenced standards. Any such references within this document neither imply accredited status by a Departmental facility or organizational unit, nor indicate compliance with the standards so cited. The policy and procedures contained within this document are intended to be compliant with all applicable statutes and/or regulatory requirements of the Federal Government and the state of Kansas. This policy and procedure is not intended to establish or create new constitutional rights or to enlarge or expand upon existing constitutional rights or duties.

## REPORTS REQUIRED

None.

## REFERENCES

K.S.A.  75-5267, 75-5268, 75-5210(a)(k)&(m)
KAR  44-7-108, et seq., 44-8-101
IMPP 04-109A, 10-136, 11-101, 11-103, 11-106, 12-120
ACO  2-4G-01
ACI  3-4288, 3-4389, 3-4391, 3-4396, 3-4409

## ATTACHMENTS

| Attachment | Title of Attachment | Page Total |
|---|---|---|
| A | Screening/Referral for Work Release and Private Industry Employment | 5 page(s) |
| B | Offender Acknowledgement Concerning Work Release Placement | 1 page(s) |
| C | Offender Managed as a Sex Offender - Work Release Plan | 1 page |
| D | Private Prison Based Industry Application | 2 pages |
| E | Offender Acknowledgement and Agreement for Prison Based Employment | 1 Page |
| F | Consent of Prison Based Employment | 2 pages |

**NOTE**:  If the above answers (1 – 10) indicate that this offender **is not** eligible for work release, but for some reason you believe s/he should be considered, please explain why:

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**NOTE**:  If the above answers (1 – 10) indicate that this offender **is** eligible for work release, but for some reason you believe s/he **should not** be considered, please explain why:

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

E.  What is the status of the offender's identification (driver's license, birth certificate, social security card); and if the offender was required to register for selective service, was this done/when? _____
**Note:** This issue should be addressed before sending the offender to work release.

**Has a birth certificate?**  ☐ Yes  ☐ No
**Has a social security card?**  ☐ Yes  ☐ No
**Has a valid driver's license?**  ☐ Yes  ☐ No
**Has a valid Kansas ID?**  ☐ Yes  ☐ No
**Has registered for selective service?**  ☐ Yes  ☐ No  ☐ Not required to register
**Comments:** _____
_____

F.  Is the offender's eligible for employment assistance through vocational rehabilitation or veteran status?

☐ Yes  ☐ No

G.  If there is a pending detainer (not felony)? If so, what has been done to address it, and what is the status?

**Pending non-felony detainer?**  ☐ Yes  ☐ No
**Comments:** _____
_____

H.  Does this offender have a "pro-social" support person, ***including a matched mentor,*** and if so, who?  Will the offender continue to have access to this support if s/he goes to work release?

**Has a support person?**  ☐ Yes  ☐ No
**Has a mentor?**  ☐ Yes  ☐ No
**Comments:** _____
_____

I.  Is work release placement a goal in this offender's case plan and/or is this referral made at the recommendation of the Prisoner Review Board?

**Work release is a goal in case plan?**  ☐ Yes  ☐ No
**Work release has been recommended by the Prisoner Review Board?**  ☐ Yes  ☐ No
**If "yes," please state specifically what recommendation the PRB made, and when.**
**Comments:** _____
_____

J.  Is there any pending behavioral or medical health issue that work release should know about, and if so, what is the status?

**Pending behavioral and/or medical issue?**  ☐ Yes  ☐ No
**Comments:** _____
_____

K.  Is there any other information you think would be useful to making the decision about whether to place this offender in work release, or about what case management and job assistance the inmate may require once at work release if admitted into the program?

**Comments:** _____
_____

Attachment B, IMPP 15-101A
Effective 07-10-18

## OFFENDER ACKNOWLEDGMENT CONCERNING WORK RELEASE PLACEMENT

I, _____, # _____ have agreed to be placed in a work release program of the Kansas Department of Corrections at the following facility _____. With respect to that placement, I fully understand, agree and acknowledge the following:

1. That I may be terminated from the program, prior to and without successful completion of the program, for any of the following reasons:

   a. Refusal to complete this acknowledgement;
   b. Failure to comply with all rules, general orders, policies and procedures of the department and program;
   c. Failure to remain in the facility at all times except when going to/coming from work, or as approved for job searching, job training, or point-to-point passes.
   d. If I am a sex offender, failing to follow treatment requirements, my work release plan as developed with unit team and SOTP treatment staff, or my having contact through a third-party contrary to IMPP 15-101.
   e. Failing to work conscientiously or effectively toward getting or keeping employment after a reasonable time and after receiving reasonable support in this effort, including if the offender is terminated for cause or under circumstances that indicate the offender's risk has become unacceptable;
   f. Being subject to disciplinary action as a result of a serious rule violation or repeated minor conduct rule violations which become unduly disruptive or create too much risk;
   g. Being involved in criminal activity or suspected of criminal activity which is referred for prosecution;
   h. Being unable to conform to the program structure or rules based on documented situations;
   i. Bringing discredit to the work release program;
   j. I request to be removed from the program;
   k. I leave the facility without proper authorization or fail to return as directed or scheduled; and/or,
   l. If for any other reason the Secretary or designee, or any program, unit team and/or treatment staff conclude my continued participation in the work release program creates an undue risk to the facility, the community or me.

2. That I have no due process protection against or upon termination from the program and am not entitled to a hearing of any type or sort prior to, after or in connection with my termination from the program.

3. That I have no due process protection against my personal property being controlled as per the provisions of IMPP 11-101 (Inmate Privileges and Incentives).

4. That I have no due process protection against or upon being transferred to another facility if my termination from the program gives rise to the need to transfer me to another facility; and I am not entitled to a hearing of any type or sort prior to, after or in connection with my transfer to another facility.

5. If terminated from a work release program for disciplinary reasons I will be placed on Incentive Level I.

6. That if I am subject to a court order for restitution, regardless of whether such order makes restitution immediately payable, restitution payments will be deducted from my trust account in accordance with IMPP 04-109A.

7. That failure to agree to payment of court-ordered restitution in accordance with IMPP 04-109A will make me ineligible for assignment to traditional work release or private industry work release.

_____    _____    _____
Offender's Signature        KDOC#             Date

_____                       _____
Witness' Signature                            Date

Attachment E, IMPP 15-101A
Effective 07-10-18

# Offender Acknowledgement and Agreement
## for Prison Based Employment

I, _____, #_____, agree to be placed in a prison-based employment program.

I understand, acknowledge and agree to all of the following conditions for employment:

1.  I may be terminated from the program, prior to and without successful completion at the discretion of the employer or the (facility location) for any of the following:
    a.  Behavior, which interferes with my participation in the program.
    b.  Behavior, which is deemed to be incompatible with the program goals.
    c.  Behavior, which jeopardizes the security of efficient operation of the employment facility.
    d.  Behavior, which is inconsistent with KAR 44-12-328 and IMPP 02-118D defining staff relationships.  Illustrations of inappropriate relationships include, but are not limited to:
        i.  Any transfer, gift or exchange of items such as money, stamps, tobacco products, food, etc.
        ii.  Any attempt to place a civilian employee on the offender visiting list.
        iii.  Any correspondence with a civilian employee of the employer.
        iv.  Any attempt to meet with a civilian employee of the employer other than during work and at the facility.
2.  I am prohibited from requesting transfer to any other KDOC facility while employed in the prison-based program.
3.  I understand and agree that there is no due process protection against or upon termination from this employment program.  I am not entitled to any type of hearing prior to, after or in connection with termination from the employment program.
4.  I understand and agree that I have no due process protection from transfer to another facility.  I am not entitled to any type of hearing prior to, after or in connection with any transfer.
5.  I understand and agree that any attempt to engage in a personal relationship with any staff including civilian employees of the employer is grounds not only for termination from employment, but also may result in disciplinary action against me for violation of provisions of the Inmate Rule Book.
6.  I may request to be removed from the program and will not participate in any prison based private industries for 180 days.


_____          _____          _____/_____/_____
Offender Signature                                           Number                                 Date


_____                                              _____/_____/_____
Witness Signature                                                                             Date

provided in the journal entry of conviction shall have 2% of their remaining salary remitted to the court.

h.   Mandatory Savings:  After the deductions noted above have been made, 10% of the offender's remaining salary shall be deposited in a savings account for disbursement to the offender only upon his release from custody.

3.   Net Salary:

a.   Monies remaining after the above deductions may be expended at the offender's discretion subject to the applicable procedures established by the Department and the facility Warden.

Payment made for court costs and court ordered restitution may be applied differently by the court than reflected on the Department of Corrections records.  It is my responsibility to inquire with the courts on the amount collected for court ordered restitution and civil procedure costs and how my payments were allocated by the courts.  My signature below signifies my understanding of the required payroll deductions any my voluntary employment with this private company/industry.

_____       _____       _____/_____/_____
Offender Signature                                      Number                                Date


_____                                               _____/_____/_____
Witness Signature                                                                             Date





**K**ansas
Department of Corrections

# INTERNAL MANAGEMENT POLICY & PROCEDURE

**Applicability:** **X** ADULT Operations Only    _ JUVENILE Operations Only   _ DEPARTMENT-WIDE

| | |
|---|---|
| **IMPP #:  15-101A** | **PAGE #:  1 of 6** |

**WORK RELEASE AND PRISON/NON PRISON BASED PRIVATE INDUSTRY: Work Release Selection Criteria and Placement Procedures**

**Original Date Issued: 11-16-17    Replaces IMPP Issued:  07-10-18   CURRENT EFFECTIVE DATE: 04-14-22**

**Approved By:** _____, **Secretary** **Next Scheduled Review:  07/2024**

## POLICY

To reduce recidivism and facilitate reentry and transition to the community at release, it is the policy of the KDOC to prepare residents for, and provide access to, work release employment, when it is safe for the community and the resident has a need for such a program. Preparation includes planning with sufficient time for program participation prior to work release, including in particular employment and education programs; addressing community identification issues in place (critical for employment); and the expectation being that residents are referred in all cases, in the absence of a clear indication the placement is unsafe or at odds with the risk reduction and reentry plan.

## DEFINITIONS

<u>Clinical Services Report</u>: A report prepared by clinical professional staff that provides information about risk and need of potentially violent residents, including sex offenders.

<u>Director of Sex Offender Management</u>: A Central Office position that oversees the department's management of sex offenders, monitors the sex offender treatment program/contract, and administers the Multidisciplinary Team (MDT) and override process for sex offenders.

<u>Multidisciplinary Team</u>: Individuals selected by the Secretary of Corrections from a variety of state and private sources for the express purpose of assessing whether a person meets the definition of a sexually violent predator.

<u>Program Management Committee (PMC)</u>: The committee, consisting of the warden or designee and an administrative/supervisory representative from the Programs and the Security divisions of the facility responsible to review and approve or deny proposed classification exceptions, program placements including amendments to program plans, and transfer requests/recommendations.

<u>Sex Offender Program Team</u>:  A group of staff in the Programs and Risk Reduction division made up of the  Clinical Director, Programs Director, Sex Offender Assessors, and Sex Offender Program Supervisors.

<u>Sex Offender Specialist</u>: A position in Programs and Risk Reduction whose duties include screening those managed as sex offenders for program participation.

<u>Vocational Rehabilitation</u>:  A division of the Department of Children and Families and that assesses for eligibility and provides eligible persons with job training, placement, and support services.

<u>Work Release/Work Release Program</u>: Any work release programs as authorized by KSA 75-5267 and governed by KSA 75- 5268, applicable Internal Management Policies and Procedures, and facility general orders as approved by the Secretary of Corrections or designee, in a KDOC facility or county facility pursuant to an agreement with that county.

## PROCEDURES

I. **Preparing Residents for Work Release**

    A.     As part of ongoing case management, unit team staff shall review cases that are 30 months from release, to determine when to refer the resident to work release, and to ensure preparation is underway so the resident is ready to be referred.

        1.     If the resident is an appropriate candidate for an industry job (private or correctional, prison or community-based), at any custody level, the plan shall be developed and implemented in a time frame that permits employment in an industry, to help build job skills and otherwise prepare for work release. If a resident works in an industry job inside a maximum or medium custody unit, and then achieves minimum custody, industry employment shall be considered anew, if time to serve permits this further preparation for work release. The timing of the work should factor in the value of working an industry job, and then moving into work release. Unit team should work with residents to help them follow this path.

    B.     Unit team shall ensure a case plan is in place, and progress is made, towards readiness for this referral. This includes addressing:

        1.     Readiness, motivation and responsivity towards working the risk reduction plan;

        2.     Barriers to minimum custody (such as detainers, disciplinary reports, other behavior issues, etc.);

        3.     Job readiness (including skills and prepared portfolio), education, employment and Cognitive Based Intervention (CBI) programs;

        4.     Use of EPICS tools; and any other issues necessary for the resident to be ready for work release.

II. **Determining Eligibility for Work Release**

    A.     Every resident shall be screened to determine if s/he is a good candidate for work release placement, in time to place residents in work release six (6) to 18 months from release. Any resident is eligible for work release, provided:

        1.     The resident does not have a diagnosis of pedophilia, or an Axis I diagnosis of not otherwise specified exhibitionism, fetishism, frotteurism, sexual masochism, sexual sadism, transvestic fetishism or voyeurism;

        2.     The resident is managed as a sex offender who is not precluded by #1, and s/he has successfully completed sex offender programming as recommended by the Sex Offender Program assessment and program team, or has not been recommended for sex offender programming;

3.     The resident is physically capable of seeking and maintaining employment, with reasonable and available assistance for any physical limitation which cannot be mitigated by services through Vocational Rehabilitation;

4.     Any medical or behavioral health treatment needs can be adequately addressed in the work release setting, including the ability to access necessary medication;

5.     The resident has no history of escapes from a secure facility in the last 10 years;

6.     The resident has not been convicted of:

    a.     A Rule 1 disciplinary infraction involving serious injury or property damage within the last five years that reflects recent and ongoing violent, assaultive, or dangerous behavior, or

    b.     A Rule 2 infraction for arson, or dangerous contraband not involving a weapon or statutory violation (felony crime), within the last six (6) months.

7.     The resident does not have a pending felony detainer or a misdemeanor detainer that it is known will require the resident to serve more than 60 days in a local jail after release from KDOC;

    a.     The referral shall specifically reflect that unit team has done due diligence in identifying, addressing, and attempting to resolve any pending detainer, and ensure that the likelihood that the resident will serve more than 60 days on a misdemeanor detainer is well established.

8.     There are no other indicators that a resident is too great a risk to the community if placed in a work release setting, including recent behavior, program summaries or a Clinical Services Report reflecting high risk for violent behavior within the last two (2) years, or otherwise.

9.     The resident has a viable residence release plan to or near the location of the work release program, in consideration of county of conviction, pro-social influencers in the area, or an established employment opportunity in the area.

III.   **Referring a Resident for Work Release Placement**

A.     Referrals shall be made timely and processed expeditiously, with the goal consistently being placement in work release.

B.     Once the referral has been completed, and unit team has confirmed eligibility, it shall be processed as follows:

    1.     After completion of the screening process, the referral shall be sent to the Program Management Committee (PMC) to confirm eligibility, and to get any necessary input from   medical and behavioral health.

    2.     Once the PMC confirms eligibility, the referral shall be sent to the administrative designee for the work release facility. The administrative designee shall complete the Victim  Notification process.

    3.     If the resident is managed as a sex offender, the administrative designee shall send the referral to the Sex Offender Specialist

        a.     The Sex Offender Specialist shall make a recommendation to approve

or  disapprove the referral for further processing, after considering the following:

    (1)    Sex offending history;

    (2)    Sex offender risk/need assessments;

    (3)    Sex offender program participation and program participation summary;

    (4)    Status current or potential as a sexually violent predator;

    (5)    Relevant diagnoses;

    (6)    Relevant parole violations;

    (7)    Relevant institutional behavior; or

    (8)    Any other information relevant to current risk for sexually reoffending.

4.    The Sex Offender Specialist may recommend approval subject to some specific conditions, and if so, those conditions shall be indicated with the approval, and shall become part of the rules the resident will follow if placed.

5.    The work release facility shall accept the referral into work release, in the absence of a definable objective safety concern, which the administrative designee shall raise and address with the referring facility to determine if it can be resolved.

6.    After the referral is accepted, the referring facility shall notify the resident and schedule the resident for transport or transfer.

## IV. Placement in Work Release

A.    All residents placed in work release shall be required to do the following:

1.    The resident shall have been continuously housed in a minimum-security living area for at least 30 days, immediately preceding placement in work release.

2.    Complete an acknowledgement concerning work release placement, using Attachment B.

3.    Comply with all rules, general orders, policies and procedures of the program and department.

4.    Participate in any job readiness or other risk-reduction programming as required by his/her unit team counselor.

5.    Actively seek and maintain full time employment, in the time frame as directed by program staff and unit team counselor.

    a.    If program and unit team staff determine the resident needs to complete some programming at the facility prior to full time employment that shall be reflected in the resident's case plan and his/her job search and employment requirement shall be tailored to this plan.

    b.    Program and unit team staff shall ensure the resident is provided job

readiness prior to work release participation as well as placement, and retention services.

    6.    Remain in the facility at all times except when going to/coming from work, or as approved, for job searching, job training or point-to-point passes.

        a.    The facility shall develop, publish, post and make available information about how to request a pass; when passes will be granted; and methods for ensuring the passes are used for the purposes granted only.

B.    The Warden or Designee s h a l l maintain the following as a permanent record in the resident's file:

    1.    Disbursement of the resident's earnings in accordance with IMPP 04-109A;

    2.    The name, address, and telephone number of the employer;

    3.    The job or position title in which the participant is employed;

    4.    The rate of compensation and pay period interval; and

    5.    The resident's regular work schedule.

C.    The Warden or designee shall provide information to the employer about the work release program including the physical address, telephone number, and email address of the facility.

## V.    Termination and Removal Procedures

A.    The Warden or Director of the work release facility, or designee, may terminate a resident's participation in a work release program for the reasons provided in the Resident Acknowledgement Concerning Work Release Placement (Attachment B).

    1.    Work release staff shall ensure that all possible effective correctional practices and interventions have been deployed to stabilize the placement before termination.

B.    Residents may be transferred to another KDOC facility if extended hospitalization or treatment is recommended, or if the resident is financially unable to meet the cost of short-term hospitalization.

    1.    After medical care is complete, the resident shall be returned to complete the work release program, in the absence of a significant barrier to doing so (such as time to release, medical/physical condition/needs).

C.    If a resident is terminated from a work release program, the reasons shall be documented, and the resident transferred from the facility. The documentation shall specifically reflect the interventions made to prevent removal.

**NOTE:** The policy and procedures set forth herein are intended to establish directives and guidelines for staff, residents, offenders and those entities that are contractually bound to adhere to them. They are not intended to establish State created liberty interests for employees, residents or offenders, or an independent duty owed by the Department of Corrections to employees, residents, offenders, or third parties. Similarly, those references to the standards of various accrediting entities as may be contained within this document are included solely to manifest the commonality of purpose and direction as shared

by the content of the document and the content of the referenced standards. Any such references within this document neither imply accredited status by a Departmental facility or organizational unit, nor indicate compliance with the standards so cited. The policy and procedures contained within this document are intended to be compliant with all applicable statutes and/or regulatory requirements of the Federal Government and the state of Kansas. This policy and procedure are not intended to establish or create new constitutional rights or to enlarge or expand upon existing constitutional rights or duties.

## REPORTS REQUIRED

None.

## HISTORY

11-16-17 Original
07-10-18 Revision 1
04-14-22 Revision 2

## REFERENCES

K.S.A.  75-5267, 75-5268
KAR  44-12-328
IMPP 02-118D, 04-109A, 12-120A,

## ATTACHMENTS

| Attachment | Title of Attachment | Page Total |
|---|---|---|
| A | Referral for Work Release | 5 page(s) |
| B | Resident Acknowledgement Concerning Work Release Placement | 1 page(s) |

Page 1 of 5, Attachment A, IMPP 15-101A
Effective 04-14-22

## <u>REFERRAL FOR WORK RELEASE EMPLOYMENT</u>

### *Initial Screening by Unit Team*

Resident Name & Number: _____ Date: _____

Unit Team Counselor Name & Phone # _____

Resident's release date (mandatory or released by PRB)? _____   To what county? _____

1. Does the resident have a diagnosis of pedophilia, or an Axis I diagnosis of not otherwise specifiedexhibitionism, fetishism, frotteurism, sexual masochism, sexual sadism, transvestic fetishism or voyeurism?
   ☐ Yes ☐ No  If **yes**, **not eligible** to proceed.

2. Is the resident managed as a sex offender, and has <u>not</u> completed sex offender treatment? ☐ Yes ☐ No    If **yes**, **not eligible** to proceed.
   **<u>Note</u>**: If this referral is for private industry, the warden may approve placement if the resident is in treatment and making progress, and after consulting with treatment provider. Please indicate status of treatment and feedback from provider if this referral is for private industry:_____

   _____

3. Is the resident physically capable of seeking and maintaining employment, with reasonable and available assistance for any physical limitation? ☐ Yes ☐ No If **no**, **not eligible** to proceed.

4. Does the resident have any medical or behavioral health treatment need that cannot be adequately addressed in the work release setting, including access to medication?
   ☐ Yes ☐ No If **yes**, **not eligible** to proceed.

5. Does the resident have a history of escape from a secure facility in the last 10 years? ☐ Yes ☐ No  If **yes**, **not eligible** to proceed.

6. Has the resident been convicted of a Rule 1 disciplinary infraction in the last five years that involved significant damage or property loss, showing current violent, assaultive, or dangerous behavior; or Rule 2 infraction for arson, or dangerous contraband not involving a weapon or statutory violation (felony crime) within the last six (6) months?

   ☐ Yes ☐ No  If **yes**, **not eligible** to proceed.

7. Does the resident have a pending felony        ☐ Yes ☐ No  If **yes**, **not eligible** to proceed.
   detainer that has been addressed with the
   jurisdiction and cannot be resolved?

   Describe/explain detainer:_____

8. Are there any other indicators that this resident shall great a risk to the community if placed in a work release setting, known to you? ☐ Yes No☐ If **yes**, **not eligible** to proceed.
   Briefly describe: _____
   _____

**NOTE**: If the above answers (1 – 10) indicate that this resident **is not** eligible for work release, but for somereason you believe s/he should be considered, please explain why:

_____
_____
_____
_____
_____
_____
_____
_____

**NOTE**: If the above answers (1 – 10) indicate that this resident **is** eligible for work release, but for some reasonyou believe s/he **should not** be considered, please explain why:

_____
_____
_____
_____
_____
_____
_____
_____

### *Referral to Work Release*

If after screening, unit team concludes a referral to work release is appropriate, complete the following:

Resident Name & Number:_____   Date:_____

Unit Team Counselor Name & Phone # _____   _____

Resident's release date (mandatory or released by PRB)? _____   To what county? _____

To which work release program is this referral being made?

**Choice #1:**   ☐ WWRF   ☐ HCF   ☐ Johnson County   ☐ TCF   ☐   LCF-East

☐   Other (describe) _____ __

**Choice #2:**   ☐ WWRF   ☐ HCF   ☐ Johnson County   ☐ TCF   ☐   LCF-East

☐   Other (describe) _____

A. <u>Employability</u>
What is the resident's work history; LSIR education/employment score; and what job readiness classes hass/he done?

**Completed Education Programming, Job Readiness, or work with a Job Specialist?** ☐ Yes ☐ No
**Risk level on education/employment:** ☐ Low ☐ Moderate ☐ High
**Comments:**_____
_____

B. <u>Relevant substance abuse history</u> (e.g., recent use, treatment, impact on employment in the past, etc.)

**Completed SARP or SAP?**   Yes ☐   No ☐   If yes, which one: _____
**Has resident had past community treatment?** ☐ Yes ☐ No
**Comments:**_____
_____

C. If the resident is high or moderate risk for anti-social thinking, based on the LSCMI or LSIR attitudes/orientation, criminal history, companions and/or leisure time domains, what has been done to address this, if anything (e.g., completed a CBI program including Advanced Practice).

**Attitudes & Orientation score:** _____
**Completed a CBI Program?**   Yes ☐   No ☐
**Comments:**_____
_____

D. What is the status of the resident's identification (driver's license, birth certificate, social security card); and if the resident was required to register for selective service, was this done/when? _____

**Note:** This issue should be addressed before sending the resident to work release.

**Has a birth certificate?** ☐ Yes ☐ No

**Has a social security card?** ☐ Yes ☐ No

**Has a valid driver's license?** ☐ Yes ☐ No

**Has a valid Kansas ID?** ☐ Yes ☐ No

**Has registered for selective service?** ☐ Yes ☐ No ☐ Not required to register

**Comments:**_____
_____

E. Is the resident eligible for employment assistance through vocational rehabilitation or veteran status? ☐ Yes ☐ No

F. If there is a pending detainer (not felony)? If so, what has been done to address it, and what is the status?

**Pending non-felony detainer?** ☐ Yes ☐ No

**Comments:**_____
_____

G. Does this resident have a "pro-social" support person, *including a matched mentor,* and if so, who? Will the resident continue to have access to this support if s/he goes to work release?

**Has a support person?** ☐ Yes ☐ No

**Has a mentor?** ☐ Yes ☐ No

**Comments:**_____
_____

H. Is work release placement a goal in this resident's case plan and/or is this referral made at the recommendation of the Prisoner Review Board?

**Work release is a goal in case plan?** ☐ Yes ☐ No

**Work release has been recommended by the Prisoner Review Board?** ☐ Yes ☐ No

**If "yes," please state specifically what recommendation the PRB made, and when.**

**Comments:**_____
_____

I. Is there any pending behavioral or medical health issue that work release should know about, and if so, what is the status?

**Pending behavioral and/or medical issue?** ☐ Yes ☐ No

**Comments:**_____
_____

J. Is there any other information you think would be useful to making the decision about whether to place this resident in work release, or about what case management and job assistance the inmate may require once at work release if admitted into the program?

**Comments:**_____
_____

### *Referral for Work Release*

1.  If the offender is **managed as a sex offender**, referral was sent to the Sex Offender Specialist and then Deputy Secretary of Facilities Management or designee?
    ☐ Yes ☐ No     Date: _____
    Comments/Result:_____
    _____

2.  If the offender is not a sex offender, or after #1 above, referral was sent to Unit Team Manager for review?   ☐ Yes ☐ No     Date: _____
    Comments/Result:_____
    _____

3.  The Unit Team Manager has reviewed the referral to confirm the resident is eligible, then  forward to PMC?

    ☐     Reviewed and Eligible      ☐     Reviewed and Not Eligible for Reason Indicated

    Date and Reason: _____
    _____

4.  PMC has confirmed eligibility and sought any additional input needed from medical or behavioral health?
    ☐ Yes  ☐ No     Date: _____

    Behavioral Health Input:_____

    Medical Input: _____

Attachment B, IMPP 15-101A
Effective 04-14-22

## RESIDENT ACKNOWLEDGMENT CONCERNING WORK RELEASE PLACEMENT

I,_____, #_____have agreed to be placed in a work release program of the Kansas Department of Corrections at the following facility_____.
With respect to that placement, I fully understand, agree and acknowledge the following:

1.    To remain in and be successful in this program, I shall:

     a.    Complete this acknowledgement.
     b.    Comply with all rules, general orders, policies and procedures of the department and program.
     c.    Remain in the facility at all times except when going to/coming from work, or as approved for job searching, job training, or point-to-point passes. I will not leave the facility without proper authorization, and I will not fail to return to the facility as directed or scheduled.
     d.    Work diligently towards getting and staying employed using all services available to me to support this effort; and maintain this employment, not being terminated for cause or for behavior that makes me a risk to the community.
     e.    Recognize that if I am subject to disciplinary action for serious or repeated rules violations which creates disruption or risk I cannot remain in the program.
     f.    Not participate in criminal activity, including any that causes me to be referred for prosecution.
     g.    If I am managed as a sex offender, participate in any programming including advanced practice as directed. I understand if I behave in risky behavior related to sexually offending, I will be removed from the program. I also understand if I am determined to be high risk for referral for filing under the Sexually Violent Predator Act I will be removed from the program.
     h.    Not engage in behavior that causes me to be a disruption at the work release facility, and I understand the work release team may review my case for removal if I do so.
     i.    Understand that I may ask to be removed from the program.

2.    That I have no due process protection against or upon termination from the program and am not entitled to a hearing of any type or sort prior to, after or in connection with my removal from work release.

3.    That I have no due process protection against my personal property being controlled as per the provisions of IMPP 12-120A Control of Resident Personal Property.

4.    That I have no due process protection against or upon being transferred to another facility if my termination from the program gives rise to the need to transfer me to another facility; and I am not entitled to a hearing of any type or sort prior to, after or in connection with my transfer to another facility.

5.    If terminated from a work release program for disciplinary reasons I will be placed on Incentive Level I.

6.    That if I am subject to a court order for restitution, regardless of whether such order makes restitution immediately payable, restitution payments will be deducted from my trust account in accordance with IMPP 04-109A.

7.    That failure to agree to payment of court-ordered restitution in accordance with IMPP 04-109A will make me ineligible for assignment to traditional work release or private industry work release.


_____          _____          _____
Resident's Signature                                      KDOC#                         Date


_____                                       _____
Witness' Signature                                                                  Date

State of Kansas
Department of Administration
,OA-146a   (Rev. 4-11-13 KDOC)



**CONTRACTUAL PROVISIONS ATTACHMENT**

Important:   This form contains mandatory contract provisions and must be attached to or incorporated in all copies of any contractual agreement. If it is attached to the vendor/contractor's standard contract form, then that form must be altered to contain the following provision:

"The Provisions found in Contractual Provisions Attachment (Form DA-146a, Rev. 04-11), which is attached hereto, are hereby incorporated in this contract and made a part thereof."

The parties agree that the following provisions are hereby incorporated into the contract to which it is attached and made a part thereof, said contract being the _____ day of _____, 20_____.

1.  **Terms Herein Controlling Provisions**:  It is expressly agreed that the terms of each and every provision in this attachment shall prevail and control over the terms of any other conflicting provision in any other document relating to and a part of the contract in which this attachment is incorporated.  Any terms that conflict or could be interpreted to conflict with this attachment are nullified.

2.  **Kansas Law and Venue**:  This contract shall be subject to, governed by, and construed according to the laws of the State of Kansas, and jurisdiction and venue of any suit in connection with this contract shall reside only in courts located in the State of Kansas.

3.  **Termination Due to Lack of Funding Appropriation or Budget Rescission or Allotment**:  If, in the judgment of the Director of Accounts and Reports, Department of Administration, sufficient funds are not appropriated to continue the function performed in this agreement and for the payment of the charges hereunder, State may terminate this agreement at the end of its current fiscal year.  State agrees to give written notice of termination to contractor at least 30 days prior to the end of its current fiscal year, and shall give such notice for a greater period prior to the end of such fiscal year as may be provided in this contract, except that such notice shall not be required prior to 90 days before the end of such fiscal year.  If, in the judgment of the Secretary of the state agency party, as a result of a budget rescission ordered by the Governor, or a budget allotment ordered by the Secretary of Administration, insufficient funds remain to support the function performed in this agreement and for payment of charges hereunder, State may terminate this agreement upon giving 30 days' written notice.  In the event of termination due to any circumstance set forth above, Contractor shall have the right to take possession of any equipment provided State under the contract, upon the effective date of termination.  State will pay to the contractor all regular contractual payments incurred up to the effective date of termination, plus contractual charges, if any, incidental to the return of any such equipment.  Upon termination of the agreement by the State, title to any such equipment shall revert to the contractor upon the effective date of termination.  The termination of the contract pursuant to this paragraph shall not cause any penalty to be charged to the agency or the contractor.

4.  **Disclaimer Of Liability**:  No provision of this contract will be given effect that attempts to require the State of Kansas or its agencies to defend, hold harmless, or indemnify any contractor or third party for any acts or omissions. The liability of the State of Kansas is defined under the Kansas Tort Claims Act (K.S.A. 75-6101 et seq.).

5.  **Anti-Discrimination Clause**:  The contractor agrees: (a) to comply with the Kansas Act Against Discrimination (K.S.A. 44-1001 et seq.) and the Kansas Age Discrimination in Employment Act (K.S.A. 44-1111 et seq.) and the applicable provisions of the Americans With Disabilities Act (42 U.S.C. 12101 et seq.) (ADA) and to not discriminate against any person because of race, religion, color, sex, disability, national origin or ancestry, or age in the admission or access to, or treatment or employment in, its programs or activities; (b) to include in all solicitations or advertisements for employees, the phrase "equal opportunity employer"; (c) to comply with the reporting requirements set out at K.S.A. 44-1031 and K.S.A. 44-1116; (d) to include those provisions in every subcontract or purchase order so that they are binding upon such subcontractor or vendor; (e) that a failure to comply with the reporting requirements of (c) above or if the contractor is found guilty of any violation of such acts by the Kansas Human Rights Commission, such violation shall constitute a breach of contract and the contract may be cancelled, terminated or suspended, in whole or in part, by the contracting state agency or the Kansas Department of Administration; (f) if it is determined that the contractor has violated applicable provisions of ADA, such violation shall constitute a breach of contract and the contract may be cancelled, terminated or suspended, in whole or in part, by the contracting state agency or the Kansas Department of Administration.

Contractor agrees to comply with all applicable state and federal anti-discrimination laws.

The provisions of this paragraph number 5 (with the exception of those provisions relating to the ADA) are not applicable to a contractor who employs fewer than four employees during the term of such contract or whose contracts with the contracting State agency cumulatively total $5,000 or less during the fiscal year of such agency.

6.  **Acceptance Of Contract**:  This contract shall not be considered accepted, approved or otherwise effective until the statutorily required approvals and certifications have been given.

7.  **Arbitration, Damages, Warranties**:  Notwithstanding any language to the contrary, no interpretation of this contract shall find that the State or its agencies have agreed to binding arbitration, or the payment of damages or penalties. Further, the State of Kansas and its agencies do not agree to pay attorney fees, costs, or late payment charges beyond those available under the Kansas Prompt Payment Act (K.S.A. 75-6403), and no provision will be given effect that attempts to exclude, modify, disclaim or otherwise attempt to limit any damages available to the State of Kansas or its agencies at law, including but not limited to the implied warranties of merchantability and fitness for a particular purpose.

8.  **Representative's Authority To Contract**:  By signing this contract, the representative of the contractor thereby represents that such person is duly authorized by the contractor to execute this contract on behalf of the contractor and that the contractor agrees to be bound by the provisions thereof.

9.  **Responsibility For Taxes**:  The State of Kansas and its agencies shall not be responsible for, nor indemnify a contractor for, any federal, state or local taxes which may be imposed or levied upon the subject matter of this contract.

10.  **Insurance**:  The State of Kansas and its agencies shall not be required to purchase any insurance against loss or damage to property or any other subject matter relating to this contract, nor shall this contract require them to establish a "self-insurance" fund to protect against any such loss or damage.  Subject to the provisions of the Kansas Tort Claims Act (K.S.A. 75-6101 et seq.), the contractor shall bear the risk of any loss or damage to any property in which the contractor holds title.

11.  **Information**:  No provision of this contract shall be construed as limiting the Legislative Division of Post Audit from having access to information pursuant to K.S.A. 46-1101 et seq.

12.  **The Eleventh Amendment**:  "The Eleventh Amendment is an inherent and incumbent protection with the State of Kansas and need not be reserved, but prudence requires the State to reiterate that nothing related to this contract shall be deemed a waiver of the Eleventh Amendment."

13. **Campaign Contributions / Lobbying:** Funds provided through a grant award or contract shall not be given or received in exchange for the making of a campaign contribution. No part of the funds provided through this contract shall be used to influence or attempt to influence an officer or employee of any State of Kansas agency or a member of the Legislature regarding any pending legislation or the awarding, extension, continuation, renewal, amendment or modification of any government contract, grant, loan, or cooperative agreement.

14. **Compliance with Prison Rape Elimination Act (PREA):**   The contractor agrees to comply with all applicable provisions of the Prison Rape Elimination Act of 2003 (42. U.S.C. §§ 15601, et seq.), as amended from time to time, and National PREA Standards promulgated by the Attorney General of the United States, under authority of that Act, found at 28 CFR Part 115, as amended from time to time.  The contractor further agrees to comply with all applicable administrative policies and procedures of the Kansas Department of Corrections and its facilities, dealing with the subject matter of sexual abuse or sexual harassment of inmates or juvenile residents.

# KUMC Contract Extension

**Final Audit Report** 2022-09-14

| | |
|---|---|
| Created: | 2022-09-06 |
| By: | Nancy Burghart (Nancy.Burghart@ks.gov) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAA2hRrA2PXPTCX9YU-txPxn480E3xUv953 |

## "KUMC Contract Extension" History

🗋 Document created by Nancy Burghart (Nancy.Burghart@ks.gov)
2022-09-06 - 7:32:08 PM GMT

✉ Document emailed to Keith Bradshaw (keith.bradshaw@ks.gov) for signature
2022-09-06 - 7:35:58 PM GMT

🗋 Email viewed by Keith Bradshaw (keith.bradshaw@ks.gov)
2022-09-06 - 7:37:51 PM GMT

✍ Document e-signed by Keith Bradshaw (keith.bradshaw@ks.gov)
Signature Date: 2022-09-06 - 7:38:30 PM GMT - Time Source: server

✉ Document emailed to Janelle Amon (janelle.amon@ks.gov) for signature
2022-09-06 - 7:38:32 PM GMT

🗋 Email viewed by Janelle Amon (janelle.amon@ks.gov)
2022-09-07 - 4:52:51 PM GMT

✍ Document e-signed by Janelle Amon (janelle.amon@ks.gov)
Signature Date: 2022-09-07 - 4:53:07 PM GMT - Time Source: server

✉ Document emailed to Natasha Carter (Natasha.Carter@ks.gov) for signature
2022-09-07 - 4:53:09 PM GMT

🗋 Email viewed by Natasha Carter (Natasha.Carter@ks.gov)
2022-09-08 - 4:28:26 PM GMT

✍ Document e-signed by Natasha Carter (Natasha.Carter@ks.gov)
Signature Date: 2022-09-08 - 4:29:55 PM GMT - Time Source: server

✉ Document emailed to Jeff Zmuda (jeff.zmuda@ks.gov) for signature
2022-09-08 - 4:29:57 PM GMT

 **Adobe Acrobat Sign**

Email viewed by Jeff Zmuda (jeff.zmuda@ks.gov)
2022-09-14 - 6:18:53 PM GMT

Document e-signed by Jeff Zmuda (jeff.zmuda@ks.gov)
Signature Date: 2022-09-14 - 6:19:19 PM GMT - Time Source: server

Agreement completed.
2022-09-14 - 6:19:19 PM GMT

**Adobe Acrobat Sign**

## INTERAGENCY SERVICES AGREEMENT

This Interagency Services Agreement ("Agreement") is made and entered into as of the 1st day of July, 2015, by and between the Department of Corrections of the State of Kansas ("KDOC") and the University of Kansas on behalf of its Medical Center ("Medical Center").

WHEREAS, KDOC, as part of the criminal justice system, contributes to the public safety by exercising reasonable, safe, secure, and humane control of offenders while actively encouraging and assisting them to become law abiding citizens; and

WHEREAS, as part of that mission, KDOC or its contractors provide medical care to its incarcerated population; and

WHEREAS, KDOC desires independent and objective review and management of the medical care provided; and

WHEREAS, Medical Center, an educational institution of the state of Kansas, desires to provide services of its employees to provide the medical management and quality assurance services described in this Agreement ("Services").

NOW, THEREFORE, in consideration of the mutual promises herein contained, the parties have agreed and do hereby enter into this Agreement according to the provisions set forth herein:

1.    **Services**

    a.    Medical Center will provide to KDOC the personnel listed on Exhibit A, attached hereto and incorporated herein ("Personnel"). Personnel will be provided as long as the positions are funded by KDOC as agreed to in the annual budget.

    b.    KDOC may participate in the selection of Personnel filling the positions listed on Exhibit A and Personnel selected to fill these positions will be subject to KDOC's approval.

       c.     KDOC and Medical Center will mutually agree upon the job descriptions and duties for each of the positions listed on Exhibit A. The job descriptions will require the personnel to comply with all applicable rules and regulations, Internal Management Policies and Procedures, and General Orders of KDOC that are generally applicable. KDOC agrees to provide all applicable rules and regulations, Internal Management Policies and Procedures, and General Orders of KDOC to the personnel.

       d.     The Director of Health Care Services is the KDOC administrative health authority and is authorized to approve all policies related to the medical care of inmates. This Authority in no way usurps the clinical responsibilities of the KDOC's Health Care Vendor's Clinical Health Authority.

       e.     Medical Center will provide twenty (20) hours per week of Services provided by physicians in Topeka, Kansas and five (5) hours per week of on-call services.

       f.     Medical Center will provide KDOC with access to specialists at the Medical Center for purposes of providing expertise on issues where KDOC believes the opinion or advice of a specialist in a particular field would be assistance to KDOC. In most instances such access would take the form of a record, policy or procedure review. Appropriate consultation fees will be paid to Medical Center from funds authorized through this Agreement if onsite consultation is necessary.

       g.     Medical Center may provide Services through a subcontract with an entity qualified and competent to provide such services, subject to written approval by KDOC.

       h.     The parties agree that the Services provided pursuant to this Agreement by physicians and Personnel are not medical or patient care but administrative services.

**2.**     **Compensation**

       a.     The parties will work together to formulate and approve a budget that includes but is not limited to the following: salary and fringe benefits of Personnel; costs of continuing education and education materials; physician Services; consultation services provided pursuant to Section 1.f; equipment needed to perform job responsibilities; family medicine fee; and per diem and travel expenses.

KDOC agrees that the following expenses will be increased each year by the amount of any increase in the consumer price index (CPI): Medical Care Services as published for the month of March each year.

b.    The parties may increase the budget upon mutual written agreement for unforeseen circumstances or to provide additional services prior to such expenditure being incurred.

c.    Medical Center will bill KDOC for consultation services detailed in Section 1.f. and actual expenses incurred. Total compensation by KDOC will not exceed the amount in Exhibit B for the current term.

d.    Medical Center will bill KDOC for one twelfth (1/12) of the budgeted amount in Exhibit B by the tenth (10th) day of each month for the Services provided during the current month. KDOC will process the billing statement for payment as soon as possible after receipt but not later than thirty (30) days after receipt.

3.    **Responsibilities of KDOC**

a.    The Personnel will have access to state vehicles on the same basis as KDOC employees.

b.    KDOC will furnish necessary office space, supplies, and telephone support.  Any property acquired pursuant to this Agreement will be and remain the property of KDOC.

c.    KDOC through the Secretary, Deputy Secretary, or designee will make all financial decisions related to this Agreement and the agreement to provide medical care to inmates.

4.    **Term and Termination**

a.    This Agreement will be in effect from July 1, 2015 to June 30, 2016. This Agreement will automatically renew from year to year unless either party notifies the other, in writing, thirty (30) days or more in advance of the expiration date of an intent to not renew the Agreement.

b.    This Agreement may be terminated by either party at any time upon ninety (90) days' written notice.

c.    In the event this Agreement is terminated, all finished or unfinished documents, data, studies, and reports prepared pursuant to this Agreement will become the property of KDOC.

5. **Insurance and Indemnification**

a.   Neither party assumes or accepts any liability for the acts or failure to act, professionally or otherwise, of agents or employees of the other party.

b.   Medical Center agrees that KDOC will not be responsible for claims, expenses, damages, or liability for personal injury or damage to property, real or personal, directly or indirectly, arising from the negligent or wrongful act of Medical Center, its officers, employees, agents, and volunteers.  Claims against Medical Center may be pursued in accordance with the provisions of the Kansas Tort Claims Act, K.S.A. 75-6101 et seq. *[handwritten: A-yms Indemnification claim can still file against Kan. Wesley - Lsan D. amb. ambulance]*

c.   KDOC agrees that Medical Center will not be responsible for claims, expenses, damages, or liability for personal injury or damage to property, real or personal, directly or indirectly arising from the negligent or wrongful act of KDOC, its officers, employees, agents, or volunteers. Claims against KDOC may be pursued in accordance with the provisions of the Kansas Tort Claims Act, K.S.A. 75-6101 et seq. *[handwritten: There is a 7yr window of opportunity to file the tort claim due to evidence by law in state court]*

6. **Status of the Parties**

a.   Nothing herein is intended to create the relationship of joint venture, partner, or agent and principal, of any party to the other nor any right to govern or control the operations of the other party.  Each party will be and remain independent and responsible for its own acts and those of its own employees.  Each party will be solely responsible for the payment of all salaries, wages, withholding, and benefits for its own employees.

7. **Records**

a.   KDOC owns and has the right of control of all reports, records and supporting documents prepared in connection with the provisions of services under this agreement. Medical Center has the right to access and copy such reports, records, and supporting documentation.  Immediately upon expiration or termination of this Agreement, all such records and files will be delivered to the KDOC; however, Medical Center may retain a copy.

8.    **Audit**

    a.    Neither party to this Agreement will prohibit or prevent the Legislative Division of Post Audit from having access pursuant to K.S.A. 46-1101 et seq. to any records, documents, or other information, confidential or otherwise, regarding or relating to the execution and/or performance of this Agreement.

9.    **Prison Rape Elimination Act Requirements**

    Medical Center shall at all times comply with the National Standards promulgated under the Prison Rape Elimination Act (42 U.S.C. § 15601, et seq.), which are found at 28 CFR 115.5 to 115.93, inclusive, and the provisions of KDOC Internal Management Policy and Procedure (IMPP) 10-103, in regard to any of its employees who have or may reasonably be expected to have contact with inmates in delivering services and/or goods pursuant to this Agreement.

    In particular, Medical Center shall:

(a)    Prior to the hiring of any employee reasonably expected to have contact with inmates, submit name and necessary identifying information to the KDOC for a criminal background check, as required by 28 CFR 115.17; and also shall inquire of prospective hires and employees considered for promotion as to their involvement in any prior events involving sexual misconduct set forth at subsection (a) thereof, also per 28 CFR 115.17;

(b)      promptly make its employees available for orientation and periodic training provided by KDOC in regard to the obligations and requirements imposed by said Act and National Standards, as required by 28 CFR 115.32 and IMPP 10-103, Sec. II;

(c)      promptly make available upon request to KDOC in any sexual abuse incident review conducted pursuant to 28 CFR 115.86 in which any of Medical Center's employees is involved as the target of the investigation and review, or witness thereto, any of its employees for interview by the Sexual Abuse Incident Review Board, as well as any pertinent records regarding the incident in question; and

(d)      promptly make available upon request any records necessary for KDOC to meet the requirements for data collection, review for corrective action, and audits, as set forth at 28 CFR 115.87, 115.88, 115.93.

Medical Center further acknowledges that KDOC must bar any employee of Medical Center found to have engaged in sexual abuse from its facilities' premises, as well as report any such employee to law enforcement agencies and relevant licensing bodies, and that KDOC otherwise must take appropriate remedial measures in response to any violation of its sexual abuse or sexual harassment policies, as set forth at CFR 115.77.   Medical Center further acknowledges and agrees that KDOC, in its sole discretion, may bar any employee of Medical Center under investigation for alleged sexual abuse or sexual harassment during the investigation.

**10.    Miscellaneous**

a.      This Agreement is subject to the provisions in the Contractual Provisions Attachment (Form DA-146a) which is attached hereto as Exhibit C and hereby incorporated in to and made part of this Agreement.

b.      As one primary purpose of the Medical Center is to provide for the professional education of various health professionals, students and intern/residents in the various professional schools will be permitted to participate in KDOC's programs and activities, with proper supervision, under arrangements mutually agreed upon by KDOC and Medical Center.

c.      This Agreement constitutes the entire understanding among the Parties hereto regarding the subject matter of this Agreement.  Any prior agreements, promises, negotiations, oral or written, not expressly set forth herein which relate to the subject matter of this Agreement are of no force or effect.

d.      No waiver of a breach of any provision of this Agreement will be construed to be a waiver of any breach of any other provision of this Agreement or of any succeeding breach of the same provision.  No delay in acting with regard to any breach of any provision of this Agreement will be construed to be a waiver of such breach.

e.      This Agreement shall be governed by and construed under the laws of the State of Kansas.

f.      All notices required under the terms of this Agreement shall be given and shall be complete upon personal delivery or upon mailing such notices by certified or registered mail, return receipt requested to the address of the Party as shown below, or to such other address as may be designated in writing.  Notice of change of address shall be given in the same manner, but shall only be deemed given upon receipt of the notice.

To KDOC:      Ray Roberts              To Medical Center:      Robert Simari, M.D.
              Secretary                                        Executive Dean
              Kansas Depart of Corrections                     KU Medical Center

714 SW Jackson, 3rd Floor                    3901 Rainbow Blvd,

Topeka, Kansas 66603                         Kansas City, Ks 66160

    g.      Medical Center may assign this Agreement to another party upon written notice to and approval by the KDOC.

    h.      If any provision of this Agreement is, or is adjudged as, unlawful or contrary to public policy, then that provision will be deemed null and void and severable from the remaining provisions of this Agreement, and in no way will affect the validity of this Agreement.

    i.      This Agreement may be executed in any number of counterparts, each of which will be treated as an original, but all of which collectively constitutes a single agreement; facsimile and/or portable document format (PDF) to be accepted as original and legally binding.

    j.      This Agreement will not confer any benefit or rights upon any person other than the parties hereto and no other third party will be entitled to enforce any obligation, responsibility or claim of any party to this Agreement.

    IN WITNESS WHEREOF, the parties have caused this Agreement to be executed on the day and year first above-mentioned.

**State of Kansas Department of Corrections**        **University of Kansas Medical Center**

Ray Roberts                            Robert D. Simari, MD

Secretary of Corrections                 Executive Dean KU School of Medicine

EXHIBIT A

PERSONNEL

Positions

1.  One (1) Director

2.  Three (3) Senior Coordinators Exempt

3.  Three (3) Program Administrators

4.  One (1) Administrative Officer

5.  One (1) Program Director

6.  (.60 FTE) Physician

EXHIBIT B

COMPENSATION

Total compensation to Medical Center for Services and personnel provided July 1, 2015 to June 30, 2016 is budgeted for and will not exceed: $1,742,851.00.

## INTERAGENCY SERVICES AGREEMENT

### Amendment No. 1

This Interagency Services Agreement Amendment ("Amendment") is made and entered into as of the 1st day of July, 2016, by and between the Department of Corrections of the State of Kansas ("KDOC") and the University of Kansas on behalf of its Medical Center ("Medical Center").

WHEREAS, the parties entered into an Interagency Services Agreement ("Agreement") for Oversight and Management of the Health Care Division Services for the Kansas Department of Corrections dated July 1, 2015; and,

   a.   All terms and conditions of the Original Agreement dated July 1, 2015 shall remain in full force and effect except as specifically amended herein;

   b.   **Services**

      1.0 FTE Senior Coordinator Position will be removed. 1.0 Master's Psychologist Position will be added in its place as outlined in Exhibit A attached. There will be no additional Funding for these Staffing Changes.

   c.   **Compensation**

      The Total Not to Exceed Compensation shall be increased by 2.3% as outlined in Exhibit B attached.

**State of Kansas Department of Corrections**          **University of Kansas Medical Center**

Joe Norwood                                        Robert D. Simari, MD

Secretary of Corrections                           Executive Dean KU School of Medicine

EXHIBIT C

State of Kansas
Department of Administration
DA-146a (~~Rev. 06-12~~)
(Rev. 04-13)

EXHIBIT A

PERSONNEL

Positions

1. One (1) Director

2. Two (2) Senior Coordinators Exempt

3. Three (3.0) RN Program Administrators

4. One (1) Administrative Officer

5. One (1) Mental Health Program Director

6. One (1) Psychologist

7. (.60 FTE) Physician

EXHIBIT B

COMPENSATION

Total compensation to Medical Center for Services and personnel provided July 1, 2016 to June 30, 2017 is budgeted for and will not exceed $1,782,936.00.

## INTERAGENCY SERVICES AGREEMENT

### Amendment No. 2

This Interagency Services Agreement Amendment No.2 ("Amendment") is made and entered into as of the 1st day of July, 2017, by and between the Department of Corrections of the State of Kansas ("KDOC") and the University of Kansas on behalf of its Medical Center ("Medical Center").

WHEREAS, the parties entered into an Interagency Services Agreement ("Agreement") for Oversight and Management of the Health Care Division Services for the Kansas Department of Corrections dated July 1, 2015; Amendment No 1 dated July 1, 2016; and,

WHEREAS, the parties desire and agree to amend certain provisions of the Agreement to expand the Services by adding Personnel as set forth herein.

a. All terms and conditions of the Original Agreement dated July 1, 2015; and Amendment No 1 dated July, 2016 shall remain in full force and effect except as specifically amended herein;

b. **Services**

Exhibit A of the Agreement is hereby replaced with the new Exhibit A attached hereto. The parties acknowledge and agree that KUMC has a separate Interagency Service Agreement with KDADS dated August 15, 2017 as amended, in which a Director for Health Care Services ("Director of HCS") performs certain monitoring and management services. The parties acknowledge and agree that the Mental Health Program Director listed in Exhibit A and the Director of HCS will each be allowed to share in the oversight of the other person's monitoring and management services as part of their duties under their respective interagency Service Agreements not to exceed five percent of their total FTE allocated time for each position. No additional compensation will be paid for these shared services.

c. **Compensation**

The Total Not to Exceed Compensation shall be increased by 3.1% as outlined in the new Exhibit B attached hereto which is replacing Exhibit B of the Agreement.

*[**Signature Page Follows**]*

**State of Kansas Department of Corrections**        **University of Kansas Medical Center**

Joe Norwood

Secretary of Corrections

Robert D. Simari, MD

Executive Dean KU School of Medicine

EXHIBIT B

COMPENSATION

Total compensation to Medical Center for Services and personnel provided July 1, 2017 to June 30, 2018 is budgeted for and will not exceed $1,843,556.00.

## INTERAGENCY SERVICES AGREEMENT

### Amendment No. 3

This Interagency Services Agreement Amendment No. 3 ("Amendment") is made and entered into as of the 1st day of July 2018, by and between the Department of Corrections and the State of Kansas ("KDOC") and the University of Kansas on behalf of its Medical Center ("Medical Center").

WHEREAS, the parties entered into an Interagency Services Agreement ("Original Agreement") for Oversight and Management of the Health Care Division Services for the KDOC dated July 1, 2015; Amendment No. 1 dated July 1, 2016; Amendment No. 2 dated July 1, 2017; and

WHERES, the parties have agreed to amend the Agreement as follows:

1. Section 2(c) is deleted in its entirety and replaced with "[Intentionally Omitted]".
2. Section 2(d) is hereby amended to state: Medical Center will invoice KDOC for actual expenses incurred and for total services performed during the preceding month, to include any family medicine fee and any consultation services provided in accordance with Section 1(f). KDOC will process the invoice for payment as soon as possible after receipt but no later than thirty (30) days after receipt. Medical Center agrees to furnish documentation of expenditures incurred if requested by KDOC. Total compensation shall not exceed the amount in Exhibit B for the current term.
3. Exhibit A is deleted in its entirety and replaced with the new Exhibit A attached hereto.

4. Exhibit B is hereby amended to state: Total compensation to Medical Center for Services and personnel provided July 1, 2018 to June 30, 2019 will not exceed $1,882,271.

5. All other terms and conditions of the Original Agreement dated July 1, 2015 and all subsequent amendments shall remain in full force and effect.

IN WITNESS WHEREOF, the parties hereto have caused this Amendment No. 3 to be executed by their duly authorized representatives the day and year indicated below.

**Kansas Department of Corrections**

JL Norwood, Secretary

Date: 6/12/18

**University of Kansas**

Robert D. Simari, MD
Executive Dean KU School of Medicine
University of Kansas Medical Center

Date: 6/19/18

## EXHIBIT A PERSONNEL

One (1) FTE: Director
Two (2) FTEs: Senior Coordinators (Exempt)
Three (3) FTEs: RN Program Administrator
One (1) FTE: Administrative Officer
One (1) FTE: Mental Health Program Director
.60 FTE: Physician

4

Attachment A, IMPP 01-105
Effective 07-28-06

DEPARTMENT OF CORRECTIONS
CONTRACT REVIEW

- Purpose of Contract: _____ KUMC amendment

- Specific Budget Item: __X__ Yes ___ No

- Program/Subprogram to be charged: _____ Medical

- Date Required for Execution: ASAP

- Staff Member Requesting Contract: Keith Bradshaw

APPROVALS:

Deputy Secretary:        (X) Approve                ( ) Disapprove
                         ( ) Hold For Information ( ) Revision Required
COMMENTS:

No change in pricing; adjusting staffing
Due to retirement and reallocation of
duites

_____     _____
Deputy Secretary                      Date

Director of Fiscal Management & Budget:   (X) Approve              ( ) Disapprove
                                          ( ) Hold For Information ( ) Revision Required
COMMENTS:

_____     _____
Director of Fiscal Management and Budget   Date

Chief Legal Counsel:   (X) Approve              ( ) Disapprove
                       ( ) Hold For Information ( ) Revision Required
COMMENTS:

_____     _____
Chief Legal Counsel                   Date

All above approvals are required prior to the contract being submitted to the Secretary of Corrections for
execution.

Secretary of Corrections:     Approve_____

                              Disapprove_____
COMMENTS:

_____     _____
Signature                             Date

Form #01-105-001

## INTERAGENCY SERVICES AGREEMENT
### Amendment No. 4

This Interagency Services Agreement Amendment No. 4 ("Amendment No. 4") is made and entered into as of the ___ day of November, 2018 ("Amendment No. 4 Effective Date"), by and between the Department of Corrections of the State of Kansas ("KDOC") and the University of Kansas on behalf of its Medical Center ("Medical Center"), collectively referring to herein as the "Parties."

**WHEREAS**, the Parties entered into an Interagency Services Agreement for Oversight and Management of the Health Care Division Services for the Kansas Department of Corrections dated July 1, 2015, and amended July 1, 2016, July 1, 2017, and July 1, 2018 ("Agreement"); and

**WHEREAS**, the Parties desire and agree to amend certain provisions of the Agreement as set forth herein.

**NOW, THEREFORE**, for and in consideration of the mutual promises of the Parties in this Amendment, as well as other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties agree as follows:

1. Exhibit A is deleted in its entirety and replaced with the new Exhibit A attached hereto.

2. Except as otherwise provided herein, all terms and conditions of the Agreement shall remain in full force and effect.

**IN WITNESS WHEREOF**, the duly designated representatives of the Parties have executed this Amendment No. 4 to be effective as of the Amendment No. 4 Effective Date.

STATE OF KANSAS DEPARTMENT OF          UNIVERSITY OF KANSAS
CORRECTIONS

Joe Norwood                            Robert D. Simari, MD
Secretary of Corrections               Executive Dean, KU School of Medicine

## EXHIBIT A PERSONNEL

One (1) FTE: Director
Two (2) FTEs: Senior Coordinators (Exempt)
Two (2) FTEs: RN Program Administrator
One (1) FTE: Program Administrator Social Work
One (1) FTE: Administrative Officer
One (1) FTE: Mental Health Program Director
One (1) FTE Psychologist
.60 FTE: Physician

{10367381 : }

## INTERAGENCY SERVICES AGREEMENT

**Amendment No. 5** This Interagency Services Agreement Amendment No. 5 ("Amendment No. 5) is made and entered into as of the 1st day of July, 2019 ("Amendment No. 5 Effective Date"), by and between the Department of Corrections of the State of Kansas ("KDOC") and the University of Kansas on behalf of its Medical Center ("Medical Center"), collectively referring to herein as the "Parties."

**WHEREAS**, the Parties entered into an Interagency Services Agreement for Oversight and Management of the Health Care Division Services for the Kansas Department of Corrections dated July 1, 2015 and amended July 1, 2016, July 1, 2017, July 1, 2018, and November 1, 2018 ("Agreement"); and

**WHEREAS**, the Parties desire and agree to amend certain provisions of the Agreement as set forth herein.

**NOW, THEREFORE**, for and in consideration of the mutual promises of the Parties in this Amendment, as well as other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties agree as follows:

1. The Parties agree that "Services" as such term is used in the Agreement shall be interpreted to include the list of services attached to this Amendment No. 5 as Attachment 1, to satisfy the requirements of Section II.2 of the Memorandum of Understanding among KDOC, Medical Center, and the Kansas Department of Health and Environment bearing the header "KDHE2019-058".

2. The Parties agree to add a 0.5 RN Program Administrator for a total of 2.5 FTE and reduce the Administrative Officer from 1.0 FTE to 0.5 FTE. Exhibit A is deleted in its entirety and replaced with the new Exhibit A attached hereto.

3. The Parties acknowledge and agree that, as a result of the personnel adjustments referenced above, the total not-to-exceed compensation, as outlined in Exhibit B of the Agreement for the period of July 1, 2019 through June 30, 2020 is reduced to $1,820,833.

4. Except as otherwise provided herein, all terms and conditions of the Agreement shall remain in full force and effect.

**IN WITNESS WHEREOF**, the duly designated representatives of the Parties have executed this Amendment No. 5 to be effective as of the Amendment No. 5 Effective Date.

STATE OF KANSAS DEPARTMENT OF
CORRECTIONS

~~Roger Werholtz~~ *Charles Simmons*
*Acting* Secretary of Corrections

UNIVERSITY OF KANSAS

Robert D. Simari, MD
Executive Dean, KU School of Medicine

{L0069473.2 }

EXHIBIT A

PERSONNEL

Positions

1.  One (1) Director

2.  Two (2) Senior Coordinators Exempt

3.  One (1) Social Worker/Medicaid Coordinator

4.  Two and half (2.5) RN Program Administrators

5.  Half (0.5) Administrative Officer

6.  One (1) Mental Health Program Director

7.  One (1) Psychologist

8.  (0.6) Physician

EXHIBIT B

COMPENSATION

Total compensation to Medical Center for Services and Personnel provided July 1, 2019 to June 30, 2020 is budgeted for and will not exceed $1,820,833.40

**BUDGET:**

| | |
|---|---|
| Salaries | $1,074,495.00 |
| Benefits @ 32% | $   343,838.40 |
| | |
| Subtotal: | $1,418,33.40 |
| | |
| KUMC Administration Fees & Costs: | $  175,000.00 |
| Legal Fees: | $   50,000.00 |
| Computer Equipment: | $   15,000.00 |
| CME/Education: | $   22,500.00 |
| Travel: | $  120,000.00 |
| Office Supplies: | $   20,000.00 |
| | |
| Total: | $1,820,833.40 |

[L0069473.2 ]

## ATTACHMENT 1

*Summary of Services provided by the KDOC/KUMC Inmate Medicaid Program Administrator (**IMPA**)*

1) The IMPA monitors and tracks all inmate hospitalization (24 hours or longer).
2) KUMC reviews and monitors all inmate hospitalizations to see if KDHE Medicaid requirements have been met.
3) Once requirements have been met, The IMPA sends an application request the correctional facility's UM nurse(s) and reviews to ensure that the appropriate facility staff obtain the appropriate information and signatures on the application.
4) The IMPA submits all applications/forms with supporting medical documentation if indicated to the KDHE clearinghouse.
5) The IMPA tracks all claim denials and approvals and makes the appropriate KDOC and Medical contractor staff aware of these claim decisions.
6) The IMPA actively coordinates with KDHE, KDOC, and the medical contractor to ensure all necessary requirements are met. In addition, The IMPA maintains that any medical billing issues between community providers and the medical contractors are resolved according to the RFP (Medical Services Contract) and KDOC guidelines.
7) The IMPA maintains that the services being provided by KUMC are administrative in nature and at no time will direct services be administered to patients.

*KDOC/KUMC Inmate Medicaid Program Administrator (**IMPA**):*
1) IMPA receives an automated email from the medical contractor containing a daily report on current inmates hospitalized in Kansas greater than 24 hours. The IMPA will track all hospital stays being applied for Medicaid.
2) KUMC will implement a review of the hospital stay and the electronic medical record (EMR) to insure the inmate meets KDHE eligibility requirements as follows:

A) Reviews inmate's assets to determine finical requirements for eligibility, the inmate's financial status and must meet accessible assets under $2,000.00. This documentation is obtained from KDOC banking and reviewed to determine if applicant will meet requirement. If amount is over $2,000.00, the case will be terminated for the hospital event.
B) If the inmate is a United States citizen, the case will be reviewed and place of birth will be verified in OMIS. If Inmate is not a United States citizen, the case is terminated. Inmates born in Kansas can be verified by KDHE database. If further proof of citizen is needed the **IMPA** will obtain the necessary documentation.
C) KDOC/KUMC **IMPA** will determine if all requirements have been met. An email is sent to the correctional site facility Utilization Management (UM) Nurse and the regional UM manager to assist the inmate in filling out the ES 3100.1 or Heath Wave (pregnant inmates only) form ES 3100.1a and HIPPA (ROI) forms. Once the forms are completed the correctional facility UM nurse will scan the application forms and email them to the **IMPA.**
D) The **IMPA** has 90 days to submit an inmate application – from first day of Date of Service (DOS) on any qualifying hospitalization.
E) A KDHE checklist form is started for KDOC and the KDHE clearing house. This tracks the applications progress.

F) Scanned copies of the applications ES 3100, ES3100.1a and HIPPA (ROI) forms will be sent from the site UM Nurse to the **IMPA**. It will be reviewed and co-signed by the **IMPA** as a representative of the Kansas Department of Corrections.  Copies are made and placed in a patient file.

G) KDHE PMDT ES-3901, ES-3903, ES-3904 forms will be filled out by the IMPA if the inmate is under the age of 65, is disabled for 12 months or longer, and has not been processed in the past year. Inmates over sixty-four (64) and under eighteen (18) are exempted from PMDT evaluation.

    a.  The **IMPA** will provide KDHE a copy of medical records as requested by KDHE PMDT.

H) Once KDHE makes a formal request, the **IMPA** will make a copy of the complete Medicaid file and submit to KDHE, along with application form ES3100.1a, ES 3100.1 and the HIPPA (ROI) form.

I) The **IMPA** keeps a running spreadsheet of all cases and their status and will email updates to the medical contract provider weekly. The spreadsheet should summarize any updates including denials, approvals, and new applicants.

J) The **IMPA** keeps release planners aware of applicants. This enables the release planners to coordinate care and release planning with Human Services and Parole offices.

K) The **IMPA** maintains that any medical billing issues between community providers and the medical contractors are resolved according to the RFP (Medical Services Contract).

## INTERAGENCY SERVICES AGREEMENT

**Amendment No. 6** This Interagency Services Agreement Amendment No. 6 ("Amendment No. 6 ) is made and entered into as of the 1st day of July, 2020 ("Amendment No. 6 Effective Date"), by and between the Department of Corrections of the State of Kansas ("KDOC") and the University of Kansas on behalf of its Medical Center ("Medical Center"), collectively referring to herein as the "Parties."

**WHEREAS**, the Parties entered into an Interagency Services Agreement for Oversight and Management of the Health Care Division Services for the Kansas Department of Corrections dated July 1, 2015 and amended July 1, 2016, July 1,2017, July 1, 2018, November 1, 2018 and July 1, 2019 ("Agreement"); and

**WHEREAS**, the Parties desire and agree to amend certain provisions of the Agreement as set forth herein.

**NOW, THEREFORE**, for and in consideration of the mutual promises of the Parties in this Amendment, as well as other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties agree as follows:

1. The Parties agree that the Medical Center will make the following changes to the personnel providing Services as set for the in the Agreement: add a 1.5 RN Program Administrator for a total of 4.0 FTE, no longer provide a Psychologist, and increase the Administrative Officer's time from 0.5 FTE to 1.0 FTE.  Because of these personnel adjustments, Exhibit A is deleted in its entirety and replaced with the new Exhibit A attached hereto.

2. The Parties acknowledge and agree that, as a result of the personnel adjustments referenced above, Exhibit B is deleted in its entirety and replaced with the new Exhibit B attached hereto.

3. Except as otherwise provided herein, all terms and conditions of the Agreement shall remain in full force and effect.

**IN WITNESS WHEREOF**, the duly designated representatives of the Parties have executed this Amendment No. 6 to be effective as of the Amendment No. 6 Effective Date.

STATE OF KANSAS DEPARTMENT OF
CORRECTIONS

UNIVERSITY OF KANSAS

_____
Jeff Zmuda
Secretary of Corrections

_____
Akinlolu O. Ojo, MD
Executive Dean, KU School of Medicine

EXHIBIT A

PERSONNEL

Positions

1.  One (1) Director

2.  Two (2) Senior Coordinators Exempt

3.  One (1) Social Worker/Medicaid Coordinator

4.  Four (4.0) RN Program Administrators

5.  One (1.0) Administrative Officer

6.  One (1) Mental Health Program Director

7.  (0.6) Physician

EXHIBIT B

COMPENSATION

Total compensation to Medical Center for Services and personnel provided July 1, 2020 to June 30, 2021 is budgeted for and will not exceed: $1,968,716.94

**BUDGET:**

| | |
|---|---|
| Salaries | $1,196,995.00 |
| Benefits @ .32: | $383.038.40 |
| Sub Total: | $1,580,033.40 |
| KUMC Administration Fees & Costs: | $188,683.54 |
| Legal Fees: | $50,000.00 |
| CME/Education: | $22,500.00 |
| Travel | $125,000.00 |
| Office Supplies | $2,500.00 |
| Total: | $1,968,716.94 |

## INTERAGENCY SERVICES AGREEMENT

**Amendment No. 7** This Interagency Services Agreement Amendment No. 7 ("Amendment No. 7) is made and entered into as of the 1st day of July, 2021 ("Amendment No. 7 Effective Date"), by and between the Department of Corrections of the State of Kansas ("KDOC") and the University of Kansas on behalf of its Medical Center ("Medical Center"), collectively referring to herein as the "Parties."

**WHEREAS,** the Parties entered into an Interagency Services Agreement for Oversight and Management of the Health Care Division Services for the Kansas Department of Corrections dated July 1, 2015 and amended July 1, 2016, July 1, 2017, July 1, 2018, November 1, 2018, July 1, 2019, and July 1, 2020 ("Agreement"); and

**WHEREAS,** the Parties desire and agree to amend certain provisions of the Agreement as set forth herein.

**NOW, THEREFORE,** for and in consideration of the mutual promises of the Parties in this Amendment, as well as other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties agree as follows:

1. The Parties acknowledge and agree that Exhibit A is attached hereto only for convenience. The terms and conditions of Exhibit A as of the 1st day of July, 2020, remain current and in effect.

2. The Parties acknowledge and agree that Exhibit B is deleted in its entirety and replaced with the new Exhibit B attached hereto.

3. Except as otherwise provided herein, all terms and conditions of the Agreement shall remain in full force and effect.

**IN WITNESS WHEREOF,** the duly designated representatives of the Parties have executed this Amendment No. 7 to be effective as of the Amendment No. 7 Effective Date.

STATE OF KANSAS DEPARTMENT OF
CORRECTIONS

UNIVERSITY OF KANSAS

Jeff Zmuda
Secretary of Corrections

Akinlolu O. Ojo, MD
Executive Dean, KU School of Medicine

EXHIBIT A

PERSONNEL

Positions

1.   One (1.0) Director

2.   Two (2.0) Senior Coordinators Exempt

3.   One (1.0) Social Worker/Medicaid Coordinator

4.   Four (4.0) RN Program Administrators

5.   One (1.0) Administrative Officer

6.   One (1.0) Mental Health Program Director

7.   (0.6) Physician

EXHIBIT B

COMPENSATION

Total compensation to Medical Center for Services and personnel provided July 1, 2021 to June 30, 2022 is budgeted for and will not exceed: $2,021,872.

**BUDGET:**

| | |
|---|---|
| Salaries | $ 1,203,722.35 |
| Benefits @ .32% | $   385,191.15 |
| Sub Total: | $ 1,588,913.50 |
| | |
| KUMC Administration Fees & Costs: | $   193,457.75 |
| Legal Fees: | $    52,500.00 |
| Computer Equipment: | $    20,000.00 |
| CME/Education: | $    28,500.00 |
| Travel: | $   125,000.00 |
| Office Supplies: | $     8,000.00 |
| License & Fees | $     5,500.00 |
| Total: | $ 2,021,871.25 |

## INTERAGENCY SERVICES AGREEMENT

**Amendment No. 7** This Interagency Services Agreement Amendment No. 7 ("Amendment No. 7) is made and entered into as of the 1st day of July, 2021 ("Amendment No. 7 Effective Date"), by and between the Department of Corrections of the State of Kansas ("KDOC") and the University of Kansas on behalf of its Medical Center ("Medical Center"), collectively referring to herein as the "Parties."

**WHEREAS**, the Parties entered into an Interagency Services Agreement for Oversight and Management of the Health Care Division Services for the Kansas Department of Corrections dated July 1, 2015 and amended July 1, 2016, July 1, 2017, July 1, 2018, November 1, 2018, July 1, 2019, and July 1, 2020 ("Agreement"); and

**WHEREAS**, the Parties desire and agree to amend certain provisions of the Agreement as set forth herein.

**NOW, THEREFORE**, for and in consideration of the mutual promises of the Parties in this Amendment, as well as other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties agree as follows:

1. The Parties acknowledge and agree that Exhibit A is attached hereto only for convenience. The terms and conditions of Exhibit A as of the 1st day of July, 2020, remain current and in effect.
2. The Parties acknowledge and agree that Exhibit B is deleted in its entirety and replaced with the new Exhibit B attached hereto.
3. Except as otherwise provided herein, all terms and conditions of the Agreement shall remain in full force and effect.

**IN WITNESS WHEREOF**, the duly designated representatives of the Parties have executed this Amendment No. 7 to be effective as of the Amendment No. 7 Effective Date.

STATE OF KANSAS DEPARTMENT OF CORRECTIONS

UNIVERSITY OF KANSAS

_____
Jeff Zmuda
Secretary of Corrections

_____
Akinlolu O. Ojo, MD
Executive Dean, KU School of Medicine

EXHIBIT A

PERSONNEL

Positions

1. One (1.0) Director

2. Two (2.0) Senior Coordinators Exempt

3. One (1.0) Social Worker/Medicaid Coordinator

4. Four (4.0) RN Program Administrators

5. One (1.0) Administrative Officer

6. One (1.0) Mental Health Program Director

7. (0.6) Physician

EXHIBIT B

COMPENSATION

Total compensation to Medical Center for Services and personnel provided July 1, 2021 to June 30, 2022 is budgeted for and will not exceed: $2,021,872.

**BUDGET:**

| | |
|---|---|
| Salaries | $ 1,203,722.35 |
| Benefits @ .32% | $   385,191.15 |
| Sub Total: | $ 1,588,913.50 |
| | |
| KUMC Administration Fees & Costs: | $   193,457.75 |
| Legal Fees: | $    52,500.00 |
| Computer Equipment: | $    20,000.00 |
| CME/Education: | $    28,500.00 |
| Travel: | $   125,000.00 |
| Office Supplies: | $     8,000.00 |
| License & Fees | $     5,500.00 |
| Total: | $ 2,021,871.25 |

Attachment A, IMPP 01-105D
Effective 03-12-15

DEPARTMENT OF CORRECTIONS
CONTRACT REVIEW

Purpose of Contract:  KUMC Contract Extension

Specific Budget Item:        X  YES        NO

Program/Subprogram to be charged: Medical

Date Required for Execution:   ASAP

Staff Member Requesting Contract:  Keith Bradshaw

**APPROVALS:**

**Deputy Secretary**  ☒ Approve    ☐ Disapprove
                      ☐ Hold For Information    ☐ Revision Required

COMMENTS:

# fund 1000-0154

*Keith Bradshaw*                                    Sep 6, 2022
_____
Deputy Secretary                                    Date

**Director of Fiscal Management & Budget** ☒ Approve    ☐ Disapprove
                      ☐ Hold For Information    ☐ Revision Required

COMMENTS:

• 

*Janelle Amon*                                      Sep 7, 2022
_____
Director of Fiscal Management & Budget              Date

**Chief Legal Counsel**  ☒ Approve    ☐ Disapprove
                      ☐ Hold For Information    ☐ Revision Required

COMMENTS:

• 

*Natasha Carter*                                    Sep 8, 2022
Natasha Carter (Sep 8, 2022 11:29 CDT)
_____
Chief Legal Counsel                                 Date

All above approvals are required prior to the contract being submitted to the Secretary of Corrections for execution.

**Secretary of Corrections:**    ☐ Approve    ☐ Disapprove

COMMENTS:

*Jeff Zmuda*                                        Sep 14, 2022
Jeff Zmuda (Sep 14, 2022 13:19 CDT)
_____
Signature                                           Date

■

## INTERAGENCY SERVICES AGREEMENT

**Amendment No. 8** This Interagency Services Agreement Amendment No. 8 ("Amendment No. 8") is made and entered into as of the 1st day of July, 2022 ("Amendment No. 8 Effective Date"), by and between the Department of Corrections of the State of Kansas ("KDOC") and the University of Kansas on behalf of its Medical Center ("Medical Center"), collectively referring to herein as the "Parties."

**WHEREAS**, the Parties entered into an Interagency Services Agreement for Oversight and Management of the Health Care Division Services for the Kansas Department of Corrections dated July 1, 2015 and amended July 1, 2016, July 1, 2017, July 1, 2018, November 1, 2018, July 1, 2019, July 1, 2020, and July 1, 2021 ("Agreement"); and

**WHEREAS**, the Parties desire and agree to amend certain provisions of the Agreement as set forth herein.

**NOW, THEREFORE**, for and in consideration of the mutual promises of the Parties in this Amendment, as well as other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties agree as follows:

1. The Parties acknowledge and agree that Exhibit B is deleted in its entirety and replaced with the new Exhibit B attached hereto.

2. Except as otherwise provided herein, all terms and conditions of the Agreement shall remain in full force and effect.

**IN WITNESS WHEREOF**, the duly designated representatives of the Parties have executed this Amendment No. 8 to be effective as of the Amendment No. 8 Effective Date.

STATE OF KANSAS DEPARTMENT OF          UNIVERSITY OF KANSAS
CORRECTIONS

*Jeff Zmuda*
Jeff Zmuda (Sep 14, 2022 13:19 CDT)
_____          _____
Jeff Zmuda                               Akinlolu O. Ojo, MD
Secretary of Corrections                 Executive Dean, KU School of Medicine

EXHIBIT B

COMPENSATION

Total compensation to Medical Center for Services and personnel provided July 1, 2022 to June 30, 2023 is budgeted for and will not exceed: $2,023,514.92

**BUDGET:**

| Salaries | $ | 1,198,458.22 |
|---|---|---|
| Benefits @ .34% | $ | 407,475.80 |
| Sub Total: | $ | 1,605,934.02 |
| KUMC Administration Fees & Costs: | | $183,955.90 |
| Legal Fees: | $ | 55,125.00 |
| Computer Equipment: | $ | 10,000.00 |
| CME/Education: | $ | 30,000.00 |
| Travel: | $ | 125,000.00 |
| Office Supplies: | $ | 8,000.00 |
| License & Fees | $ | 5,500.00 |
| Total: | $ | 2,023,514.92 |

EXHIBIT A

PERSONNEL

Positions

1.  One (1.0) Director

2.  One (1.0) Administrative Assistant

3.  Two (2.0) Senior Coordinators Exempt

    a.  Grievance Coordinator

    b.  Risk Manager

4.  Two (2.0) RN Clinical/Administrators

5.  Three (3.0) Program Administrators

6.  One (1.0) Director of Behavioral Health Services

7.  (0.6) Physician

Attachment E, IMPP 12-120A
Effective 08-09-2021

## Kansas Department of Corrections
## Resident Property Receipt

This form is to be used to document the receipt of any personal property a resident receives. A separate form is to be used for each occasion property is received. Property shown on this form is transferred to a Property Inventory and Registration form at the time the next inventory is taken.

RESIDENT NAME & NUMBER:_____   DATE:_____

| ITEM | BRAND, MODEL, SERIAL NUMBER | *VALUE | RESIDENT INITIALS |
|------|------------------------------|--------|-------------------|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

*If value of item is verified by sales receipt, indicate that value and place a "V" in the value column. If value cannot be verified, indicate the value as declared by the resident and place an "I" in the value column and have the resident initial his/her declaration of value.

I hereby acknowledge receipt of the above-described property on this date.


_____          _____
Resident Signature                    Date          Staff Witness                    Date

Attachment F, IMPP 12-120A
Effective 08-09-2021

**Kansas Department of Corrections**
**Request/Authorization to Remove Personal Property**

Facility: _____     Date: _____

Resident Name: _____     Number: _____

I hereby request that the below described personal property be removed from the facility by the means specified.

_____     _____
Resident Signature          Date          Staff Signature          Date

| ITEM | DESCRIPTION |
|------|-------------|
|      |             |
|      |             |
|      |             |
|      |             |
|      |             |

**Method of Removal (Check One)**          Receiving Party

☐ Picked up by visitor or other authorized person.          _____
                                                              Name

☐ Donated to charitable organization.          _____
                                               Address

☐ Destroyed. Of no value to resident.          _____
                                               City          State          Zip

☐ Delivered to the local address shown by facility staff.          _____
                                                                    Relationship

☐ Shipped or mailed to person/address indicated.          _____
                                                           Signature of Person Picking Up Items

Removed via furlough.

- If items are to be picked up or shipped, the resident must indicate the name and address of the receiving party.

- If donation to charitable organization is indicated, staff member must indicate the name and address of the organization at the time of disposition.

- If items are to be shipped, the resident must be provided with and complete the actual shipping label used.

The above described property was removed from the facility as specified on this date.

_____          _____
Staff Signature                            Date

Attachment G, IMPP 12-120A
Effective 08-09-2021

## SPECIAL PROPERTY INVENTORY FORM

RESIDENT NAME & NUMBER:_____   DATE:_____

The following Items were permitted under the provisions of a property policy prior to April 15, 1991.

The resident is permitted to retain these items until the time of transfer to another facility. Replacement is not permitted. If the resident becomes the subject of a disciplinary action involving these items, such items are to be removed from the facility. The value of these items is fixed according to prior applicable versions of IMPP 12-120A, and General Orders of the facility housing the resident as of April 15, 1991 concerning discretionary property values.

| ITEM | BRAND, MODEL, SERIAL NUMBER | VALUE |
|------|------------------------------|-------|
|      |                              |       |
|      |                              |       |
|      |                              |       |
|      |                              |       |
|      |                              |       |
|      |                              |       |
|      |                              |       |
|      |                              |       |
|      |                              |       |
|      |                              |       |
|      |                              |       |
|      |                              |       |
|      |                              |       |
|      |                              |       |
|      |                              |       |
|      |                              |       |
|      |                              |       |
|      |                              |       |
|      |                              |       |

_____     _____
Signature of Resident     Number     Date          Officer Signature                    Date

Was the resident present when property was inventoried?  Yes_____     No_____.

If resident was not present, explain why _____

_____
Officers Signature

Attachment H, IMPP 12-120A
Effective 04-14-22

## ADMISSION PROPERTY

The following items may be retained by resident at the time they are transported by a Kansas county Sheriff to KDOC custody at a Reception and Diagnostic Unit (RDU). All other items are to be returned with officers transporting the resident to the KDOC.

| ITEM | SPECIFICATIONS | QUANTITY | VALUE |
|---|---|---|---|
| Bible/Primary Religious Text | Approved by reception facility Chaplain. | 1 | |
| Contact Lenses | As received, may be in resident's possession until replaced.  Replace with eyeglasses from State contract unless health care provider determines that contacts are the preferred corrective device. | 1 | |
| Dentures | As received with or prescribed by health authority. | 1 set | |
| Glasses, Eye Prescription | As received. | 1 | |
| Identification Documents- Documents Are to be retained by KDOC until release | Driver's license, social security card, birth certificate or any other form of identification in a resident's possession. | As received | |
| Letters, Personal | | 10 | |
| Photographs | Non-Polaroid, 8 1/2" x 11" or smaller, each separate physical image on multi-image sheets counts as one (1) photograph (ex. 20 images on one sheet counts as 20 photographs). Commercial/published pictures, whether individual or packaged, are prohibited. "Commercial published content" is defined as those depictions which are produced in bulk, considered a commodity and often are replicated/ produced for sale or purchase. | 50 | |
| Prosthetic Device | As received with resident and approved by health authority. | As received | |
| Wedding Band | Plain, no stone. | 1 | 50.00 |
| Wristwatch | No stones. | 1 | 25.00 |

Attachment I, IMPP 12-120A
Effective 08-09-2021

## KANSAS DEPARTMENT OF CORRECTIONS ELECTRONIC CHECKLIST

FROM FACILITY:_____    TO FACILITY:_____

EMPLOYEE INITIALS:_____

RESIDENT NAME:_____    NUMBER_____    DATE_____

|  |  | Packout | | Return | |
|---|---|---|---|---|---|
| Television | Volume Works | Yes __ | No __ | Yes __ | No __ |
|  | On/Off Switch Works | Yes __ | No __ | Yes __ | No __ |
|  | Reception Works | Yes __ | No __ | Yes __ | No __ |
|  | Visible Cracks or Broken Parts | Yes __ | No __ | Yes __ | No __ |

Comments: Model / Ser. No._____
_____
_____

| Fan: | On/Off Switch Works | Yes __ | No __ | Yes __ | No __ |
|---|---|---|---|---|---|
|  | Speed Control Works | Yes __ | No __ | Yes __ | No __ |
|  | Visible Cracks or Broken Parts | Yes __ | No __ | Yes __ | No __ |
|  | Fan Oscillates (if applicable) | Yes __ | No __ | Yes __ | No __ |

Comments: Model_____
_____

| Typewriter: | On/Off Switch Works | Yes __ | No __ | Yes __ | No __ |
|---|---|---|---|---|---|
|  | Keys Work | Yes __ | No __ | Yes __ | No __ |
|  | Visible Cracks or Broken Parts | Yes __ | No __ | Yes __ | No __ |
|  | Carriage Locks in Place (if applicable) | Yes __ | No __ | Yes __ | No __ |

Comments: Model / Ser. No._____
_____
_____

| Radio/Tape Player | On/Off Switch Works | Yes __ | No __ | Yes __ | No __ |
|---|---|---|---|---|---|
|  | Volume Works | Yes __ | No __ | Yes __ | No __ |
|  | Reception Works | Yes __ | No __ | Yes __ | No __ |
|  | FFW, REW, Switches Work | Yes __ | No __ | Yes __ | No __ |
|  | Visible Cracks or Broken Parts | Yes __ | No __ | Yes __ | No __ |

Comments: Model / Ser. No._____
_____

| MP3 Player , Batteries | On/Off Switch Works | Yes __ | No __ | Yes __ | No __ |
|---|---|---|---|---|---|
| & Charger | Volume Works | Yes __ | No __ | Yes __ | No __ |
|  | Battery Charger Works | Yes __ | No __ | Yes __ | No __ |
|  | Visible Cracks or Broken Parts | Yes __ | No __ | Yes __ | No __ |

Comments: Model / Ser. No.._____
_____
_____

Officer Signature: _____    Date: _____

Resident Signature: _____    Date: _____

Was resident present when the checklist was completed:          Yes __    No __

If resident was not present, explain why?

Return Officer Signature: _____    Date:_____

Resident Signature on Property Return_____    Date:_____

**PROPERTY ALLOWED IN RESTRICTIVE HOUSING**
**(Alphabetical)**

| ITEM | SPECIFICATIONS | QUANTITY | VALUE |
|------|----------------|----------|-------|
| Address Book | Not to exceed 8" x 9," to be purchased through canteen or special purchase order. | 1 | CP |
| Bible/Primary Religious Text | Must be approved by facility Chaplain. | 1 | |
| Blue Book, AA Text | | 1 | Current AA Rate |
| Books/Magazines/ Newspapers | Owned prior to placement in RH. | 6 | |
| Calendar | Issued by facility. | 1 | CP |
| Cards | Poker, Pinochle, or UNO | 2 decks | CP |
| Checkers | Plastic or wooden; factory manufactured, to include cardboard or paper checker board. | 1 set | CP |
| Chess Set | Plastic or wooden; factory manufactured, to include cardboard or paper chess board. | 1 set | CP |
| Clock, Alarm (APPLIANCE) | | 1 | 15.00 |
| Comb | Plastic only. | 1 | CP |
| Conditioner | | 2 | CP |
| Copy Ticket | | CL | CP |
| Dental Floss | | 2 | CP |
| Denture Adhesive | | 2 | CP |
| Denture Container (Cup) | | 1 | CP |
| Denture Crème | | 2 | CP |
| Dentures | As received with resident or prescribed by Health Authority. | 1 set | |
| Deodorant, Stick | | 2 | CP |
| Dictionary | In addition to book limitation. | 1 | |
| Dominoes | Wood or plastic; factory manufactured. | 1 set | CP |
| Drinking Cup | Plastic; no logo permitted; up to 22 ounces. If insulated, must be clear view/double walled. | 2 | CP |
| Earplug (APPLIANCE) | | 1 | CP |
| Earplug Adapter | | 1 | CP |
| Envelopes | All sizes. No padded envelopes of any kind, including those containing "bubble wrap" as a component. | 2 boxes | CP |
| Eyeglasses | As received during or after admission (with frames approved by the warden or designee) or as provided per health authority determination, prescription only. Unless required by Health Authority prescription, are to be non-tint, non-wired, non-mirrored, non-wrap-around. Received eyeglasses approved by a Warden are transferable property. | 1 pair | Frames limited to $200, with claims replacement limited to value of eyeglasses issued by Health Authority. |

| Item | Description | Quantity | Price |
|---|---|---|---|
| Eyeglasses, non-prescription / reading | As received during or after admission (with frames approved by the warden or designee), are to be non-tint; non-wired; non-mirrored; or non-wraparound. Received reading glasses approved by a Warden are transferable property. | 1 pair | 20.00 |
| Fan (APPLIANCE) | Blade size limited to twelve (12) inches diameter fan; electric; plastic blades; UL approved; safety guard. Additionally, on and after 04/01/97, the safety guard on all fans purchased by residents through SPOs, or purchased by a facility canteen for resale to residents, must be constructed of plastic. | 1 | CP |
| Feminine Napkins, Tampons, Pads | Females only. | 2 boxes | CP |
| File Folder | Non-metal only. | 2 | CP |
| Food Items | Only as authorized to be sold on the canteen list for long-term restriction in A and B cell house at EDCF and A2 at LCF only. Commissary package programs are not authorized. Other short-term restrictive housing residents are not authorized to purchase or receive food items through canteen. Commissary package programs are not authorized. | | |
| Foot Powder | | 2 | CP |
| Greeting Cards | As sold in canteen or Chaplain provides. | 10 | CP |
| Hairbrush | Wood or Plastic only. | 1 | 5.00 |
| Hair Care Products | | 2 | CP |
| Headphone Extension (APPLIANCE) | Maximum length 12'. | 1 | CP |
| Headphones (APPLIANCE) | One any size | 1 | CP |
| Ice Chest | 6-pack size; hard plastic; no styrofoam. | 1 | 16.50 |
| Lamp (APPLIANCE) | High intensity reading lamp; desktop. | 1 | CP |
| Letters, Personal | | 10 | |
| Lotion, Hand | Non-alcoholic; clear plastic container. | 2 | CP |
| Medications / Over The Counter | Residents at all other facilities are limited to the following items: Acetaminophen, Aspirin, A&D Ointment, Alka-Seltzer, Alka-Seltzer Cold +, Acne-Peroxide Lotion – Benzyl Peroxide, Ben Gay, Carmex, Cough Drops, Chest Rub, Eucerin or Nivea Cream, Imodium, Motrin, Medicated Shampoo, Pepto-Bismol, Medicated Foot Powder, Metamucil Powder, Natural Tears, Hydrocortisone cream, Ibuprofen, Pepcid AC, Antacid tablets, Anti-fungal cream, Hemorrhoidal cream, Triple antibiotic cream. | 1 each | CP |
| MP3 Player | MPE player and accessories (4 double A rechargeable batteries, charger, and AC wall adapter) | 1 | CP |
| Notebooks | Non-metal only. | 2 | 2.00 |
| Paper, Writing | | 2 pkg. | CP |
| Pen, Ballpoint | Non-retractable tip only. | 2 | CP |
| Photo Album | Non-metal; non-glass; 10" x 14". | 2 | 20.00 Total |

| | | | |
|---|---|---|---|
| Photographs | Non-Polaroid, 8 1/2" x 11" or smaller, each separate physical image on multi-image sheets counts as one (1) photograph (ex. 20 images on one sheet counts as 20 photographs). Commercial/published pictures, whether individual or packaged, are prohibited. "Commercial published content" is defined as those depictions which are produced in bulk, considered a commodity and often are replicated/ produced for sale or purchase. | 50 | |
| Pick, Hair | Plastic only, no handle; no rattail. | 1 | 5.00 |
| Postage Stamps | Any denomination up to and including that which is required to mail a one (1) ounce First Class letter. | 25 | CP |
| Q-Tips | | 2 packs | CP |
| Radio – AM/FM /Tape Player /or/ Clock Radio – AM-FM (APPLIANCE) | 20" x 10" x 8"; may be radio, tape player, or radio/tape player (single cassette/tape deck) combination, standard cassette; equipped for headphone, earphone or earplug; UL approved. Only AM/FM Radios or AM/FM Clock Radios may be purchased by residents on SPO or ordered by facility canteens. Existing appliances with tape player capability may be sold by facility canteens until the existing stock is depleted, and existing units held by residents may be retained and transferred, but may be neither repaired nor replaced with anything except AM/FM Radios or AM/FM Clock Radios. | 1 If device is an AM/FM clock radio, no separate clock is permitted as personal property. | CP |
| Religious Beads (e.g., prayer, rosary) | Must be approved by facility Chaplain/Warden and received through Chaplain/Warden. | 2 | 20.00 Total |
| Religious Head Garments | Must be approved by facility Chaplain/Warden and received through Chaplain/Warden. | 2 | 25.00 Total |
| Religious Medal or Medallion with Chain | Must be approved by facility Chaplain/Warden and received through Chaplain/Warden.  No precious metals or stones. Longest dimension may not exceed 2 inches. | 1 | 20.00 |
| Rug, Prayer | Must be approved by facility Chaplain/Warden and received through Chaplain/Warden. | 1 | 25.00 |
| Shampoo | | 2 | CP |
| Shaving Crème or powder | Non-aerosol. | 2 | CP |
| Shaving Cup/Brush | Plastic only. | 1 | CP |
| Shirts, Under | State-issued only | 7 | NA |
| Shoe Insoles | | 1 set | 5.00 |
| Shoe, Shower | | 1 pair | CP |
| Shorts, Athletic | A minimum of 4" inseam, gray only. | 2 | 30.00 Total |
| Soap, Bar or Gel | | 2 | CP |
| Soap Dish | Plastic. | 1 | 2.00 |
| Socks | State-issued only. | 5 | NA |

| | | | |
|---|---|---|---|
| Sunglasses | Non-mirror; non-prescription; non-wrap around; non-wire frame. | 1 | 10.00 |
| Surge Protector (APPLIANCE) | Single outlet or power strip type, no more than 6 outlets, UL approved. | 1 | CP |
| Sweat Suit (Basic) | Non-work release males and females. Plain gray; pullover hoodless; no logo; unaltered. No designer sweat suits, including those approved under previous policies, i.e. grand fathered prior to the effective date of this IMPP. | 1 | 55.00 |
| Tissues | | 2 | CP |
| Toothbrush | State-issued safety brush | 1 | NA |
| Toothpaste | | 2 | CP |
| Underwear/Boxers | State-issue only | 5 | NA |
| Vitamins | | 1 bottle | CP |

EXHIBIT - 4

Page 1 of 1, Attachment C, IMPP 01-101D
Effective 11-01-21



# KANSAS
### Department of Corrections

# INTERNAL MANAGEMENT POLICY & PROCEDURE

**Applicability:** ☐ Adult Operation Only   ☐ JUVENILE Operations Only   ☐ DEPARTMENT-WIDE

| | |
|---|---|
| **IMPP #:**   20-109 | **PAGE #:**  1 of 1 |

**SEGREGATION:** General Lockdown, Waiver of Rights, and Transfer of Inmates in Administrative Segregation

**Original Date Issued: 02-15-02   Replaces IMPP Issued:  07-21-04   CURRENT EFFECTIVE DATE: 07-01-22**

**Approved By:** _____ , Secretary

## NOTICE OF REVOCATION

**IMPP 20-109 General Lockdown, Waiver of Rights, and Transfer of Inmates in Administrative Segregation**

This IMPP was originally issued on 02-15-02. Following the consolidation of the Kansas Department of Corrections and the Juvenile Justice Authority pursuant to Executive Reorganization Order No. 42, this policy is hereby revoked on 07-01-22.

To avoid redundancy, IMPP 20-109 is deleted and manual users seeking policy and procedures related to this top are referred to the following:

Portions of this IMPP pertaining to General Lockdown were incorporated into IMPP 12-101A Standards of Supervision for Custody Levels.

Portions pertaining to Waiver of Rights are revoked.

Portions pertaining to the Transfer of Inmates in Administrative Segregation were incorporated into IMPP 20-105A Basic Operations of Administrative Restrictive Housing.





EXHIBIT-4

**Kansas**

Department of Corrections **INTERNAL MANAGEMENT POLICY & PROCEDURE**

Applicability: __X__ ADULT Operations Only_ JUVENILE Operations Only _ DEPARTMENT-WIDE

| | |
|---|---|
| **IMPP #: 20-105A** | **PAGE #: 1 of 5** |

RESTRICTIVE HOUSING: Basic Operations of Administrative Restrictive Housing

Original Date Issued: 03-10-21    Replaces IMPP Issued: 04-09-21    CURRENT EFFECTIVE DATE: 05-13-22

Approved By: _____, Secretary          Next Scheduled Review: 06/2025

## POLICY

The inability to isolate disruptive, violent and/or residents capable of influencing violence and disruption in a prison environment compromises the safety of both residents and staff. Administrative restrictive housing procedures are to be established for the control of residents necessary for purposes other than punishment. Residents are to be housed in the general population at the lowest appropriate custody level unless circumstances or resident behavior dictate otherwise. Only residents who require restrictive housing are to be assigned there. Procedures are to be effectively related to the control of the resident for stated purposes. These procedures may be increased in scope and extent as necessary to maintain effective control. When the need to isolate a resident in restrictive housing no longer exists, the resident is to be returned to the general population.

All basic operations of an administrative restrictive housing unit, including the placement of residents, filing of reports, notification of residents, enforcement of resident privileges and rights, transfer to more restricted areas, and administration of discipline are to be carried out in accordance with the provisions of this IMPP.

In each facility there is to be an administrative restrictive housing review board (RHRB) appointed by the Warden.

## DEFINITIONS

Restrictive Housing Review Board (RHRB): A board consisting of one person from security staff, one person from the site behavioral health staff, and one person from the classification staff.

## PROCEDURES

I.    **Placement Within Administrative Restrictive Housing; Notification Requirements; Hearing**

    A.    In all cases in which residents are placed in administrative restrictive housing, a shift supervisor or the restrictive housing unit manager must approve the placement.

        1.    The shift supervisor is to forward a written report to the warden before the end of that particular shift.

        2.    No resident may be placed in administrative restrictive housing without receiving a medical/ mental health evaluation by qualified medical/mental health staff prior to placement or as soon as possible after placement.

a.  In addition to the health services restrictive housing screening evaluation, a checklist of possible self-harm indicators (Attachment A) must be completed for each resident placed in a KDOC administrative restrictive housing unit.

(1)  This checklist must be completed by the restrictive housing unit OIC, unit team counselor, or shift supervisor.

(2)  The checklist must be completed prior to placement or immediately upon placement in restrictive housing and must be as a result of direct contact between the affected resident and the security, unit team or medical staff completing the checklist.

(3)  Subsequent to the completion of the checklist, appropriate referrals are to be made as indicated internally on the checklist form (Attachment A).

(4)  Residents placed on administrative restrictive housing status, but actually housed in county jails, are to be exempt from the completion of the checklist and are subject to the jail's admissions policies and practices.

B.  Except as provided in Section I.C., residents placed in administrative restrictive housing are to be provided with a hearing prior to placement in order to provide them with an opportunity to present objections, explanations, or reasons why such a placement cannot be effected.

1.  This hearing is to be held by the warden's designee who can consider alternative housing that may be available to meet the separation needs.

C.  A hearing prior to placement is not required if an emergency situation exists.

1.  The shift supervisor or restrictive housing unit manager may order immediate placement in administrative restrictive housing when necessary:

a.  To protect the residents or others;

b.  To prevent escape; or,

c.  To maintain control of the correctional facility.

2.  This action must be reviewed by the warden or designee within 24 hours.

## II.  Administrative Restrictive Housing Report

A.  An administrative restrictive housing report (Attachment B) must be completed in all cases of administrative restrictive housing.

1.  The report (Attachment B) must indicate, specifically, the reason for placing the resident in administrative restrictive housing.

a.  The administrative restrictive housing report (Attachment B) may be used as the written report of the shift supervisor to the warden as required by Section II.A.1. of this IMPP.

b.  A copy of the report (Attachment B) may be used as the written notice to the resident required by Section III.A.1. of this IMPP.

## III.  Notice and Explanation to Resident

A.  Written notice of the reasons for placement in administrative restrictive housing, stated in sufficient detail to allow the resident to understand the reasons and make a response to them, must be provided to the resident before the resident is placed in administrative restrictive housing unless a serious emergency or major disturbance exists.

1. If a serious emergency or major disturbance involves a substantial number of residents, or a clear and present danger thereof, notice and is to be given; not more than three (3) working days after placement in administrative restrictive housing, or sooner, if the nature of the emergency has been resolved.

   a. The serious emergency or major disturbance is to be described briefly, in writing, by the officer and made part of the record. In all cases, the notice must be given to the resident before the hearing so the resident knows the reason for the placement.

## IV.   Procedure for the RHRB Upon Initial Placement

A. Within 24 hours, of a resident's initial placement, Monday-Friday, and the next working day following a weekend/holiday, the administrative RHRB must hold an initial hearing to review the placement decision.

B. The resident is to be given the opportunity to present the resident's case.

C. When necessary, the RHRB is to obtain clarifying information from the officer and staff involved in the placement.

D. If the RHRB determines the resident to be disruptive or a danger to self or others, the RHRB may exclude the resident from the review.

   1. In this situation, the RHRB is to, if possible, interview the resident at the cell or obtain a written statement from the resident in response to the placement.

## V.   Regular Review and Monitoring by the RHRB

A. The administrative restrictive housing review board is to review the status of each resident confined in administrative restrictive housing once per week for the first four weeks, and at least once per month thereafter.

B. The RHRB may recommend the following:

   1. That the resident be retained in administrative restrictive housing.

      a. This recommendation must be a unanimous vote of the RHRB; and

      b. Become the final action in the case for that particular review period and does not require approval by the facility Warden.

      c. The RHRB must document in detail what is required for the resident to be returned to general population.

   2. That the resident be returned to general population.

      a. This recommendation must be a unanimous vote of the RHRB; and

      b. Become the final action in the case for that particular review period and does not require approval by the facility Warden.

   3. The RHRB may recommend that the resident be transferred to another Kansas facility or to another institution in another state or to a federal institution.

      a. Unless released from administrative restrictive housing status by the warden of the sending facility prior to transfer, the resident is to be held on that same status at the receiving facility pending the resident's next regularly scheduled review.

      b. These transfers are not to require issuance and service of an administrative

restrictive housing report or an initial appearance before the administrative restrictive housing review board of the receiving facility unless those procedures were not employed at the sending facility due to a serious emergency or major disturbance.

    c.    In appropriate cases, a recommendation that a resident's status be changed prior to the resident's next regularly scheduled review may be made to the Warden of the receiving facility by that facility's administrative review board.

    4.    The following exceptions apply and must be forwarded to the facility Warden (or designee in the absence of the Warden) for approval:

    a.    If the RHRB is not unanimous;

    b.    Removing the resident from Long Term Restrictive Housing status;

    c.    Specific circumstances that could affect the safety and security of the facility if the resident is returned to general population;

    d.    If on a case-by-case basis, the RHRB determines the Warden's approval is necessary.

C.    The resident may submit written requests for release to the RHRB using a Form-9.

## VI.    Privileges and Rights in Administrative Restrictive Housing

A.    When privileges, property, and/or programs are restricted beyond what is allowed by restrictive housing policy, the following shall be documented:

    1.    the opportunities that have been limited;

    2.    the reason for the limitation; and

    3.    the duration of the limitation.

B.    Administrative restrictive housing must not be used or considered as punishment.

## VII.    Transfer to More Restricted Area in Special Cases

A.    A narrative is to be prepared to document any instance or incident leading to more restrictive confinement within the restrictive housing unit.

B.    Transfers to more restrictive confinement may be permitted only for administrative security and control and must not constitute or be used as punishment.

    1.    Each such transfer to a more restrictive confinement is to be authorized and approved by the restrictive housing unit team manager or designee, or in that person's absence, by the shift commander or designee.

## VIII.    Regular Review and Monitoring by the Program Management Committee

A.    The Program Management Committee of each facility housing restrictive housing residents shall review those residents maintained continuously in administrative restrictive housing at least every 180 days.

## IX.    Reports by Warden on Residents Continuously Housed in Administrative Restrictive Housing for Over One (1) Year

A.    The Warden of each facility housing restrictive housing residents is to submit a monthly report to the

Deputy Secretary for Facilities Management for all residents continuously held in administrative restrictive housing for six (6) months, a year or longer, and on each anniversary thereafter.

    1.     The report is to include, at a minimum, information justifying the continued placement in RHU.

    a.     If the Warden and RHRB cannot articulate reason(s) for continuing the placement, then the placement is to end.

**X.**    **Discipline While in Administrative Restrictive Housing**

    C.     All applicable provisions and requirements of the disciplinary procedure set forth within K.A.R. 44-13-101, *et seq.*, apply to resident housed in a restrictive housing unit.

**NOTE:** The policy and procedures set forth herein are intended to establish directives and guidelines for staff, residents and offenders and those entities that are contractually bound to adhere to them. They are not intended to establish State created liberty interests for employees, residents or offenders, or an independent duty owed by the Department of Corrections to employees, residents, offenders, or third parties. Similarly, those references to the standards of various accrediting entities as may be contained within this document are included solely to manifest the commonality of purpose and direction as shared by the content of the document and the content of the referenced standards. Any such references within this document neither imply accredited status by a Departmental facility or organizational unit, nor indicate compliance with the standards so cited. The policy and procedures contained within this document are intended to be compliant with all applicable statutes and/or regulatory requirements of the Federal Government and the state of Kansas. This policy and procedure are not intended to establish or create new constitutional rights or to enlarge or expand upon existing constitutional rights or duties.

**REPORTS**

| Name/Type of Report | By Whom/To Whom | Due |
|---|---|---|
| Residents Continuously Housed in Administrative Restrictive Housing | Wardens to DSOFM | Monthly |

**REFERENCES**

K.A.R. 44-13-101, *et seq.*

**HISTORY**

03-10-21 Original

04-09-21 Revision 1

05-13-22 Revision 2

**ATTACHMENTS**

| Attachments | Title of Attachments | Page Total |
|---|---|---|
| A | Checklist of Possible Self-Harm Indicators | 1 page |
| B | Administrative Restrictive Housing Report | 1 page |

Attachment A, IMPP 20-105A
Effective 05-13-22

## Checklist of Possible Self-Harm Indicators

Resident Name:_____DOC Number:

Reporting Officer:_____Date:_____Time: _____

YES    NO

____   ____   01.  Escorting officer has information that resident may be a suicide risk.

____   ____   02.  Resident is expressing suicidal thoughts/making threats to harm self.

____   ____   03.  Resident shows signs of depression (crying, withdrawn, passive).

____   ____   04.  Resident is acting/talking in a strange manner (hearing/seeing things that are not there, statements do not make sense).

____   ____   05.  Resident appears to be under the influence of drugs/alcohol.

____   ____   06.  Resident has had a recent family change (death/divorce).

____   ____   07.  Resident brought to restrictive housing due to serious infraction that could lead to criminal charges (assault/battery, drugs/contraband).

____   ____   08.  Resident states he/she is taking psychotropic medication.

____   ____   09.  Resident is normally housed in the Behavioral Health Unit.

____   ____   10.  Resident has been assaulted (physically or sexually) by another resident.

____   ____   11.  Resident shows anger, hostility, and makes threats.

____   ____   12.  Resident displays signs of self-neglect or abuse (poor hygiene, cuts, bruises).

____   ____   13.  Resident states this is his/her first placement in restrictive housing.

              14.  Resident has recent legal status change (parole violation, new charges).

**IF ANY ITEM ABOVE IS CHECKED "YES", THE RESTRICTIVE HOUSING OIC MUST IMMEDIATELY TELEPHONE/CONTACT THE CHARGE NURSE, WHO MUST IMMEDIATELY NOTIFY A BEHAVIORAL HEALTH PROFESSIONAL.**

Responding BH staff:_____Date:_____

INSTRUCTIONS: The restrictive housing OIC on shift is to ensure that this form is completed for all residents placed in restrictive housing. The escorting officer must be asked why the resident is being brought in, and whether there is any indication that he/she might engage in self-harm. The resident must be asked if there are any issues of which staff need to be aware, and if he/she takes medications. The officer must note whether or not the resident was uncooperative. Any notes, letters or other documents obtained from the resident that appears to indicate the resident's state of mind must be attached to this report and made available to the behavioral health professional for review.

**COMMENTS** _____

_____

cc:    Clinic, Behavioral Health, Unit Team Manager

Attachment B, IMPP 20-105A
Effective 05-13-22

## Kansas Department of Corrections
## Administrative Restrictive Housing Report

TO:_____    Report Number: _____

FROM: _____

Date This Report Filed ___/___/_____    Time Report Filed ____:____m

Date of Restrictive Housing placement ___/___/_____    Time of Placement ____:____m

Resident Name:_____#_____Reason(S) For Restrictive Housing (Including Rule No. and Title)

Moved from Cell #:_____to Restrictive Housing Cell #: _____    _____

☐ Pre-Restrictive Housing hearing conducted

☐ Pre-Restrictive Housing hearing NOT conducted (Explain) _____

Facts:_____

☐ This placement is an Involuntary Protective Custody due to PREA Concerns (Respond to next two (2) sections)What is the basis for the facility's concern for the resident's safety?

What is the reason no alternative means of separation can be arranged?

Approved By:

_____ Date___/___/_____    _____Date___/___/___
Signature and Title of Reporting Officer    Shift Supervisor or RH Unit Mgr.

_____Date___/___/___
Warden Authorization (If Needed)

************************************************************************************************ RESIDENT ACKNOWLEDGMENT:

I received a copy of this report on:   Date___/___/_____   Time:   :_____m

_____#_____    _____
Resident Signature and Number    Staff Witness and Title

Record this Document in ImagingOriginal
to Master File
Copy to: Warden
        Resident