IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

RONNIE ALLEN BELLAMY, JR.,

    **Plaintiff,**

    v.                                                                          CASE NO. 23-3051-JWL

STATE OF KANSAS, et al.,

    **Defendants.**

## MEMORANDUM AND ORDER TO SHOW CAUSE

Plaintiff brings this pro se civil rights action under 42 U.S.C. § 1983. Plaintiff is incarcerated at the Lansing Correctional Facility in Lansing, Kansas ("LCF"). On May 3, 2023, the Court entered a Memorandum and Order (Doc. 27) ("M&O) dismissing Plaintiff's claims against the State of Kansas, the Kansas Department of Corrections ("KDOC"), and Jeff Zmuda, and dismissing Plaintiff's claims regarding his state court sentence and conviction. The Court also found that the remaining Eighth Amendment claims in Plaintiff's Second Amended Complaint could not be fully screened without additional information from LCF officials. *See Martinez v. Aaron*, 570 F.2d 317 (10th Cir. 1978); *see also Hall v. Bellmon*, 935 F.2d 1106 (10th Cir. 1991). Accordingly, the Court ordered the LCF officials to prepare and file a *Martinez* Report. The M&O provides that "[o]nce the report has been received, the Court can properly screen Plaintiff's claims under 28 U.S.C. § 1915A." (Doc. 27, at 7.) The *Martinez* Report (Doc. 35) (the "Report") has now been filed. Therefore, this matter is before the Court for screening Plaintiff's Eighth Amendment claims. The Court's screening standards are set forth in detail in the Court's M&O.

**I. Nature of the Matter before the Court**

The facts underlying Plaintiff's claims are set forth in detail in the Court's orders at Docs. 11 and 23. In summary, Plaintiff claims in his Second Amended Complaint that he has been assaulted on multiple occasions at LCF due to staff's failure to protect him. Plaintiff also claims that he did not receive proper medical care after the attacks.

Plaintiff alleges that he was attacked in his sleep, causing him to be placed in the mental health unit.[1] Plaintiff alleges that after this initial attack, he has been attacked four additional times at LCF as follows:

1. Plaintiff alleges that he was attacked in the hallway at LCF when he was returning from chow on October 12, 2021. Plaintiff alleges that the injuries he suffered were caused by the SST officer tackling Plaintiff from the side while Plaintiff was attempting to defend himself. Plaintiff alleges that he suffered from whiplash and was placed in segregation.

2. Plaintiff alleges that he was attacked from behind by a gang member in the hallway at LCF when he was returning from breakfast on May 18, 2022. Plaintiff attached a statement from an eyewitness that claims Plaintiff was hit about ten times by another inmate who had a sock with a weight in it. He claims Plaintiff "passed out," and when he regained consciousness he started going to his cell. Plaintiff alleges that he was beaten severely, received a severe concussion, was unable to walk or stand without assistance for 17 days. Plaintiff claims he was thrown in a crisis strip cell without proper medical care for his head injury. Plaintiff alleges that although he was unconscious several times and disoriented, he was forced to walk to the medical clinic. Plaintiff alleges that he was prescribed Meclizine for dizziness at some point, but was never taken to the hospital.

---

[1] This initial incident occurred at the El Dorado Correctional Facility and was the subject of a prior case. *See Bellamy v. Cline*, Case No. 20-cv-3229-DDC-ADM (D. Kan.).

3. Plaintiff claims that on September 29, 2022, CS1-OIC Larry E. Wagner opened Plaintiff's cell door, knowing Plaintiff lives alone, to allow another inmate holding a knife to enter Plaintiff's cell to attempt to stab Plaintiff. Plaintiff alleges that this was done to coverup criminal activity by another inmate.

4. Plaintiff alleges that he was attacked from behind at the entry to the chow hall at LCF on October 7, 2022. Plaintiff alleges that SST-SORT Officer Hristofidus held the door for the attacker. Plaintiff alleges that when he went to grab his attacker, SST-Sort Busby was already tackling Plaintiff from the side, despite seeing that Plaintiff was bleeding from his head and the attacker was standing there with the weapon. Plaintiff alleges that this attack was related to the September 29, 2022 attack. Plaintiff alleges that his injuries required staples, sutures, and reattachment of Plaintiff's ear. Plaintiff alleges that following the attack he was required to spend 6 months in restricted housing without privileges. Plaintiff alleges that after the disciplinary hearing officer watched the video of the incident Plaintiff was released from segregation.

Plaintiff alleges that despite suffering serious injuries, he was not taken to the hospital and was made to get up off the floor on his own and walk to medical. Plaintiff claims that after the attacks he was placed in a strip cell used for drug overdoses and suicide watches, or in segregation. Plaintiff alleges that the attacks, except for the one occurring in Plaintiff's cell, were done by general population inmates and should not have been possible due to the separation of the mental health unit and general population and the fact that they are not supposed to have yard or chow together. Plaintiff also alleges that staff were aware of the attacks and failed to protect Plaintiff.

## II. The Report

The Report addresses all four of Plaintiff's attacks and the medical attention he received following those attacks as follows:

> On October 12, 2021, Bellamy was involved in a physical altercation with resident Elijah Moore. During the altercation, resident Moore was taken to the ground in a use of force for refusing verbal directives to discontinue fighting. There is no indication that Bellamy was taken to the ground. (Exhibit X).
>
> Following the altercation, Bellamy refused medical assessment but stated he suffered no injuries during or after the altercation. Medical staff did not visibly observe any injuries or acute distress. (Exhibit V at p. 1–6; Exhibit X at p. 6).
>
> Based on the October 12, 2021 altercation, Bellamy received a Disciplinary Report (DR) for fighting. This DR was eventually dismissed once it was determined Bellamy had acted in self-defense. (Exhibit B).
>
> On October 22, 2021, Bellamy requested a return to general population and signed a protective custody waiver. He did not express concerns for his safety with regard to his placement at LCF. (Exhibit D; Exhibit E; Englis Dec. [Exhibit L] at ¶ 15; Wagner Dec. [Exhibit M] at ¶ 15; Meredith Dec. [Exhibit N] at ¶ 11; Gift Dec. [Exhibit O] at ¶ 9).
>
> On May 18, 2022, Bellamy was battered by a resident. (Exhibit F; Exhibit Z).
>
> Following the battery, Bellamy received medical treatment and was placed in the Infirmary for nine days for concussion protocol. (Exhibit F; Exhibit V at p. 289–361).
>
> On May 27, 2022, Bellamy requested a return to general population and signed a protective custody waiver. He did not express concerns for his safety with regard to his placement at LCF. (Exhibit G; Englis Dec. at ¶ 15; Wagner Dec. at ¶ 15; Meredith Dec. at ¶ 11; Gift Declaration at ¶ 9).
>
> On September 29, 2022, Bellamy was involved in a physical altercation with a resident. (Exhibit H; Exhibit Y).
>
> Following the altercation, Bellamy received medical treatment

before being moved to Restrictive Housing. (Exhibit I; Exhibit V at p. 486–490).

Based on the September 29, 2022, altercation, Bellamy received a DR for fighting. This DR was eventually dismissed once it was determined Bellamy had acted in self-defense. (Exhibit H).

On October 5, 2022, Bellamy requested a return to general population and signed a protective custody waiver. He did not express concerns for his safety with regard to his placement at LCF. (Exhibit J; Englis Dec. at ¶ 15; Wagner Dec. at ¶ 15; Meredith Dec. at ¶ 11; Gift Dec. at 9).

On October 7, 2022, Bellamy was involved in a physical altercation with a resident. (Exhibit Q).

Following the altercation, Bellamy received medical treatment before being moved to Restrictive Housing. (Exhibit V at p. 499–518).

After being escorted to Restrictive Housing, a strip search of Bellamy was conducted. It was discovered that he was carrying a pepper shaker and freezer sealed baggie of a substance that tested positive for marijuana and multiple syringes. Bellamy received a DR for Dangerous Contraband, a Class I offense. (Exhibit P).

His classification in Restrictive Housing was considered "Pending Results of an Investigation" (PI), a category of Short-Term Administrative Restrictive Housing. (Exhibit Q).

On October 12, 2022, Bellamy was found guilty of the Dangerous Contraband DR. (Exhibit P).[2]

On October 21, 2022, Bellamy's classification changed from PI to "Other Security Risk" (OSR), a category of Long-Term Administrative Restrictive Housing. He remained in Restrictive Housing until April 5, 2023, due to the number of times he had been attacked and the new concerns with drugs around him in general population and residents after him for drug payment. (Exhibit R, Exhibit S, Exhibit U).

On April 5, 2023, Bellamy requested a return to general population and signed a protective custody waiver. It was determined at this time that the issues and concerns of Bellamy being targeted for

---

[2] It appears that Plaintiff pleaded guilty to the charge. *See* Doc. 35–16, at 6.

> drug payments had been resolved. He did not express concerns for his safety with regard to his placement at LCF. (Gift Dec. at ¶ 9; Exhibit T).

(Doc. 35, at 5–7) (internal paragraph symbol omitted).  The Report also provides that inmates housed in the mental health unit at LCF are allowed to go to yard and the chow hall with general population inmates.  (Doc. 35–22, Declaration of Sonya Latzke, UTM.)

**III. DISCUSSION**

The Eighth Amendment guarantees a prisoner the right to be free from cruel and unusual punishment. "Under the Eighth Amendment, prison officials have a duty to 'provide humane conditions of confinement,' including 'tak[ing] reasonable measures to guarantee the safety of . . . inmates.'" *Requena v. Roberts*, 893 F.3d 1195, 1214 (10th Cir. 2018), *cert. denied*, 139 S. Ct. 800 (2019) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quotation marks omitted)).  This duty includes "a duty to protect prisoners from violence at the hands of other prisoners." *Farmer*, 511 U.S. at 833 (ellipsis and quotation marks omitted).  To prevail on a failure to protect claim, a plaintiff must show:  "(1) 'that the conditions of his incarceration present an objective substantial risk of serious harm' and (2) 'prison officials had subjective knowledge of the risk of harm,' '[i]n other words, an official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Requena*, 893 F.3d at 1214 (citation omitted).

"[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' . . . proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (citation omitted).  The "deliberate indifference" standard includes both an objective and a subjective component. *Martinez v. Garden*, 430 F.3d 1302, 1304 (10th Cir. 2005) (citation omitted).

In the objective analysis, the deprivation must be "sufficiently serious," and the inmate must show the presence of a "serious medical need," that is "a serious illness or injury." *Estelle*, 429 U.S. at 104, 105; *Farmer*, 511 U.S. at 834, *Martinez*, 430 F.3d at 1304 (citation omitted). A serious medical need includes "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Martinez*, 430 F.3d at 1304 (quoting *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000)).

"The subjective component is met if a prison official knows of and disregards an excessive risk to inmate health or safety." *Id*. (quoting *Sealock*, 218 F.3d at 1209). In measuring a prison official's state of mind, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 1305 (quoting *Riddle v. Mondragon*, 83 F.3d 1197, 1204 (10th Cir. 1996)).

The Report shows that Plaintiff received prompt and ongoing medical and mental health treatment at all times relevant to his Second Amended Complaint. *See* Doc. 36 (sealed medical records). KDOC staff were not aware of any fears expressed by Plaintiff and did not have knowledge of any threat towards Plaintiff's safety prior to any of the altercations mentioned in his Second Amended Complaint. Once the KDOC received information leading to a possible cause of the attacks—drug debts—the KDOC took steps to ensure Plaintiff's safety by placing him in extended restrictive housing until the situation had been resolved. Plaintiff also signed protective custody waivers each time he was released to general population. *See* Docs. 35–4, 35–7, 35–10, and 35–20.

Plaintiff should show good cause why his Eighth Amendment claims should not be dismissed for failure to state a claim regarding his medical care or a failure to protect him.

Plaintiff has failed to show that any defendant was both aware of facts from which the inference could be drawn that a substantial risk of serious harm existed and also drew the inference. Plaintiff should show good cause why his Eighth Amendment claims should not be dismissed for failure to show deliberate indifference by Defendant James Englis or Defendant Larry Wagner.[3]

### III. Response Required

The *Martinez* report developed as a means "to ascertain whether there is a factual as well as a legal basis for [a] prisoner's claims." *Gee v. Estes*, 829 F.2d 1005, 1007 (10th Cir. 1987). The report "is treated like an affidavit, and the court is not authorized to accept the factual findings of the prison investigation when the plaintiff has presented conflicting evidence." *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991) (citing *Sampley v. Ruettgers*, 704 F.2d 491, 493 n. 3 (10th Cir. 1983)). Thus, at this point in the proceedings the Court does not use the Report to resolve conflicts of fact. *See Swoboda v. Duback*, 992 F.2d 286, 290 (10th Cir. 1993) ("In determining whether a plaintiff has stated a claim, the district court may not look to the Martinez report, or any other pleading outside the complaint itself, to refute facts specifically pled by a plaintiff, or to resolve factual disputes."). In light of the Report, the Court is considering dismissal of this matter for failure to state a claim. Plaintiff will be given an opportunity to respond to the Report and to show good cause why dismissal should not be entered. Failure to respond by the Court's deadline may result in dismissal of this action without further notice.

**IT IS THEREFORE ORDERED BY THE COURT** that Plaintiff is granted until **October 26, 2023,** in which to respond to the Report and to show good cause, in writing to the

---

[3] Defendants Englis and Wagner are the only two defendants remaining in this case.

undersigned, why Plaintiff's remaining Eighth Amendment claims should not be dismissed for failure to state a claim.

**IT IS SO ORDERED.**

**Dated September 26, 2023, in Kansas City, Kansas.**

<u>S/ John W. Lungstrum</u>
**JOHN W. LUNGSTRUM**
**UNITED STATES DISTRICT JUDGE**