## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS

**RONNIE ALLEN BELLAMY, JR.,**

     **Plaintiff,**

     v.                     **CASE NO.  23-3051-JWL**

**STATE OF KANSAS, et al.,**

     **Defendants.**

### MEMORANDUM AND ORDER

Plaintiff brings this pro se civil rights action under 42 U.S.C. § 1983.  Plaintiff is incarcerated at the Lansing Correctional Facility in Lansing, Kansas ("LCF").  On May 3, 2023, the Court entered a Memorandum and Order (Doc. 27) ("M&O) dismissing Plaintiff's claims against the State of Kansas, the Kansas Department of Corrections ("KDOC"), and Jeff Zmuda, and dismissing Plaintiff's claims regarding his state court sentence and conviction.  The Court also found that the remaining Eighth Amendment claims in Plaintiff's Second Amended Complaint could not be fully screened without additional information from LCF officials.  *See Martinez v. Aaron*, 570 F.2d 317 (10th Cir. 1978); *see also Hall v. Bellmon*, 935 F.2d 1106 (10th Cir. 1991).  Accordingly, the Court ordered the LCF officials to prepare and file a *Martinez* Report.  The M&O provides that "[o]nce the report has been received, the Court can properly screen Plaintiff's claims under 28 U.S.C. § 1915A."  (Doc. 27, at 7.)

After the *Martinez* Report (Doc. 35) (the "Report") was filed, the Court screened Plaintiff's Eighth Amendment claims and entered a Memorandum and Order to Show Cause (Doc. 39) ("MOSC") directing Plaintiff to show good cause why his remaining claims should not be dismissed for failure to state a claim.  This matter is before the Court on Plaintiff's response (Docs. 42, 44, and 46).  Plaintiff has also filed a motion for appointment of counsel, for

preliminary injunction, and to compel discovery (Doc. 50).

## I.  Nature of the Matter before the Court

The facts underlying Plaintiff's claims are set forth in detail in the Court's orders at Docs. 11 and 23.  In summary, Plaintiff claims in his Second Amended Complaint that he has been assaulted on multiple occasions at LCF due to staff's failure to protect him.  Plaintiff also claims that he did not receive proper medical care after the attacks.

Plaintiff alleges that he was attacked in his sleep, causing him to be placed in the mental health unit.[1]  Plaintiff alleges that after this initial attack, he has been attacked four additional times at LCF as follows:

1.  Plaintiff alleges that he was attacked in the hallway at LCF when he was returning from chow on October 12, 2021.  Plaintiff alleges that the injuries he suffered were caused by the SST officer tackling Plaintiff from the side while Plaintiff was attempting to defend himself. Plaintiff alleges that he suffered from whiplash and was placed in segregation.

2.  Plaintiff alleges that he was attacked from behind by a gang member in the hallway at LCF when he was returning from breakfast on May 18, 2022.  Plaintiff attached a statement from an eyewitness that claims Plaintiff was hit about ten times by another inmate who had a sock with a weight in it.  He claims Plaintiff "passed out," and when he regained consciousness he started going to his cell. Plaintiff alleges that he was beaten severely, received a severe concussion, was unable to walk or stand without assistance for 17 days.  Plaintiff claims he was thrown in a crisis strip cell without proper medical care for his head injury.  Plaintiff alleges that although he was unconscious several times and disoriented, he was forced to walk to the medical

---

[1] This initial incident occurred at the El Dorado Correctional Facility and was the subject of a prior case.  *See Bellamy v. Cline*, Case No. 20-cv-3229-DDC-ADM (D. Kan.).

clinic.  Plaintiff alleges that he was prescribed Meclizine for dizziness at some point, but was never taken to the hospital.

3.   Plaintiff claims that on September 29, 2022, CS1-OIC Larry E. Wagner opened Plaintiff's cell door, knowing Plaintiff lives alone, to allow another inmate holding a knife to enter Plaintiff's cell to attempt to stab Plaintiff.  Plaintiff alleges that this was done to coverup criminal activity by another inmate.

4.   Plaintiff alleges that he was attacked from behind at the entry to the chow hall at LCF on October 7, 2022.  Plaintiff alleges that SST-SORT Officer Hristofidus held the door for the attacker.  Plaintiff alleges that when he went to grab his attacker, SST-Sort Busby was already tackling Plaintiff from the side, despite seeing that Plaintiff was bleeding from his head and the attacker was standing there with the weapon.  Plaintiff alleges that this attack was related to the September 29, 2022 attack.  Plaintiff alleges that his injuries required staples, sutures, and reattachment of Plaintiff's ear.  Plaintiff alleges that following the attack he was required to spend 6 months in restricted housing without privileges. Plaintiff alleges that after the disciplinary hearing officer watched the video of the incident Plaintiff was released from segregation.

Plaintiff alleges that despite suffering serious injuries, he was not taken to the hospital and was made to get up off the floor on his own and walk to medical.  Plaintiff claims that after the attacks he was placed in a strip cell used for drug overdoses and suicide watches, or in segregation.  Plaintiff alleges that the attacks, except for the one occurring in Plaintiff's cell, were done by general population inmates and should not have been possible due to the separation of the mental health unit and general population and the fact that they are not supposed to have

yard or chow together.  Plaintiff also alleges that staff were aware of the attacks and failed to protect Plaintiff.

## II.  The Report

The Report addresses all four of Plaintiff's attacks and the medical attention he received following those attacks as follows:

> On October 12, 2021, Bellamy was involved in a physical altercation with resident Elijah Moore. During the altercation, resident Moore was taken to the ground in a use of force for refusing verbal directives to discontinue fighting. There is no indication that Bellamy was taken to the ground. (Exhibit X).

> Following the altercation, Bellamy refused medical assessment but stated he suffered no injuries during or after the altercation. Medical staff did not visibly observe any injuries or acute distress. (Exhibit V at p. 1–6; Exhibit X at p. 6).

> Based on the October 12, 2021 altercation, Bellamy received a Disciplinary Report (DR) for fighting. This DR was eventually dismissed once it was determined Bellamy had acted in self-defense. (Exhibit B).

> On October 22, 2021, Bellamy requested a return to general population and signed a protective custody waiver. He did not express concerns for his safety with regard to his placement at LCF. (Exhibit D; Exhibit E; Englis Dec. [Exhibit L] at ¶ 15; Wagner Dec. [Exhibit M] at ¶ 15; Meredith Dec. [Exhibit N] at ¶ 11; Gift Dec. [Exhibit O] at ¶ 9).

> On May 18, 2022, Bellamy was battered by a resident. (Exhibit F; Exhibit Z).

> Following the battery, Bellamy received medical treatment and was placed in the Infirmary for nine days for concussion protocol. (Exhibit F; Exhibit V at p. 289–361).

> On May 27, 2022, Bellamy requested a return to general population and signed a protective custody waiver. He did not express concerns for his safety with regard to his placement at LCF. (Exhibit G; Englis Dec. at ¶ 15; Wagner Dec. at ¶ 15; Meredith Dec. at ¶ 11; Gift Declaration at ¶ 9).

On September 29, 2022, Bellamy was involved in a physical altercation with a resident. (Exhibit H; Exhibit Y).

Following the altercation, Bellamy received medical treatment before being moved to Restrictive Housing. (Exhibit I; Exhibit V at p. 486–490).

Based on the September 29, 2022, altercation, Bellamy received a DR for fighting. This DR was eventually dismissed once it was determined Bellamy had acted in self-defense. (Exhibit H).

On October 5, 2022, Bellamy requested a return to general population and signed a protective custody waiver. He did not express concerns for his safety with regard to his placement at LCF. (Exhibit J; Englis Dec. at ¶ 15; Wagner Dec. at ¶ 15; Meredith Dec. at ¶ 11; Gift Dec. at 9).

On October 7, 2022, Bellamy was involved in a physical altercation with a resident. (Exhibit Q).

Following the altercation, Bellamy received medical treatment before being moved to Restrictive Housing. (Exhibit V at p. 499–518).

After being escorted to Restrictive Housing, a strip search of Bellamy was conducted. It was discovered that he was carrying a pepper shaker and freezer sealed baggie of a substance that tested positive for marijuana and multiple syringes. Bellamy received a DR for Dangerous Contraband, a Class I offense. (Exhibit P).

His classification in Restrictive Housing was considered "Pending Results of an Investigation" (PI), a category of Short-Term Administrative Restrictive Housing. (Exhibit Q).

On October 12, 2022, Bellamy was found guilty of the Dangerous Contraband DR. (Exhibit P).[2]

On October 21, 2022, Bellamy's classification changed from PI to "Other Security Risk" (OSR), a category of Long-Term Administrative Restrictive Housing. He remained in Restrictive Housing until April 5, 2023, due to the number of times he had been attacked and the new concerns with drugs around him in general population and residents after him for drug payment. (Exhibit R, Exhibit S, Exhibit U).

---

[2]  It appears that Plaintiff pleaded guilty to the charge. *See* Doc. 35–16, at 6.

> On April 5, 2023, Bellamy requested a return to general population and signed a protective custody waiver. It was determined at this time that the issues and concerns of Bellamy being targeted for drug payments had been resolved. He did not express concerns for his safety with regard to his placement at LCF. (Gift Dec. at ¶ 9; Exhibit T).

(Doc. 35, at 5–7) (internal paragraph symbol omitted).   The Report also provides that inmates housed in the mental health unit at LCF are allowed to go to yard and the chow hall with general population inmates.  (Doc. 35–22, Declaration of Sonya Latzke, UTM.)

## III.  DISCUSSION

The Eighth Amendment guarantees a prisoner the right to be free from cruel and unusual punishment. "Under the Eighth Amendment, prison officials have a duty to 'provide humane conditions of confinement,' including 'tak[ing] reasonable measures to guarantee the safety of . . . inmates.'" *Requena v. Roberts*, 893 F.3d 1195, 1214 (10th Cir. 2018), *cert. denied*, 139 S. Ct. 800 (2019) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quotation marks omitted)).  This duty includes "a duty to protect prisoners from violence at the hands of other prisoners." *Farmer*, 511 U.S. at 833 (ellipsis and quotation marks omitted).  To prevail on a failure to protect claim, a plaintiff must show:  "(1) 'that the conditions of his incarceration present an objective substantial risk of serious harm' and (2) 'prison officials had subjective knowledge of the risk of harm,' '[i]n other words, an official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Requena*, 893 F.3d at 1214 (citation omitted).

"[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' . . . proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (citation omitted).  The "deliberate indifference" standard

includes both an objective and a subjective component.  *Martinez v. Garden*, 430 F.3d 1302, 1304 (10th Cir. 2005) (citation omitted).

In the objective analysis, the deprivation must be "sufficiently serious," and the inmate must show the presence of a "serious medical need," that is "a serious illness or injury." *Estelle*, 429 U.S. at 104, 105; *Farmer*, 511 U.S. at 834, *Martinez*, 430 F.3d at 1304 (citation omitted).  A serious medical need includes "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Martinez*, 430 F.3d at 1304 (quoting *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000)).

"The subjective component is met if a prison official knows of and disregards an excessive risk to inmate health or safety." *Id.* (quoting *Sealock*, 218 F.3d at 1209).  In measuring a prison official's state of mind, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 1305 (quoting *Riddle v. Mondragon*, 83 F.3d 1197, 1204 (10th Cir. 1996)).

The Report shows that Plaintiff received prompt and ongoing medical and mental health treatment at all times relevant to his Second Amended Complaint.  *See* Doc. 36 (sealed medical records).  KDOC staff were not aware of any fears expressed by Plaintiff and did not have knowledge of any threat towards Plaintiff's safety prior to any of the altercations mentioned in his Second Amended Complaint. Once the KDOC received information leading to a possible cause of the attacks—drug debts—the KDOC took steps to ensure Plaintiff's safety by placing him in extended restrictive housing until the situation had been resolved.  Plaintiff also signed protective custody waivers each time he was released to general population.  *See* Docs. 35–4, 35–7, 35–10, and 35–20.

The Court ordered Plaintiff to show good cause why his Eighth Amendment claims should not be dismissed for failure to state a claim regarding his medical care or a failure to protect him. Plaintiff failed to show that any defendant was both aware of facts from which the inference could be drawn that a substantial risk of serious harm existed and also drew the inference. Plaintiff was ordered to show good cause why his Eighth Amendment claims should not be dismissed for failure to show deliberate indifference by Defendant James Englis or Defendant Larry Wagner.[3]

The Court advised Plaintiff that in light of the Report, the Court was considering dismissal of this matter for failure to state a claim, and gave Plaintiff an opportunity to respond to the Report and to show good cause why dismissal should not be entered. Plaintiff has filed multiple documents that the Court considers as his response. *See* Docs. 42, 44, and 46.

In his response, Plaintiff takes issue with being placed in restrictive housing and claims that the Defendants are "attempting to cover up the true facts and what occurred and just how bad it really was." (Doc. 42, at 2–3.) Plaintiff acknowledges that Defendants "keep asking the Plaintiff what can we do to help keep you safe, with what[']s going on," and Plaintiff "refuse[s] to have private conversations with them, which would only further put the Plaintiff[']s life at risk and in jeopardy." *Id*. at 3.

Plaintiff states the following regarding the first incident at LCF:

> the attacker pulled a 12, inch knife out of [h]is pocket to stab Plaintiff, and Plaintiff threw his hands up to fight with the attacker, while the attack was in progress and the Sort-SST Team Members showed up the video in A-Building hallway where attack took place, it was more like an attempt at a playground fight truthfully, but the man intended to try and kill me obviously, you don't have a twelve inch knife made to scratch someone with, and in the video you can see just how hard the Plaintiff was hit from the side

---

[3] Defendants Englis and Wagner are the only two defendants remaining in this case.

> by a responding member of the Sort-SST team which could have gotten the Plaintiff and someone else killed or seriously hurt as the attacker was fighting with the Sort Member, and Plaintiff was not fighting with either of them and should never have been tackled in such an aggressive and use of force way or placed in segregation and threatened and double bunked by the Lt. on duty Mr. Barnett, as it was already an irritating day filled with malice and hate for no justifiable reasons . . . .

*Id*. at 4.

Plaintiff also submitted affidavits from inmates John Helm and Brian Fellers. (Doc. 44.) The affidavits are not notarized or signed under penalty of perjury. Helm's affidavit states that Officer Englis showed him and his cellmate–Brian Fellers—a video which "made it look like" Englis had nothing to do with it, "but he is actually the one who opened the door to begin with." *Id*. at 1. Helm claims that based on the video and what Englis said, his cellmate decided to attack Plaintiff "because Mr. Mark Riddle was already in P.C. and Mr. Hernandez was an affiliated member and OIC Mr. Larry Wagner, agreed to open Bellamy's door. Bellamy never yelled out his cell number he was in his room door covered and Wagner knew it." *Id*. Feller's affidavit states that he attacked Plaintiff because someone broke into his cell and stole from them, and they thought it was Plaintiff but after Englis showed them the video footage it turned out to be inmate Riddle. Fellers claims that "OIC Mr. Englis is the one who opened the door for Resident Mr. Riddle." *Id*. at 2. Fellers suggest that Riddle left the canteen bag in Plaintiff's room "in an obvious attempt to set Bellamy up for some reason." *Id*. at 3.[4]

Plaintiff's final response states that Defendants are lying, videos of the incidents will show the truth, and Defendants have not complied with the Court's order to include all video

---

[4] The Court notes that after this incident, Plaintiff received a Disciplinary Report on October 7, 2022, and on October 12, 2022, Plaintiff was found guilty of the Dangerous Contraband DR. It appears that Plaintiff pleaded guilty to the charge. *See* Doc. 35–16, at 6.

footing in the Report.[5] (Doc. 46, at 1.)  On November 11, 2023, the Court entered an Order (Doc. 47) directing the KDOC to supplement the Report with any available video footage of the incidents at issue in this case.  The KDOC filed a response (Doc. 48) indicating that the KDOC does not routinely retain footage of every physical altercation and in this case video footage of the incidents was not retained. The KDOC indicated that video footage is only retained for 45 days, Plaintiff's latest assault took place in October of 2022, and this case was filed 134 days following the most recent attack.  (Doc. 48, at 2.)

Plaintiff argues that he was forced to walk to medical despite having a head injury. (Doc. 46, at 2.)  Plaintiff states that officers should have known that he should not walk because he had blood all over him and Officer Ellison (who is not a defendant) stated "you have blood all over you that's probably why you don't feel good." *Id.*  Plaintiff also argues that it is not protocol or policy to place someone that could possibly have a concussion in a crisis cell unattended. *Id.*

In his Second Amended Complaint, Plaintiff alleges that "two SST-SORT Officers forced Plaintiff to walk to medical, between them, instead of medical coming to get Plaintiff on a stretcher, or gurney . . .."  (Doc. 24, at 8.)  It also appears that Plaintiff returned to his cell without assistance after the incident. *Id.* at 9.   Plaintiff does not allege that he asked for a stretcher or that he was unable to walk to medical.  It also appears that he was walking with an

---

[5]  Plaintiff attaches a copy of the Court's M&O and exhibits from his previous case, which deal with the assault at EDCF.  Doc. 46–1, at 1–21; *see Bellamy v. Cline*, Case No. 20-cv-3229-DDC-ADM (D. Kan.).  Plaintiff's failure to protect claim in that case was based on the September 2019 attack at EDCF. The Court dismissed Plaintiff's official capacity claims for damages and declaratory relief holding that Eleventh Amendment immunity bars those claims. *Id.* at Doc. 62, at 6–7. The Court granted summary judgment to the defendants on the rest of Plaintiff's claims based on qualified immunity and Plaintiff's failure to establish a triable issue as to whether defendants violated his Eighth Amendment rights. *Id.* at 7. The Court found that Plaintiff failed "to adduce any evidence that there was a substantial risk of serious harm *before* Kidd attacked him." *Id.* at 10.  The Court found that Plaintiff did not tell defendants that he feared attack, he acknowledged he didn't know anything about Kidd before they were placed in the same cell, and the record also contained "no objective evidence from which officials could ascertain a substantial risk of serious harm to plaintiff." *Id.* at 10–11.

officer on each side of him.  Although he argues that they should have known that he should not have been walking, arguing that a defendant "should have known" is insufficient.  An official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

Plaintiff has failed to show that any defendant was both aware of facts from which the inference could be drawn that a substantial risk of serious harm existed and also drew the inference.  Plaintiff has failed to show good cause why his Eighth Amendment claims should not be dismissed for failure to show deliberate indifference by Defendants.  Therefore, Plaintiff's remaining claims are dismissed for failure to state a claim.

## IV. Motions

 Plaintiff filed a reply (Doc. 49) to the KDOC's response indicating that no video footage was available, and included in the reply a motion seeking appointment of counsel, a preliminary injunction, and to compel discovery.  (Doc. 50.)   In his reply, Plaintiff accusing the KDOC of perjury because they included photos in the Report, arguing that the photos must have been made into still images from the video system.  Plaintiff provides no evidence that the still photos were made from a video, nor does the argument address the issue that any such video would no longer be available.[6]

---

[6] The photos appear to be close-up still photos of Plaintiff's injuries, and do not appear to be part of a video.  *See, e.g.,* Doc. 35–16, at 8 (close-up photo of Plaintiff's profile showing injuries); *id.* at 9 (close-up and straight-on photo of Plaintiff's face taken in what appears to be a medical office); *id.* at 10 (up-close photo of injury behind Plaintiff's ear with a gloved hand pointing to the laceration); *id.* at 12 (up-close photo of Plaintiff's head from behind with medical provider in the background); Doc. 35–23, at 14 (straight-on photo of Plaintiff standing in a cell); Doc. 35–25, at 13 (close-up photo of small injury on Plaintiff's forehead); *id.* at 14 (close-up photo of red mark on the back of Plaintiff's neck); *id.* at 15 (close-up photo of small red mark below a tattoo); *id.* at 16 (close-up photo of small injury on the back of a hand); *id.* at 17 (close-up photo of Plaintiff laying down on a bed and receiving medical care); *id.* at 18 (close-up photo of injury on Plaintiff's elbow).  All of the images appear to be photographs taken to document Plaintiff's injuries while receiving medical care and nothing suggests the photos were retrieved from video footage.

Plaintiff seeks the appointment of counsel, arguing that the case is complex, he is uneducated in the law, and he suffers from mental disabilities. (Doc. 50, at 2.) The Court denies the current request for the same reasons set forth in prior orders denying Plaintiff's request for appointment of counsel. *See* Docs. 11, 23, and 45. Furthermore, the request is moot in light of the Court's dismissal of this case.

Plaintiff also requests a preliminary injunction to ensure his safety, and seeks unspecified discovery. In light of the Court's dismissal, these requests are likewise denied.

**IT IS THEREFORE ORDERED BY THE COURT** that this matter is **dismissed** for failure to state a claim.

**IT IS FURTHER ORDERED** that Plaintiff's motion seeking appointment of counsel, a preliminary injunction, and to compel discovery (Doc. 50) is **denied.**

**IT IS SO ORDERED.**

**Dated November 30, 2023, in Kansas City, Kansas.**

**S/  John W. Lungstrum**
**JOHN W. LUNGSTRUM**
**UNITED STATES DISTRICT JUDGE**